932 A.2d 571

**Frank CONAWAY, et al.**

v.

**Gitanjali DEANE, et al.**

**No. 44, Sept. Term, 2006.**

Court of Appeals of Maryland.

Sept. 18, 2007.

220

Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Kathryn M. Rowe, Asst. Atty. Gen., Annapolis; Margaret Ann Nolan and Steven M. Sullivan, Asst. Attys. Gen., Baltimore), all on brief, for Appellants.

David W. New, Bethesda, petition and brief of Professors of Psychology and Psychiatry in Support of Defendants-Appellants, amici curiae.

Matt M. Paavola, Law Office of Matt M. Paavola & Assoc., Francis A. Pommett, III, Law Offices of Nathanson & Pommett, P.C., William F. Mulroney, Ashcraft & Gerel, LLP, Baltimore, brief of Senators Janet Greenip, Alex X. Mooney, and Delegates Don Dwyer, Jr., Patrick L. McDonough, Richard K. Impallaria, Tonya Thornton Shewell, Joseph C. Botel-

er, III, Tony McConkey, Christopher B. Shank and Emmett C. Burns, Jr., for Appellants, amicus Curiae.

Steven L. Tiedemann, Columbia, Benjamin W. Bull, Glen Lavy, Christopher R. Stovall, Dale Schowengerdt, Alliance Defense Fund, Scottsdale, AZ, brief of Family Research Council in support of Defendants-Appellants, amicus curiae.

David Kinkopf, Gallagher Evelius & Jones, LLP, Baltimore, Paul Benjamin Linton, Northbrook, IL, brief of the Maryland Catholic Conference in support of Defendants-Appellants, amici curiae.

John R. Garza, Rockville, Erik W. Stanley, Mary E. McAlister, Liberty Counsel, Lynchburg, VA, brief of Association of Maryland Families and Liberty Counsel in support of Appellants, amici curiae.

Timothy Barkley, Sr., Tim Barkley Law Offices, Mt. Airy, brief of the National Legal Foundation, for appellants, amicus curiae.

Joshua K. Baker, Institute for Marriage and Public Policy, Manassas, VA, Charles J. Jannace, III, Charles J. Jannace, III, P.C., Salisbury, brief of James Q. Wilson, et al., Legal and Family Scholars, in support of Defendants-Appellants, amici curiae.

Lincoln C. Oliphant, Robert A. Destro, Anne G. Collins, Robert E. Mittendorff, Peter A. Gebauer, The Marriage Law Project, Washington, DC, Paul R. Devin, Supreme Advocate, New Haven, CT, J. Bradley Ortins, Washington, DC, petition and brief of the Knights of Columbus in support of Defendants-Appellants, amicus curiae.

Roman P. Storzer, Storzer & Greene, P.L.L.C., Anthony R. Picarello, Roger T. Severino, The Becket Fund for Religious Liberty, Washington, DC, brief of the Becket Fund for Religious Liberty in support of Defendants-Appellants and Urging Reversal of the Decision of the Circuit Court for Baltimore City, amicus curiae.

Dwight G. Duncan, North Dartmouth, MA, James P. Gleason, Jr., Rockville, brief of Alliance for Marriage in support of Defendants-Appellants, amicus curiae.

Vincent P. McCarthy, Kristina J. Wenberg, Laura B. Hernandez, American Center for Law & Justice Northeast, Inc., New Milford, CT, Owen McDonnell Taylor, Glen Burnie, brief of the American Center for Law & Justice, Northeast, Inc., in support of Defendant-Appellant, amicus curiae.

Monte N. Stewart, Marriage Law Foundation, Orem, UT, C. Paul Smith, Rockville, petition and brief of Citizens for Traditional Families, Family Leader Foundation, and United Families International in support of Defendants-Appellants, amici curiae.

Toni Marie Davis, Baltimore, for appellees, amici curiae.

Stuart F. Delery, Nora Freeman Engstrom, Benjamin C. Mizer, Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC, brief of Equality Maryland, Inc.; Families with Pride; Gay Fathers Coalition; Gay, Lesbian, Bisexual, and Transgender Community Center of Baltimore and Central Maryland; Maryland Lesbian & Gay Law Association; PFLAG Baltimore; PFLAG Columbia/Howard County; Gay & Lesbian Advocates & Defenders; Human Rights Campaign; Human Rights Campaign Foundation; National Black Justice Coalition; National Center for Lesbian Rights; and National Gay and Lesbian Task Force in support of appellees, amici curiae.

Susan Sommer, Lambda Legal, New York, NY, C. Christopher Brown, Brown, Goldstein & Levy, LLP, Baltimore, Helene B. Madonick, Amy L. McGinnis, Leslie M. Hill, Joshua I. Kaplan, Arnold & Porter, LLP, Washington, DC, brief Addressing Proper Application of Maryland's Rational Review Standards Submitted by the Bazelon Center for Mental Health Law, the Maryland Disability Law Center, Maryland Adapt, the National Council on Independent Living, the National Mental Health Association, the National Senior Citizens Law Center, and People for the American Way, for appellees, amici curiae.

Lawrence P. Fletcher-Hill, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, brief of Religious Organizations and Leaders, for appellees, amici curiae.

Dan Friedman, Robin D. Leone, Saul Ewing, LLP, Baltimore, brief of Maryland Law Professors, for appellees, amici curiae.

William M. Hohengarten, Jenner & Block, LLP, Nathalie F.P. Gilfoyle, American Psychological Association, Paul M. Smith, Eric Berger, Jenner & Block, LLP, Washington, DC, brief of American Psychological Association, Maryland Psychological Association, Baltimore Psychological Association, and American Psychiatric Association in support of Plaintiffs-Appellees, amici curiae.

Carmen M. Shepard, Buc & Beardsley, Washington, DC, brief of the National Association of Social Workers, the Maryland Chapter of the National Association of Social Workers, Maryland Chapter of the American Academy of Pediatrics, Ellen C. Perrin, M.D., Judith Stacey and Timothy Biblarz, for appellees, amicus curiae.

Cheryl Lynn Hepfer, President, American Acedemy of Matrimonial Lawyers, Chicago, IL, Susan Carol Elgin, Secretary, American Academy of Matrimonial Lawyers, Towson, brief in support of appellees, Gitanjali Deane & Lisa Polyak, et al., amici curiae.

Suzanne Sangree, Janet Hostetler, Murnaghan Appellate Advocacy Fellow, Baltimore, Beth Mellen Harrison, Rockville, brief of Organization of American Historians; Bar Association of Baltimore City; Maryland Latino Coalition for Justice; Maryland NOW; National Lawyer's Guild-Maryland; Public Justice Center; James & Colette Roberts; City of Takoma Park; the Women's Law Center of Maryland, Inc.; Asian American Justice Center; Asian American Legal Defense and Education Fund; Freedom to Marry; Legal Momentum; National Organization of Women Foundation; Southern Poverty Law Center; and 34 Individual Historians & Scholars, for appellees, amici curiae.

Theodore M. Shaw, Jacqueline A. Berrien, Norman J. Chachkin, Victor A. Bolden, NAACP Legal Defense and Educational Fund, Inc., Roberta A. Kaplan, Andrew J. Ehrlich, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY, Craig A. Benson, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Washington, DC, petition and brief of NAACP Legal Defense and Educational Fund, Inc., for appellees, amici curiae.

Argued before BELL, C.J., RAKER,*WILNER,* CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

Frank Conaway, Clerk of the Circuit Court for Baltimore City, and other circuit court clerks throughout Maryland ("the Clerks") denied marriage licenses to certain same-sex couples. The Clerks denied those applications pursuant to Maryland Code (1957, 2006 Repl.Vol.), Family Law Article, § 2–201 (hereinafter "Family Law § 2–201").[1] The Circuit Court for Baltimore City, where the aggrieved applicants filed suit against the Clerks, granted summary judgment in favor of the Plaintiffs–Appellees, declaring that the statute discriminates facially on the basis of sex, in violation of Article 46 of the Declaration of Rights of Maryland, otherwise known as the Equal Rights Amendment ("ERA").[2] The Circuit Court, in its memorandum opinion, expressly declined to address Appellees' equal protection and substantive due process arguments that were based on the "Law of the Land" provisions of

---

* Wilner and Cathell, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

1. MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–201, provides that "[o]nly a marriage between a man and a woman is valid in this State."

2. Article 46 of the Maryland Declaration of Rights ("Article 46") states that "[e]quality of rights under the law shall not be abridged or denied because of sex."

Article 24 of the Declaration of Rights.[3] Defendants–Appellants noted a timely appeal to the Court of Special Appeals. We issued a writ of certiorari to the intermediate appellate court before it could decide the appeal. 393 Md. 477, 903 A.2d 416 (2006). For the reasons stated here, we shall reverse the judgment of the Circuit Court.

## FACTUAL BACKGROUND

The factual background, much like challenges to similar state marriage statutes in other jurisdictions, is undisputed. Maryland law provides that no individuals may marry "in this State without a license issued by the clerk for the county in which the marriage is performed." MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–401(a). In order to apply for such a license, at least one of the parties to the marriage must appear before the clerk of the circuit court for that county and, under oath, provide the following information: (1) the full name of each party; (2) the residence of each party; (3) each party's age; (4) the degree of consanguinity, if any, between the parties; (5) the marital status of each of the parties; and (6) the social security number of each party. MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–402(b). If, while questioning an applicant, "the clerk finds that there is a legal reason why the applicants should not be married, the clerk shall withhold the license unless ordered by the court to issue the license." MD.CODE (1957, 2006 Repl. Vol.), Family Law Article, § 2–405(e).

Eighteen of the Appellees here are nine same-sex couples who, at various times in June and July 2004, sought marriage licenses in Baltimore City and several counties in Maryland. The nineteenth Respondent is a homosexual male who expressed a wish to apply in the future for a marriage license.[4]

---

**3.** Article 24 of the Maryland Declaration of Rights ("Article 24") states that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

**4.** The nine same-sex couples who applied for marriage licenses are as follows: Gitanjali Deane and Lisa Polyak; Charles Blackburn and Glen

Frank Conaway, Clerk of the Circuit Court for Baltimore City, and the other circuit court clerks denied[5] these applications pursuant to Family Law § 2–201, which provides that "[o]nly a marriage between a man and a woman is valid in this State," thereby depriving Appellees of the various benefits and privileges that accompany the institution of marriage.[6] It is

Dehn; Jodi Kelber–Kaye and Stacey Kargman–Kaye; Alvin Williams and Nigel Simon; Steven Palmer and Ryan Killough; Patrick Wojahn and David Kolesar; Mikkole Mozelle and Phelicia Kebreau; Donna Myers and Maria Barquero; and Takia Foskey and Joanne Rabb. John Lestitian is the surviving partner of a thirteen-year same-sex relationship who formed a new same-sex relationship and wishes to preserve the right to apply for a marriage license in the future.

5. Although Lestitian has not applied for a marriage license, he plans to do so in the future and, according to Appellees, the Clerk of the Circuit Court for Washington County would deny his application under the current statutory scheme. There is scant doubt about the accuracy of this prediction.

6. Through the efforts of Appellees' counsel, we are directed to 339 Maryland laws that provide for benefits, conditioned on marital status, which grant rights and responsibilities to married couples, to the effective exclusion of same-sex couples. They include, but are not limited to, the areas of taxation, business regulation, secured commercial transactions, spousal privilege and other procedural matters, education, estates and trusts, family law, decision-making regarding spousal health care, insurance, labor and employment, child care and child rearing, pensions, and the responsibilities attendant to spousal funeral arrangements. This is but a partial list of the benefits provided in Maryland to married couples and denied to same-sex couples prohibited from marriage.

In terms of federal benefits, the Government Accounting Office (GAO) compiled in 1997, and updated in 2004, a list of federal rights, responsibilities, and privileges granted to married couples, but denied to same-sex couples. According to the study, there were 1,138 federal statutes providing such benefits. A.B.A. SEC. OF FAM L., *A White Paper: An Analysis of the Law Regarding Same–Sex Marriage, Civil Unions, and Domestic Partnerships*, 38 FAM. L.Q. 339, 366, n. 98 (citing Report No. 04–353R (4 January 2004), *available at* http://www.gao.gov/new.items/d 04353r.pdf). Although disposition of the present case would have no effect on Appellees' eligibility for those federal benefits under the Federal Defense of Marriage Act, it illustrates the current regulatory landscape regarding same-sex marriage and the marital benefits from which Appellees are excluded.

The privileges that accompany marriage, according to Appellees, are not limited to demonstrable statutory benefits. Same-sex couples suffer, it is proffered, various intangible harms, which include the stigma

undisputed that Appellees were denied marriage licenses by the Clerks solely because they are same-sex couples. Appellees are otherwise qualified to marry: each partner is unrelated by blood or by marriage,[7] each partner is over the age of 17,[8] each partner is unmarried,[9] each of the relationships are consensual, and each of the applicants possess the capacity to marry.

Appellees filed on 7 July 2004 a Complaint for Declaratory and Injunctive Relief, naming as defendants Frank Conaway; Rosalyn Pugh, Clerk of the Circuit Court for Prince George's County; Evelyn Arnold, Clerk of the Circuit Court for St. Mary's County; Dennis Weaver, Clerk of the Circuit Court for Washington County; and Michael Baker, Clerk of the Circuit Court for Dorchester County.[10] The four count complaint alleges that Family Law § 2–201:(1) unconstitutionally discriminates based on sex, in violation of Article 46 of the Maryland Declaration of Rights; (2) unjustifiably discriminates based on sexual orientation, in violation of the equal protection provisions of Article 24 of the Maryland Declaration of Rights; (3) disparately inhibits, in violation of the equal protection provisions of Article 24 of the Maryland Declaration of Rights, the same-sex couples' fundamental rights to marry, privacy, autonomy, and intimate association, because the statute allows similarly-situated opposite-sex couples to exercise those rights; and (4) unjustifiably burdens the exercise of

---

attached to the couples and their children, and harm to dignity resulting from being singled-out for unequal treatment on the basis of their sexual preference.

7. MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–202.

8. MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–301.

9. MD.CODE (1957, 2006 Repl.Vol.), Family Law Article, § 2–402(b)(1)(v)–(vi).

10. According to the record, four of the couples reside in Baltimore City; three couples reside in Prince George's County; one member of another couple resides in St. Mary's County, while the other member resides in Costa Rica; Mr. Lestitian resides in Washington County; and one couple resides in Dorchester County.

same-sex couples' fundamental rights to marry, privacy, autonomy, and intimate association, in violation of the due process provisions of Article 24 of the Maryland Declaration of Rights.

Three motions to intervene were filed subsequent to the filing of Appellees' complaint. Robert P. Duckworth, Clerk of the Circuit Court for Anne Arundel County, was the first to file a motion to intervene as a defendant. Mr. Duckworth contended that, as a county circuit court clerk, a decision in favor of the Plaintiffs–Appellees would create uncertainty with regard to the discharge of his job duties, and would subject him to potential civil and criminal litigation in the future discharge of those duties. *Duckworth v. Deane*, 393 Md. 524, 530–31, 903 A.2d 883, 887 (2006) (describing the procedural history of the litigation to that point in time). Eight members of the Maryland General Assembly likewise attempted to intervene as defendants, claiming that, as members of the Legislature, their legislative authority included the power to regulate marriage in the State of the Maryland. *Duckworth*, 393 Md. at 532, 903 A.2d at 887. A judicial decision invalidating the marriage statute, according to the legislators, would be a "judicial encroachment" upon their legislative authority in violation of the separation of powers principles in Article 8 of the Maryland Declaration of Rights. *Duckworth*, 393 Md. at 532, 903 A.2d at 887–88. The third motion to intervene was filed in proper person by Toni Marie Davis, a resident of Baltimore City. Ms. Davis asserted that because "the homosexual lifestyle [was] against [her] religion," allowing same-sex marriage would, in essence, burden unconstitutionally her First Amendment right to practice her religion. *Duckworth*, 393 Md. at 532–33, 903 A.2d at 888. The motions were denied by the Circuit Court and the interveners each noted appeals to the Court of Special Appeals. We issued, on our initiative, a writ of certiorari on 17 December 2005 before the intermediate appellate court decided the appeal. *Duckworth v. Deane*, 384 Md. 448, 863 A.2d 997 (2004). For reasons not pertinent to the merits before us now, this Court, after briefing and oral argument, affirmed on 28 July 2006 the Circuit Court's deci-

sion to deny the requested interventions. *Duckworth,* 393 Md. at 545, 903 A.2d at 895.

After the motions to intervene were denied, the parties filed cross-motions for summary judgment, pursuant to Maryland Rule 2–501. The Appellees supported their motion with a series of exhibits and declarations by the various plaintiffs and others.[11] The trial judge held a motions hearing on 30 August 2005 and, on 20 January 2006, issued a memorandum opinion in which she held that the exclusion of same-sex couples from marriage constitutes a sex-based classification, lacking a constitutionally sufficient justification in violation of Article 46.

She granted, therefore, Appellees' motion for summary judgment, denied Appellants' cross-motion, and entered summary judgment in favor of the same-sex couples. The Circuit Court, pursuant to Maryland Rule 2–632, stayed enforcement of its ruling pending the resolution of the expected appeal and because of the potential consequences of the ruling on circuit court clerks' offices throughout the State.[12] We issued a writ of certiorari upon the Clerks' timely petition. 393 Md. 477, 903 A.2d 416 (2006).

## STANDARD OF REVIEW

Any party to an action may file a motion for summary judgment, pursuant to Maryland Rule 2–501(a), if it is claimed that there exists no genuine dispute as to any material

---

11. Appellees filed a motion to strike the accompanying declarations of Lisa Ayers, Esquire; Judith Stacey, Ph. D; Nancy F. Cott, Ph.D; and, M.V. Lee Badgett, Ph. D. These declarations purported to be expert opinions debunking the General Assembly's assumed factual underpinnings for Family Law § 2–201. The trial judge granted Appellants' motion as to the declaration of Ms. Ayers.

12. Maryland Rule 2–632(f) provides that "[w]hen an appeal is taken from an order or a judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the adverse party." Although the record is unclear whether this Rule was relied on as the basis for the grant of the stay, the validity of the stay is unchallenged here.

fact, and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501(a). The questions for the trial court to determine from the pleadings and papers properly before it on a motion for summary judgment, therefore, are whether there exists a genuine dispute of material fact and, if no such dispute is revealed, whether the movant is entitled to prevail as a matter of law on those undisputed facts. *See, e.g., Brewer v. Mele,* 267 Md. 437, 441, 298 A.2d 156, 159 (1972). Whether a trial court's grant of summary judgment was proper is a question of law and is reviewed *de novo* by the appellate courts. *Livesay v. Baltimore,* 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In such review, an appellate court resolves in favor of the non-moving party all reasonable inferences that may be adduced from the underlying facts as revealed by the pleadings, admissions, and affidavits. *Miller v. Bay City Prop. Owners Ass'n, Inc.,* 393 Md. 620, 631, 903 A.2d 938, 944–45 (2006) (quoting *King v. Bankerd,* 303 Md. 98, 110–11, 492 A.2d 608, 614 (1985) (citing in turn *Lynx, Inc. v. Ordnance Prod., Inc.,* 273 Md. 1, 7–8, 327 A.2d 502, 509 (1974))); *Merchants Mtg. Co. v. Lubow,* 275 Md. 208, 339 A.2d 664 (1975).

 " 'Maryland appellate courts, as a general rule, will consider only the [legal] grounds upon which the [trial] court relied in granting summary judgment.' " *Ross v. State Bd. of Elections,* 387 Md. 649, 667, 876 A.2d 692, 702 (2005) (quoting *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003)); *Miller,* 393 Md. at 632, 903 A.2d at 945 (" 'An appellate court . . . examines the same information from the record and determines the same issues of law as the trial court.' " (quoting *PaineWebber, Inc. v. East,* 363 Md. 408, 413, 768 A.2d 1029, 1032 (2001))); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 729 (2001) (quoting *PaineWebber,* 363 Md. at 422, 768 A.2d at 1036). This premise is only valid, however, when "there are two or more separate and distinct grounds for the grant of summary judgment, and the trial court relies on one, but not another, in granting summary judgment." *Ross,* 387 Md. at 667, 876 A.2d at 702–03. Thus, if two or more similar and "inextricably intertwined" grounds for summary judgment exist, this Court may consider alternatively any related

ground, if raised properly by the litigant in his, her, or its motion for summary judgment, if we find fault with the ground relied upon facially by the trial court. *Id.; see also Eid,* 373 Md. at 10–11, 816 A.2d at 849 (holding that the issues of ERISA preemption and the existence of a patient-physician relationship giving rise to a state law medical malpractice cause of action are so "inextricably intertwined" that both grounds may be considered in the review of a grant of summary judgment, even though the trial court relied solely upon the ERISA preemption issue in granting summary judgment); *cf. Geisz v. Greater Balt. Med. Ctr.,* 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988) ("On appeal from the grant of summary judgment which is reversible because of error in the ground relied upon by the trial court[,] the appellate court will not ordinarily sustain the judgment by ruling on another ground, not ruled upon [by] the trial court, *if the alternative ground is one as to which the trial court had . . . discretion to deny summary judgment.*") (emphasis added). Whether Family Law § 2–201 is violative of Articles 24 or 46 are issues purely of law and are so inextricably intertwined with one another that we shall consider the Article 24 claim, even though we find error in the Circuit Court's singular reliance on Article 46.

## DISCUSSION

### I. Claim of Sex-based Discrimination Under Article 46 of the Declaration of Rights

██ Appellees assert that, because Family Law § 2–201 excludes same-sex couples from marriage, the statute draws an impermissible classification on the basis of sex, in violation of Article 46 of the ERA. Specifically, Appellees reason that "[a] man who seeks to marry a woman can marry, but a woman who seeks to marry a woman cannot. Similarly, a woman who seeks to marry a man can marry, but a man who seeks to marry a man cannot." Thus, because Family Law § 2–201 allows opposite-sex couples to marry but, at the same time, necessarily prohibits same-sex couples from doing so, the

statute "makes sex a factor in the enjoyment and the determination of one's right to marry," and is therefore subject to strict scrutiny.[13]

■ Appellees' argument, at first glance, is beguiling. They point to several Maryland precedents that, if viewed literally, appear to support the proposition that a statute receives strict scrutiny analysis under Article 46 if sex is *at all* a factor in determining whether certain individuals are entitled to the benefits provided by the particular legislative enactment under review. *See Giffin v. Crane*, 351 Md. 133, 148, 716 A.2d 1029, 1037 (1998) ("[S]ex is not, and can not be, a factor in the enjoyment or the determination of legal rights.") (citing *Rand v. Rand*, 280 Md. 508, 513, 374 A.2d 900, 902–03 (1977) and Barbara A. Brown et al., *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 YALE L.J. 871 (1971)); *Burning Tree Club, Inc. v. Bainum*, 305 Md. 53, 63–64, 501 A.2d 817, 822 (1985) (*Burning Tree I* ) ("[S]ex is not a permissible factor in determining the legal

---

**13.** If Family Law § 2–201 discriminates on the basis of sex, as the Appellees assert, this Court would examine the statute with the strictest of scrutiny. *Tyler v. State*, 330 Md. 261, 266, 623 A.2d 648, 651 (1993) (holding that, "because of Article 46 of the Maryland Declaration of Rights, sex-based classifications are suspect and are subject to strict scrutiny"); *Murphy v. Edmonds*, 325 Md. 342, 357 n. 7, 601 A.2d 102, 109 n. 7 (1992) (holding that classifications based on sex are suspect and subject to strict scrutiny review under the Equal Rights Amendment of Article 46); *State v. Burning Tree Club, Inc.*, 315 Md. 254, 295–96, 554 A.2d 366, 387 (1989) (*"Burning Tree II "*). If it is determined that Family Law § 2–201 does not draw a sex-based classification, however, our cases instruct us to analyze the constitutionality of the statute under rational basis review. *See Murphy*, 325 Md. at 355–56, 601 A.2d at 108–09 (1992) (holding that statutory classifications that do not affect a suspect or quasi-suspect class are subject to rational basis review, and will be upheld so long as the statute is rationally related to a legitimate governmental purpose).

Judge Battaglia's dissent goes to great lengths to explain that "[t]he majority in the present case fails to recognize that *Burning Tree II* clearly adopted strict scrutiny as the standard in ERA cases." Judge Battaglia's Dissent op. at 383, 932 A.2d 670. To the contrary, the Majority recognizes that strict scrutiny should be applied when the ERA is implicated. But in order for strict scrutiny to be the approach standard, it must first be found that the statute *discriminates* on the basis of sex. We conclude that it does not.

rights of women, or men ... [such that] the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other."); *Boblitz v. Boblitz*, 296 Md. 242, 274–75, 462 A.2d 506, 522 (1983) (holding that, after "legislative passage and approval by the people of Article 46 of the Declaration of Rights, any ancient deprivation of rights based upon sex would contravene the basic law of this State"). When considering those cases in context,[14] however, and because we believe that Article 46 was not intended by the General Assembly and the Maryland voters who enacted and ratified, respectively, the Maryland ERA in 1972 to reach classifications based on *sexual orientation*, we conclude that Family Law § 2–201 does not draw an impermissible sex-based distinction.

A. *The Legislative History of the Maryland Equal Rights Amendment indicates that the ERA was intended to combat discrimination between men and women as classes.*

The Maryland General Assembly, in 1972, ratified overwhelmingly a proposed Federal Equal Rights Amendment,[15]

---

**14.** As will be described *infra,* each case relied on by Appellees in support of their argument involved legislative classifications that gave certain rights to an entire class of men or women, to the exclusion of the opposite sex. The classifications in those cases are so obviously sex-based that they are of negligible value in demonstrating the invalidity of a statute such as Family Law § 2–201 that, on its face, applies equally to the members of both sexes.

**15.** Originally introduced in 1923 to Congress by the National Women's Party, RENEE FEINBERG, THE EQUAL RIGHTS AMENDMENT 16 (1986), the proposed federal equal rights amendment, upon which the Maryland counterpart was based, was proposed in every Congressional session since then and through the 1971 Ninety–Second session. Allison L. Held, Sheryl L. Herndon, Danielle M. Stager, *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States,* 3 WM. & MARY J.WOMEN & L. 113, 116 (1997). "Propelled by a wave of political support for women's rights reform, the amendment passed Congress by an overwhelming majority...." *Id.* The proposed amendment passed in the House by a vote of 354 to 24 and in the Senate 84 to 8. 117 Cong. Rec. 35,815 (1971); 118 Cong. Rec. 9598 (1972). Three-quarters of the States (38 at the time) were required to

and passed during that same legislative session Chapter 366, § 1 of the Acts of 1972. GOVERNOR'S COMM'N TO STUDY IMPLEMENTATION OF THE EQUAL RIGHTS AMENDMENT, APPLICATION OF THE EQUAL RIGHTS AMENDMENT 1 (1977). The General Assembly, through this legislative enactment, amended the Declaration of Rights to include an Equal Rights Amendment (ERA) that tracked closely the language of the proposed federal amendment.[16] Chapter 366, § 1 of the Acts of 1972. In its final form, the amendment to the Maryland Declaration of Rights read: "Equality of rights under the law shall not be abridged or denied because of sex." *Id.* Maryland voters ratified overwhelmingly this amendment, by a 2 to 1 margin, in the November 1972 referendum, and the amendment became Article 46 on 5 December 1972. GOVERNOR'S COMM'N TO STUDY IMPLEMENTATION OF THE EQUAL RIGHTS AMENDMENT, APPLICATION OF THE EQUAL RIGHTS AMENDMENT 1 (1977).

The official legislative history, at least for the Maryland ERA, is not particularly instructive as to discrete legislative intent because legislative bill files were not retained systematically by the General Assembly's Standing Committees or the Department of Legislative Reference (now known as the Department of Legislative Services) until 1975. Resources useful in determining the purpose of pre–1975 legislative action are therefore limited to selected committee bill files (which do not exist for the ERA), the Legislative Council Reports to the General Assembly for 1941–1976 (which do not

---

ratify the amendment before 1979 in order for it to become part of the U.S. Constitution. FEINBERG, *supra,* at 14. When only 35 states ratified the amendment by the deadline, FEINBERG, *supra,* at 14, Congress adopted a resolution extending the deadline for ratification to 30 June 1982. Held et al., *supra,* at 117; H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978). The amendment did not receive the three remaining votes required by 1982, and thus failed to become part of the U.S. Constitution. FEINBERG, *supra,* at 1.

16. The proposed federal amendment read in pertinent part: "SECTION 1: Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." *Proposed Amendment to the United States Constitution,* H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972).

**248**

contain reference to the ERA), task force reports, and archival newspaper accounts published during the period. Dep't of Legislative Serv., Md. Gen. Assembly, *Legislative History Resources, available at* http://www.dls.state.md.us/side_pgs/library_info/library_legislative_history.html (20 February 2007). We were unable to locate any formal legislative documents created contemporaneous with consideration and promulgation of the Maryland ERA that indicate the General Assembly's overriding purpose in passing the amendment. We were able to locate, however, extrinsic sources created at or about the time of the pendency of the proposed amendment and its promulgation that suggest that the intended scope of Article 46 was to prevent discrimination between men and women as classes.[17]

---

17. As we have stated in the past,

> [i]f the text [of a constitutional provision] is ambiguous, the Court should first endeavor to ascertain its meaning from other parts of the instrument. *It is not until the means of solution afforded by the entire Constitution have been exhausted without success that the Court is justified in calling outside facts or considerations to its aid. When that becomes necessary, however, it is permissible to inquire into the prior state of the law, the previous and contemporary history of the people, the circumstances attending the adoption of the organic law, as well as broad considerations of expediency. The object is to ascertain the reason which induced the framers to enact the provision in dispute and the purpose sought to be accomplished thereby....*

*Reed v. McKeldin*, 207 Md. 553, 560–61, 115 A.2d 281, 285 (1955) (emphasis added).

We are mindful, however, of pitfalls and limitations in relying on contemporary newspaper·accounts in interpreting legislative intent. *In re Jason W.*, 378 Md. 596, 607–11, 837 A.2d 168, 175–78 (2003) (Harrell, J., concurring) (stating that, on the *"rare* occasion[ ] when it is appropriate for a court to consider, to some degree, relatively contemporaneous relevant newspaper articles in ascertaining the legislative intent of an enactment of comparable vintage . . ., the use of newspaper accounts should be approached with caution and selectivity," and cataloging cases from various jurisdictions in which courts have declined to consider contemporaneous newspaper articles as conclusive evidence of legislative intent); *see also Hornbeck*, 295 Md. at 661, 458 A.2d at 792 (Cole, J., dissenting) ("Newspaper articles . . . are hardly the most reliable sources for extrapolating legislative intent; they certainly are not adequate substitutes for cogent analysis of the *purpose* of a provision as discerned from its historical context and basic goals."). We consider the contemporaneous newspaper accounts here

In the time surrounding the promulgation of Article 46, for example, Governor Marvin Mandel created a commission designed to study the amendment's post-implementation affects. One of the Commission's stated purposes was to examine Maryland laws that, while not facially discriminatory, drew classifications that discriminated in their application on the basis of sex:

> Laws While Not Facially Sexually Discriminatory are Sexually Discriminatory in their Application or Effect: The Commission had as a precedent the considerable body of federal and state law which has declared that laws which are unoffensive facially are nevertheless racially discriminatory in their application. An example is the Supreme Court decision which outlaws literacy tests because they disproportionately exclude racial minorities. *The Commission, therefore sought to identify laws, practices and procedures which in application has a disproportionately adverse affect on the sex [ (women) ] which has traditionally been victim of discrimination.*

GOVERNOR'S COMM'N TO STUDY IMPLEMENTATION OF THE EQUAL RIGHTS AMENDMENT, FINAL REPORT TO THE GOVERNOR 11 (1979).

▆▆▆ In addition to documents originating from executive agencies created to study the effects of the newly passed equal rights amendment, various newspaper accounts from the period of time surrounding the 1972 electoral vote on Article 46 shed light on the intended scope of the proposed amendment. On Monday, 23 October 1972, the *Washington Post* published a staff-written compendium entitled *Maryland Voters to Decide on Constitutional Changes,* which described the various proposed amendments to the Maryland Constitution. According to the article, the

> amendment, sponsored by a majority of the legislators, would be effective immediately with referendum approval and would, at the least, place the state Constitution in

---

only to provide context for our analysis. *In re Jason W.,* 378 Md. at 610–11, 837 A.2d at 177–78.

agreement with the U.S. Constitution in assuring equal rights *for men and women.*

This amendment is often referred to as a *"women's rights "* measure, but it also would assure men that they could not be discriminated against because of their sex.

This amendment and the pending amendment to the U.S. Constitution are likely eventually to have a far-reaching impact on court decisions in the areas of family and domestic relations laws dealing with such matters as child custody, alimony and paternity cases.

Douglas Watson, *Maryland Voters to Decide on Constitutional Changes,* WASH. POST, 23 October 1972, at B4 (emphasis added); *see also 18 Referendum Issues Confront Voters,* THE NEWS AM., 24 October 1972, at 3–A ("The amendment is often referred to as a 'women's rights' measure, but it also would assure men that they could not be discriminated against because of their sex."); Barry C. Rascovar, *Feminists find new foes of ballot question,* BALT. SUN, 31 October 1972, at C24 (describing the lack of male opposition to the women's liberation movement's efforts to pass the Maryland ERA). While these are but a few examples of the newspaper accounts originating around the time the ERA was ratified by the Maryland voters, they represent accurately the bulk of the articles of the time on that subject, and reinforce that the primary purpose of the ERA was to eliminate discrimination as between men and women as a class.

Because the 1972 General Assembly considered in tandem the proposed federal and Maryland amendments, we find instructive also the objectives revealed by the legislative history of the federal initiative. Introduced originally in 1923 by the National Women's Party, the proposed federal amendment was introduced at every legislative session during the mid–20th century. RENEE FEINBERG, THE EQUAL RIGHTS AMENDMENT 16 (1986). It was not until 1972 that the proposed federal amendment, introduced to the 92nd Congress as House Joint Resolution (HJR) No. 208 by Representative Martha W. Griffiths (Michigan) and propelled significantly by the women's rights movement occurring during that time, passed Congress

by an overwhelming majority. Allison L. Held, Sheryl L. Herndon, Danielle M. Stager, *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States*, 3 WM. & MARY J. WOMEN & L. 113, 116 (1997).

In the House of Representatives, for example, there was much discussion of the intended scope of the proposed federal amendment. During a hearing before the House Committee on Rules, in requesting that HJR 208 be considered by The Committee of the Whole of the House on the State of the Union, Representative Thomas Phillip "Tip" O'Neill, Jr. (Dem., Massachusetts), then a member of the Committee on Rules, stated:

> As a group, women have been victims of wide discrimination. In many States they are denied educational opportunities equal to those for men. In some States they are not allowed to manage their own property and a wife has fewer property rights.
>
> Our legal system currently contains the vestiges of a variety of ancient common law principles which discriminate unfairly against women. This legislation would clarify the intent of the Congress that all irrational discrimination on the basis of sex be eliminated.

117 Congr. Rec. 35289 (daily ed. 6 October 1971) (statement of Rep. O'Neill). During that same hearing, Representative John B. Anderson (Rep., Illinois) commented:

> Indeed, we are being called upon today to do the chivalrous thing—to redress a wrong out of fairness and respect for women. We are being called upon once and for all to make women equal under the law of the land—remove the last vestiges of their second-class citizenship from the books.

117 Congr. Rec. 35290 (daily ed. 6 October 1971) (statement of Rep. Anderson).

During the floor debate in the House, in opposing the addition of the Wiggins Amendment [18] to the proposed ERA, it

---

**18.** The Wiggins Amendment provided for an additional clause in the proposed ERA that stated that "[t]his article shall not impair the

was stated by Representative Herman Badillo (Dem., New York):

It is clear that there is flagrant discrimination against women in this country—in employment opportunities, in the ownership of private property, in education, in a variety of Federal benefits such as social security and retirement and in numerous other areas of American society. This discrimination exists at all levels—Federal, State, and local and in both the public and private sector.

Although some advances have been made in the past, there is still much to be done and meaningful and effective steps must be taken to insure that women enjoy the same rights and privileges which are now generally available to men. Existing constitutional provisions and various court decisions have failed to provide equal rights for women and we cannot depend on piecemeal legislative measures to achieve this goal. In order to avoid any undue delays or possible erroneous interpretations, a comprehensive effort is required and I believe a constitutional amendment is the most appropriate and effective device for securing equal rights for all citizens, regardless of sex.

117 Congr. Rec. 3580 (daily ed. 12 October 1971) (statement of Rep. Badillo). Many comments of similar substance appear throughout the discussion in the House, regardless of whether a particular Representative was speaking in favor of or in opposition to the Wiggins Amendment.

The Senate debate concerning the proposed equal rights amendment contains sentiments consistent with that of the House. When discussing the issue on 22 March 1972, for example, Senator Charles H. Percy (Rep., Illinois) stated:

Even among the [proposed amendment's] opponents, there seems to be little question but that tradition and law have worked together to relegate women to an inferior status in our society. In many cases this has been inten-

---

validity of any law of the U.S. which exempts a person from compulsory military service or any other law of the U.S. or of any state which reasonably promotes the health and safety of the people."

tional, based on an archaic precept that women, for physiological or functional reasons, are inferior. This concept has lead to the implementation of laws that prohibit [among other things] women from engaging in certain businesses, managing their own properties and finances, entering into legal contracts, holding jobs which they are deemed incapable of performing, actively competing in public and private educational institutions for a quality education, and serving on a jury.

118 Congr. Rec. 9595 (daily ed. 22 March 1972) (statements of Sen. Percy). Senator Percy concluded his statements by quoting Susan B. Anthony and articulating that

[n]either does the equal rights amendment lessen or demean the importance of women as wives, mothers, and mainstays of the home. Equality does not imply sameness. While the family structure is at the heart of our society and this legislation does nothing to disrupt that notion, we must recognize that women of today are different, they are aware of and willing to accept their responsibilities as citizens in a modern society and ought to be free to accept those responsibilities much as they are free to remain in the home if that is their choice.

. . . .

Today we will truly acknowledge that equality can no longer be legally conditioned upon sex, that women, as they assume new roles in our society, deserve as a matter of law equal treatment under the law.

*Id.* at 9596.

Speaking directly on the point of the proposed amendment and its effects on marriage between members of the same sex, it was contended by Senator Birch Evans Bayh II (Dem., Indiana) during the Senate debate that

[t]he equal rights amendment would not prohibit a State from saying that the institution of marriage would be prohibited to men partners. It would not prohibit a State from saying the institution of marriage would be prohibited to women partners. All it says is that if a State legislature makes a judgment that it is wrong for a man to marry a

man, then it must say it is wrong for a woman to marry a woman-or if a State says it is wrong for a woman to marry a woman, then it must say that it is wrong for a man to marry a man.

118 Congr. Rec. 9331 (daily ed. 21 March 1972) (statements of Sen. Bayh).

> *B. Maryland precedent interpreting generally Article 46 indicates that the ERA was intended to combat discrimination between men and women as classes.*

This Court has had the opportunity on several occasions to examine the historical underpinnings of the ERA. Since the passage, ratification, and promulgation of Article 46 in 1972, our applications of the ERA indicate that its primary purpose was to remedy the long history of subordination of women in this country, and to place men and women on equal ground as pertains to the enjoyment of basic legal rights under the law.

In virtually every case where this Court had the occasion to consider Article 46, the challenged classification drew clear lines between men and women as classes. In *Burning Tree I,* for example, the primary question before the Court was whether deferred State real property tax assessments given to a private country club that, according to the club's bylaws, expressly prohibited women from membership was violative of Article 46. 305 Md. at 58–59, 501 A.2d at 819–20.[19] In route to concluding that such favorable treatment violated the Mary-

---

**19.** In *Burning Tree I,* the preferential tax assessment was conditioned upon the club's compliance with an anti-discrimination clause in the statutory scheme granting the tax benefits, which read, in pertinent part, as follows:

> In order to qualify under this section, the club shall not practice or allow to be practiced any form of discrimination in granting membership or guest privileges based upon the race, color, creed, sex, or national origin of any person or persons. The determination as to whether or not any club practices discrimination shall be made by the Office of the Attorney General after affording a hearing to the club. *The provisions of this section with respect to discrimination in sex shall not apply to any club whose facilities are operated with the primary purpose, as determined by the Attorney General, to serve or*

land Declaration of Rights, we discussed briefly the history and purpose of the ERA:

[t]hat equal rights amendments to state constitutions were prompted by a long history of denial of equal rights for women is well recognized. As the commentators have indicated, the subordinate status of women in our society has for all too many years been firmly entrenched in our legal system, with women being excluded by law from various rights, obligations or responsibilities.

*Burning Tree I,* 305 Md. at 63–64, 501 A.2d at 822 (citing Barbara A. Brown et al., *The Equal Rights Amendment: Constitutional Basis for Equal Rights for Women,* 80 YALE L.J. 871 (1971)).[20] We concluded that "the [ERA] flatly

---

benefit members of a particular sex, nor to the clubs which exclude certain sexes only on certain days and at certain times.
*Burning Tree I,* 305 Md. at 57–58, 501 A.2d at 819 (emphasis added). Central to the plurality opinion of this Court that the statute violated the Maryland Declaration of Rights, was the "primary purpose" qualification to the anti-discrimination provision emphasized in italics above. Based on this "primary purpose" provision, the Attorney General found that the club did not discriminate on the basis of sex because the club, pursuant to the statute, operated for the "primary purpose" of benefitting one sex, namely men. *Burning Tree I,* 305 Md. at 59, 501 A.2d at 820.

20. Respected commentators such as Barbara A. Brown, Thomas I. Emerson, Gail Falk, and Ann E. Freedman, have discussed the intended scope of the Equal Rights Amendment. In their oft-cited law review article, the authors examined generally the need for an equal rights amendment:

An amendment that deals with all sex discrimination, *and only sex discrimination,* corresponds roughly to the boundaries of a distinct and interrelated set of legal relationships.... [A] woman's status before the law in one area, such as employment, relates both practically and theoretically to her status in other areas, such as education or responsibility for family support. Coming to grips with the dynamics of discrimination against women requires that we recognize the indications of, the excuses for, and the problems presented by *women's inferior status.* An understanding of these dynamics in any one field informs and enlightens understanding of sex bias elsewhere in the law. *This is because, in the past, the legal and social systems have been permeated with a sometime inchoate, but nevertheless pervasive, theory of women's inferiority.*

prohibits gender-based classifications, either under legislative enactments, governmental policies, or by application of common law rules, in the allocation of benefits, burdens, rights and responsibilities *as between men and women.*" *Burning Tree I,* 305 Md. at 64, 501 A.2d at 823 (emphasis added).[21]

Consistent with this underlying purpose of the ERA, we held in *Rand v. Rand,* 280 Md. 508, 515–16, 374 A.2d 900, 905 (1977), that the " 'broad, sweeping, mandatory language' of the [ERA] is cogent evidence that the people of Maryland are fully committed to equal rights for men and women. The adoption of the [ERA] in this state was intended to, and did, drastically alter traditional views of the validity of sex-based classification." (quoting *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882, 889 (1975)); *see also Giffin v. Crane,* 351 Md. 133, 151, 716 A.2d 1029, 1038 (1998). In *Rand,* we considered the validity of a judgment of the Court of Special Appeals allocating child support obligations based, for the most part, on the sex of the parents. Despite the common law rule at the time that a father primarily was responsible for support of children born during the marriage, *Rand,* 280 Md. at 510–11, 374 A.2d at 902 (internal citations omitted), we concluded that, in light

---

Barbara A. Brown et al., *The Equal Rights Amendment: Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 885 (1971) (emphasis added). The authors stated further that

without a constitutional mandate, women's status will never be accorded the special concern which race now receives because of the history of the Fourteenth Amendment. *For these reasons it is important to have a constitutional amendment directed to this specific area of equality, out of which a special body of new law can be created.* *Id.* (emphasis added).

21. In *Burning Tree II,* two members of the country club attacked as unconstitutional a statute, enacted in response to *Burning Tree I,* that excluded from preferential tax treatment those clubs that discriminated on the basis of race, color, creed, sex, or national origin. 315 Md. at 261, 554 A.2d at 370. The plaintiffs in that case argued that the statute burdened unconstitutionally the club's First Amendment freedom of association and constituted a violation of Art. 1, § 10 (the Contract Clause) of the U.S. Constitution and Article III, § 33 of the Maryland Constitution. *Burning Tree II,* 315 Md. at 261–62, 554 A.2d at 370. This Court affirmed summarily the holdings of *Burning Tree I* that the discriminatory practices of the country club violated Article 46. *Burning Tree II,* 315 Md. at 263, 554 A.2d at 371.

of Article 46, sex was not a permissible factor in the determination of child support obligations *as between the mother and father:*

> The common law rule is a vestige of the past; it cannot be reconciled with out commitment to equality of the sexes. Sex of the parent in matters of child support cannot be a factor in allocating this responsibility. Child support awards must be made on a sexless basis.

*Rand,* 280 Md. at 516, 374 A.2d at 905; *cf. Boblitz v. Boblitz,* 296 Md. 242, 245, 273, 462 A.2d 506, 507, 521 (1983) (abrogating the common law doctrine of inter-spousal immunity [22] as a "vestige of the past" in "derogation of married women"). We thus determined that, after the promulgation of Article 46, as between men and women, men no longer as a class were the primary source of child support. Rather, both the mother and father fundamentally were responsible equally for the monetary support of their children born during the marriage.

Appellees turn to *Giffin* for the proposition that "sex is not, and cannot be, a factor in the enjoyment or the determination of legal rights." 351 Md. at 148, 716 A.2d at 1036. As with the other cases relied on by Appellees, we conclude, upon reflection, that *Giffin* does not support their argument as mounted. In *Giffin,* the primary issue was whether the Court

---

**22.** The common law doctrine of inter-spousal immunity barred a wife from bringing a cause of action, without her husband's concurrence, in order to recover for losses sustained as a result of either person or property injury. *Boblitz v. Boblitz,* 296 Md. 242, 244, 462 A.2d 506, 507 (1983). In *Boblitz,* Ms. Lauretta Baseman–Boblitz was injured as a result of her husband's negligent operation of an automobile. *Boblitz,* 296 Md. at 243, 462 A.2d at 507. In that case, therefore, we were called upon to determine whether the common law doctrine remained viable, in light of Article 46, as an affirmative defense to an action arising in tort when the wife's personal injury occurred as the result of negligence of her husband. *Boblitz,* 296 Md. at 244, 462 A.2d at 507. As Appellees point out, we held there that "any deprivation of rights based upon sex would contravene the basic law of this State." Our decision to abrogate the common law doctrine, however, was based on the premise that such an archaic doctrine, founded entirely on the "derogation of married women," *Boblitz,* 296 Md. at 245, 462 A.2d at 507, had no place in modern society. We find, therefore, that Appellees' reliance on language parsed from *Boblitz* is misplaced.

of Special Appeals was correct in concluding that the sex of each parent, relative to the sex of their children born during the marriage, was a permissible factor to be considered in the grant of child custody at the dissolution of the marriage. In that case, James M. Giffin and Donna L. Crane entered, upon their divorce, an agreement whereby Mr. Giffin was awarded physical custody of the couple's two daughters. *Giffin*, 351 Md. at 135–36, 716 A.2d at 1030–31. The agreement provided for annual reviews by a disinterested mental health professional, at the request of the non-custodial parent, of the residential status of the children. *Giffin*, 351 Md. at 137, 716 A.2d at 1031. Ms. Crane requested in 1995 an annual review of the residential status of the children and, following an unfavorable recommendation by the health professional, filed in the Circuit Court for Montgomery County a petition for modification of custody. *Giffin*, 351 Md. at 138, 716 A.2d at 1032. The trial court granted the petition, holding that, even though both parents were otherwise qualified to care for the children, the daughters' particular need for a female influence was a "necessary factor" in the court's determination that the mother should be granted custody. *Giffin*, 351 Md. at 139–141, 716 A.2d at 1032–33. In other words, the determination of custody was based entirely on sex.

Viewing the reasoning of *Giffin* in its context, it is clear that the Court's statement that "sex is not, and cannot be, a factor" related to distinctions drawn between men and women *as classes*. *See Giffin*, 351 Md. at 149, 716 A.2d at 1037 ("[T]he equality *between sexes* demanded by the Maryland [ERA] focuses on 'rights' of individuals 'under the law,' which encompass all forms of privileges, immunities, benefits and responsibilities of citizens.") (citing *Burning Tree I*, 305 Md. at 70, 501 A.2d at 825) (emphasis added). In other words, the grant of child custody no longer could be based on pre-conceived notions, based solely on the parents' sex, concerning the care a certain parent was capable of providing.

Virtually every Maryland case applying Article 46 has dealt with situations where the distinction drawn by a particular governmental enaction or action singled-out for disparate

treatment men and women as discrete classes. *See, e.g.,*
*Turner v. State,* 299 Md. 565, 474 A.2d 1297 (1984) (invalidat-
ing a law that made it unlawful for any tavern, concert hall, or
other place of variety entertainment to employ female sitters,[23]
but which made no mention of males hired for the same
purpose); *Condore v. Prince George's Co.,* 289 Md. 516, 425
A.2d 1011 (1981) (determining that the aspect of the common
law of necessaries obligating a husband to provide for the
wife's necessities, regardless of the income of the parties,
unconstitutionally burdened an entire class of citizens based
on sex); *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980)
(holding unconstitutional the cause of action of criminal con-
versation [24] that, at common law, was available only to a man);
*Kerr v. Kerr,* 287 Md. 363, 412 A.2d 1001 (1980) (upholding
provision of Maryland Constitution providing for imprison-
ment for failure to pay child support because it applied equally
to men and women); *accord Hofmann v. Hofmann,* 50 Md.
App. 240, 437 A.2d 247 (1981) (rejecting an ex-husband's
argument that the award of alimony payments to his ex-wife
violated Article 46 on the basis that, unlike the payment of
necessaries, the statute governing the award of alimony is sex-
neutral such that either party to a marriage is entitled to an
award of alimony if appropriate under the circumstances of
the particular case).[25]

---

**23.** "Sitters" were individuals employed by a place of entertainment for
the purpose of generating sales by circulating amongst the patrons in
order to solicit them to purchase drinks or other items. *Turner v. State,*
299 Md. 565, 569, 474 A.2d 1297, 1298–99 (1984). In *Turner,* for
example, the proprietor of a tavern required female dancers employed
by the tavern to interact with patrons in order to "produce sales."
*Turner,* 299 Md. at 569, 474 A.2d at 1299.

**24.** "Criminal Conversation," at common law, was the act of adultery
committed by a married woman. *Kline v. Ansell,* 287 Md. 585, 586–87,
414 A.2d 929, 929 (1980). Criminal conversation was actionable by a
husband against the third party male who engaged in sexual inter-
course with the married woman. BLACK'S LAW DICTIONARY 402 (8th
ed.2004). Only a man could sue or be sued under the doctrine. *Kline,*
287 at 586–87, 414 A.2d at 929.

**25.** The trend of this line of precedent, as our judicial peers in Vermont
have indicated when similarly confronted, is consistent with the semi-

Based on our precedents interpreting Article 46, we conclude that the Legislature's and electorate's ultimate goal in putting in place the Maryland ERA was to put men and women on equal ground, and to subject to closer scrutiny any governmental action which singled out for disparate treatment men or women as discrete classes. As we stated in *Burning Tree I,*

> [t]he cases construing equal rights amendments share a common thread; they generally invalidate governmental action which imposes a burden on one sex but not the other, or grants a benefit to one but not the other. . . .

*Burning Tree I,* 305 Md. at 70, 501 A.2d at 825; *see also Burning Tree I,* 305 Md. at 65–66, 501 A.2d at 823–24 ("That the [ERA] is essentially limited in its scope to unequal treatment imposed by the law as between the sexes is clear from our cases.").[26] Unless the statute under scrutiny grants,

---

nal U.S. Supreme Court equal protection cases addressing classifications based on sex. *See Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864, 881 n. 13 (1999). In each of these landmark decisions, the U.S. Supreme Court struck down as unconstitutional statutes that differentiated between men and women as discrete classes for the purposes of unequal treatment between the sexes. *Id. See, e.g., United States v. Virginia,* 518 U.S. 515, 555–56, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (invalidating a Virginia statute excluding women from a "citizen-soldier" program offered at Virginia Military Institute); *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (holding unconstitutional a Mississippi University for Women admission policy denying the admission of an adult male to the nursing education program solely because of his sex); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (striking down an Oklahoma statute that allowed females to purchase 3.2% beer at the age of 18, while prohibiting males from purchasing the same until they reached 21); *Weinberger v. Wiesenfeld,* 419 U.S. 822, 95 S.Ct. 38, 42 L.Ed.2d 45 (1974) (declaring unconstitutional a federal statute providing that widows and divorced mothers, but not widowers, may collect social security benefits); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (nullifying federal statute that made it more difficult for the spouses of service-women to claim dependent status for purposes of quarters' allowance and medical benefits); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (rendering unconstitutional an Idaho statute that provided that, as between two or more persons equally qualified to be the administrator of an estate, males are preferred to females).

**26.** The dissent points out that a plurality of this Court in *Burning Tree I* rejected the "equal application" theory and attempts to label that

discredited theory as one espoused anew by the majority here. Judge Battaglia's Dissent, op. at 356–67, 932 A.2d at 654–61. Aside from the fact that the language quoted in the main text to this footnote was provided merely to synthesize the holdings of the multitude of Maryland cases cited previously in the majority opinion, the "separate but equal" approach, introduced by Chief Judge Murphy and rejected by a plurality of that Court in *Burning Tree I*, 305 Md. at 79, 501 A.2d at 830, is not the "equal application" theory grounding our analysis in the present case.

*Burning Tree I* concerned the constitutionality of a "primary purpose" qualification to an anti-discrimination provision upon which the receipt of preferential property tax assessments for private country clubs was based. The qualification provided that "[t]he provisions of the section [prohibiting discrimination on the basis of, among other characteristics,] sex shall not apply to any club whose facilities are operated with the primary purpose ... to serve or benefit members of a particular sex, nor to clubs which exclude certain sexes on certain days and at certain times." *Burning Tree I*, 305 Md. at 57–58, 501 A.2d at 819. In other words, Burning Tree Club, an all-male country club, could discriminate against women based solely on their sex, yet still enjoy the preferential treatment pursuant to the "primary purpose" exemption, so long as the exclusion of women was total. *Burning Tree I*, 305 Md. at 58–59, 501 A.2d at 819–20. The circuit court held that the primary purpose provision, although gender neutral by its language, was discriminatory in its effect.

In *Burning Tree I*, Chief Judge Murphy, writing for two others, espoused a so-called "separate but equal" approach, 305 Md. at 79, 501 A.2d at 830, which provided essentially that, "[u]nder its terms, the primary purpose provision is sex-neutral because it operates without regard to gender." *Burning Tree I*, 305 Md. at 71, 501 A.2d at 826. According to the Chief Judge, "the statute [did] no more than afford the tax benefit to all eligible private country clubs, whether comprised of all men, all women, or of mixed membership, in return for the club's agreement to preserve its open spaces in the public interest." *Id.* Because there was nothing in the statute to prohibit all-women clubs from forming and excluding all men from membership, while still enjoying the statute's protections, Chief Judge Murphy and his two colleagues felt that the statute did not implicate the ERA. *Burning Tree I*, 305 Md. at 78, 501 A.2d at 830 ("The mere fact that Burning Tree is the only club presently qualifying under the primary purpose provision does not of itself change a sex-neutral statute into a nefarious state sponsored scheme to invidiously discriminate against women solely on account of their sex. Needless to say, [the statute] did not cause there to be no all-female country clubs."). Chief Judge Murphy opined also that the State's acquiescence in the country club's discrimination did not amount to state action. *Burning Tree I*, 305 Md. at 76–77, 79, 501 A.2d at 828–29, 830. Recognizing, however, that his "separate but equal" approach was not going to command a majority of the Court, 305 Md. at 80, 501 A.2d at 830–31, Chief Judge Murphy opined that the primary purpose provision was not severable from the remainder of the anti-discrimination provision. *Burning Tree I*, 305 Md. at 81–84, 501 A.2d at 831–32.

Although Judge Rodowsky agreed with Chief Judge Murphy that the club's participation in the open space program did not, by itself, amount to state action, *Burning Tree I*, 305 Md. at 85, 501 A.2d at 833 (Rodowsky, J., concurring), he opined that the primary purpose provision itself was state action and violative facially of the ERA. *Burning Tree I*, 305 Md. at 85–86, 501 A.2d at 833 (Rodowsky, J., concurring). He wrote separately because, in his view, "the lead opinion ha[d] not identified, and responded directly to, [the plaintiffs'] argument that 'the primary purpose provision by its terms single[d] out for special exception from an otherwise uniformly applicable anti-discrimination measure private discrimination of a certain type-sex-and to a certain degree-total-which neither the State nor a private club receiving a tax exemption could otherwise practice.' " *Burning Tree I*, 305 Md. at 85, 501 A.2d at 833 (Rodowsky, J., concurring). In stating his view that the primary purpose provision would violate clearly on its face the ERA, Judge Rodowsky explained that, "in application, the provision will always be applied to a particular sex, the one excluded by a given, participating club. In all of the cases previously decided by this Court in which a rule of common law or a statute was invalidated under the E.R.A. the rule or statute itself isolated one sex and specified either males or females for different burdens or benefits." *Burning Tree I*, 305 Md. at 87, 501 A.2d at 834 (Rodowsky, J., concurring). Thus, "in the context of sex discrimination, only one sex will be the object of discrimination." *Id.* In rejecting the "separate but equal" approach presented by the Chief Judge, Judge Rodowsky concluded that "[i]t is not an answer . . . to say that at the elevated level of the statewide open space program, the program . . . is neutral with respect to sex, in the sense that an all female or an all male country club is eligible to participate. The ostensible prohibition against sex discrimination applies to each individual country club participating in the open space program." *Id.* Judge Rodowsky agreed that the primary purpose provision was not severable from the anti-discrimination provision. *Burning Tree I*, 305 Md. at 88, 501 A.2d at 835 (Rodowsky, J., concurring).

Judge Eldridge, writing for himself and two other judges, disagreed completely with Chief Judge Murphy, opining that, "[i]f the views set forth in [the "majority's"] opinion were in the future to be adopted by a majority of this Court, the effectiveness of the [E.R.A.] to the Maryland Constitution would be substantially impaired." *Burning Tree I*, 305 Md. at 89, 501 A.2d at 835 (Eldridge, J., concurring in part, dissenting in part). Judge Eldridge took issue specifically with what he deemed to be the majority's "separate but equal" approach that the "primary purpose" provision " '[did] not apportion or distribute benefits or burdens unequally among the sexes' and ma[d]e[ ] the statutory 'benefit available to all single sex country clubs agreeing to participate in the State's open space program.' " *Burning Tree I*, 305 Md. at 90–91, 501 A.2d at 836 (Eldridge, J., concurring in part, dissenting in part). Judge Eldridge criticized additionally Chief Judge Murphy's opinion that "the express sanctioning of single sex clubs [did not] impos[e] a burden upon the excluded sex, as long as the governmental action in theory equally sanction[ed] discrimination by single sex facilities against persons of the other sex." *Burning Tree I*, 305 Md. at 95, 501 A.2d at 838

(Eldridge, J., concurring in part, dissenting in part). Instead, Judge Eldridge opined that the ERA should be construed broadly "in accordance with its language and purpose," cataloging several cases that, as we have stated in the majority opinion in the present case, dealt expressly with situations where the line was drawn clearly between men and women in terms of the burdens imposed and benefits conferred upon them. *Burning Tree I*, 305 Md. at 89, 501 A.2d at 835 (Eldridge, J., concurring in part, dissenting in part) (discussing *Kuhn, Rand, Condore, Kline*, and cases from other jurisdictions of similar import). Judge Eldridge found fault further in Chief Judge Murphy's "separate but equal" theory, based on the fact that, in his opinion, "[w]hile it is true that many of our prior cases have involved government action directly imposing a burden or conferring a benefit entirely upon either males or females, we have never held that the [ERA] is narrowly limited to such situations." Judge Eldridge determined finally that the primary purpose provision was severable from the anti-discrimination provision, *Burning Tree I*, 305 Md. at 102, 501 A.2d at 842.

The end result was a four member majority of concurring judges that the primary purpose provision constituted state action violative of the ERA. Because Chief Judge Murphy, joined by two other judges and Judge Rodowsky, were of the opinion that the primary purpose provision was not severable from the remainder of the anti-discrimination provision, the entire provision was invalidated.

Despite the dissent's attempts here to turn Judge Eldridge's opinion into something it is not, the "narrow interpretation," to which Judge Eldridge referred, pertained to Chief Judge Murphy's proposed construction of the ERA requiring language of the challenged statute to single out, in express gender-specific terms, either "males" or "females." Judge Eldridge's argument, in essence, was that, merely because the "primary purpose" provision did not refer either to "males" or "females" in gender-specific terms, that did not save the statute when it sanctioned total discrimination of one sex by members of the opposite sex. *Burning Tree I*, 305 Md. at 98–99, 501 A.2d at 835 (Eldridge, J., concurring in part, dissenting in part) ("The principal classification implicating the E.R.A. arises from the language authorizing clubs, totally segregated on the basis of sex, to maintain their discriminatory practices and, at the same time, to continue receiving significant state benefit. On the other hand, sexually integrated country clubs are generally precluded from discriminating on the basis of sex.").

In sum, the opinions of Judges Eldridge and Rodowsky, which ultimately represented a plurality opinion of this Court, that the "primary purpose" provision was violative of the ERA, *Burning Tree I*, 305 Md. at 91 n. 5, 501 A.2d at 836 n. 5 ("In effect, the Court's entire mandate in this case reflects the conclusions of only one member, Judge Rodowsky.") (Eldridge, J., concurring in part, dissenting in part), was based on the fact that the statute allowed a club, whether comprised of all males or all females, to exclude all members of the opposite sex while still enjoying deferred assessments for the purposes of real estate taxation. Chief Judge Murphy's "separate but equal" approach to interpreting the ERA, rejected by the plurality in *Burning*

either on its face or in application,[27] rights to men or women as a class, to the exclusion of an entire subsection of similarly situated members of the opposite sex, the provisions of the ERA are not implicated and the statutory classification under review is subjected to rational basis scrutiny, unless there exists some other reason to apply heightened scrutiny.

Turning to the language of Family Law § 2–201, it becomes clear that, in light of the aforementioned purpose of the ERA, the marriage statute does not discriminate on the basis of sex in violation of Article 46. The limitations on marriage effected by Family Law § 2–201 do not separate men and women into discrete classes for the purpose of granting to one class of persons benefits at the expense of the other class. Nor does the statute, facially or in its application, place men and women on an uneven playing field. Rather, the statute prohibits equally both men and women from the same conduct. A legislative enactment "should be construed according to the ordinary and natural import of the language used without resorting to subtle or forced interpretations for the purpose of limiting or extending its operation." *Massage Parlors, Inc. v. Mayor & City Council of Balt.*, 284 Md. 490, 494, 398 A.2d 52, 55 (1979) (quoting *Burch v. State*, 278 Md. 426, 429, 365 A.2d 577 (1976)). To accept Appellees' contention that Family Law § 2–201 discriminates on the basis of sex would be to extend the reach of the ERA beyond the scope intended by the Maryland General Assembly and the

---

*Tree I*, differs substantially from the "equal application" theory relied on by the majority of the Court in the present case. While the plurality in *Burning Tree I* determined that a statute was violative of the ERA when it allowed, albeit in gender-neutral terms, the exclusion of the entire opposite sex by a uniform-gender club, we deal here with a statute that in no way singles out an entire group of persons based on sex. The "equal application" theory proposed here is not inconsistent with the plurality in *Burning Tree I*.

27. *Burning Tree I*, 305 Md. at 100, 501 A.2d at 841 (Eldridge, J., concurring in part and dissenting in part) ("Even when a statute is not facially discriminatory, or does not expressly draw or recognize a suspect classification, an inquiry into the actual facts, to determine the existence of a discriminatory purpose and impact, is appropriate.") (citations omitted).

State's voters who enacted and ratified, respectively, the amendment. In other words, it "stretch[es] the concept of gender discrimination to assert that [the marriage statute] applies to treatment of same-sex couples differently from opposite-sex couples." *Dean v. Dist. of Columbia,* 653 A.2d 307, 363 n. 2 (D.C.1995) (Steadman, J., concurring).

### C. *Interpretations Given Equal Rights Amendments By Other Jurisdictions In Similar Situations.*

Perhaps most persuasive here is the growing body of case law from foreign jurisdictions flatly rejecting the argument that statutes that limit marriage to unions between a man and woman discriminate impermissibly on the basis of sex. *Rand,* 280 Md. at 512, 374 A.2d at 903 ("Cases from other state jurisdictions interpreting the breadth and meaning of their equal rights amendments are instructive in ascertaining the reach of Maryland's [ERA].").

The Court of Appeals of Washington, in *Singer v. Hara,* 11 Wash.App. 247, 522 P.2d 1187 (1974), was one of the first appellate courts to weigh-in on same-sex marriage in light of the then-newly promulgated ERA. There, the court held that

[p]rior to adoption of the ERA, the proposition that women were to be accorded a position in the law inferior to that of men had a long history. Thus, in that context, the purpose of the ERA is to provide the legal protection, as between men and women, that apparently is missing from the state and federal Bills of Rights, and it is in light of that purpose that the language of the ERA must be construed. To accept the [same-sex couples'] contention that the ERA must be interpreted to prohibit statutes which refuse to permit same-sex marriages would be to subvert the purpose for which the ERA was enacted by expanding its scope beyond that which was undoubtedly intended by the majority of the citizens of this state who voted for the amendment.

*Singer,* 522 P.2d at 1194. The majority of federal and state courts called on to consider analogous legal challenges since then have disposed of equal rights challenges in a similar

manner. *See, e.g., In re Kandu,* 315 B.R. 123 (Bankr. W.D.Wash.2004) (upholding the constitutionality of the federal Defense of Marriage Act (DOMA) and stating, "[t]here is no evidence, from the voluminous legislative history or otherwise, that DOMA's purpose is to discriminate against men or women as a class. Accordingly, the marriage definition contained in DOMA does not classify according to gender. . . ."); *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 6 (2006) ("By limiting marriage to opposite-sex couples, [the State] is not engaging in sex discrimination. The limitation does not put men and women in different classes, and give one class a benefit not given to the other. Women and Men are treated alike-they are permitted to marry people of the opposite sex, but not people of their own sex."); *Andersen v. King Co.,* 158 Wash.2d 1, 138 P.3d 963, 987–89 (2006) (holding that the state DOMA does not discriminate on the basis of sex and cataloging the various cases from other jurisdictions interpreting their own equal rights amendments); *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185, 186–87 (1971); *but see Brause v. Bureau of Vital Statistics,* No. 3AN–95–6562 CI, 1998 WL 88743, at *6 (Alaska Super.Ct. 27 February 1998), *superceded by* ALASKA. CONST. art. I, § 25 (amended 1999); *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, 64 (1993) (plurality opinion) (determining that same-sex marriage statute drew a sex-based classification), *abrogated by* 1997 HAW. SESS. LAW H.B. 117 § 2, at 1247 ("The Legislature shall have power to reserve marriage to opposite-sex couples.").

The Supreme Court of Vermont, in *Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864 (1999), despite holding unconstitutional the exclusion of same-sex couples from the various benefits and protections that accompany marriage, rejected the argument that a statute limiting marriages to those between a man and woman constitutes sex-based discrimination. As the Vermont court stated, "[t]he difficulty here is that the marriage laws are facially neutral; they do not single out men or women as a class for disparate treatment, but rather prohibit men and women equally from marrying a person of the same sex." *Baker,* 744 A.2d at 881 n. 13. Because there is no "discrete

class subject to differential treatment," according to the court's analysis, the prohibition on same-sex marriage did not draw a sex-based classification.

### D. Individuality of Rights Argument Presented by Appellees

Appellees counter the "equal application theory" by stating that the proper inquiry in this case is not whether Family Law § 2–201 singles out one sex or the other as a discrete class for disparate treatment. Rather, because constitutional rights are individual rights, the same-sex couples posit that this Court should examine how the legislative enactment affects individually each person seeking to marry. Appellees rely principally in support of this argument on *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the landmark U.S. Supreme Court equal protection case in which the Court held unconstitutional a Virginia miscegenation statute despite the fact that the statute "punish[ed] equally both the white and the Negro participants in an interracial marriage." [28] *Loving*, 388 U.S. at 8, 11–12, 87 S.Ct. at 1822, 1823,

---

**28.** Appellees rely additionally upon other cases containing reasoning similar to that in *Loving*. *See, e.g., McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (rendering unconstitutional a statute that made criminal the co-habitation between an African American and Caucasian person); *Perez v. Lippold*, 32 Cal.2d 711, 198 P.2d 17 (1948) (striking down California statute that prohibited interracial marriage).

Still other cases cited by Appellees, such as *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), clearly are distinguishable from the present case. In *Shelley*, the issue was whether a restrictive covenant prohibiting "persons of color" from real property ownership was violative of the Fourteenth Amendment to the U.S. Constitution. 334 U.S. at 4, 68 S.Ct. at 838, 92 L.Ed. 1161. Even though the defendants in that case argued that the covenant was applicable to members of all races (because the Court in previous cases was prepared to enforce similar restrictive covenants applicable to African Americans and Caucasians), *Shelley*, 334 U.S. at 21–22, 68 S.Ct. at 846, 92 L.Ed. 1161, the Court found no merit in the argument. We fail to see how a statute that so patently discriminated on the basis of race sheds any light on the present case.

Reliance upon *Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979) is likewise misplaced. In that case, the Supreme

18 L.Ed.2d 1010; *see also McLaughlin v. Florida*, 379 U.S. 184, 188, 85 S.Ct. 283, 286, 13 L.Ed.2d 222 (1964). The analogy to the present case is inapt.

 We must concede at the outset that the mere equal application of a statute does not shield automatically a discriminatory statute from constitutional review under either the Equal Protection Clause of the Fourteenth Amendment, the equal protection provisions embodied in Article 24 of the Maryland Declaration of Rights,[29] or the ERA. *See McLaughlin*, 379 U.S. at 191, 85 S.Ct. at 288, 13 L.Ed.2d 222; *Loving*, 388 U.S. at 8, 87 S.Ct. at 1822, 18 L.Ed.2d 1010. By the same token, however, a statute does not become unconstitutional

---

Court struck down a federal statute that provided benefits to families whose fathers had become unemployed, but denied those same benefits where the mothers lost their jobs. *Califano*, 443 U.S. at 79, 99 S.Ct. at 2657–58, 61 L.Ed.2d 382. In other words, the statute put an express sex qualification on the receipt of familial benefits. *Califano*, 443 U.S. at 79, 99 S.Ct. at 2658, 61 L.Ed.2d 382. The argument made in support of the statute was that, although it contained an express sex classification, it did not discriminate against women as a class because the entire family was impacted. *Califano*, 443 U.S. at 83–84, 99 S.Ct. at 2660–61, 61 L.Ed.2d 382. Although the Court rejected this argument, it did so on the basis that the statute was

> part of the "baggage of sexual stereotypes," *Orr v. Orr*, [440 U.S. 268, 283, 99 S.Ct. 1102, 1113], 59 L.Ed.2d 306 [(1979)], that presumes the father has the "primary responsibility to provide a home and its essentials," *Stanton v. Stanton*, 421 U.S. 7, 10, 95 S.Ct. 1373, 1376, 43 L.Ed.2d 688 (1975), while the mother is the " 'center of home and family life.' " *Taylor v. Louisiana*, 419 U.S. 522, 534 n. 15, 95 S.Ct. 692, 699 n. 15, 42 L.Ed.2d 690 (1975).

*Califano*, 443 U.S. at 89, 99 S.Ct. at 2663, 61 L.Ed.2d 382. The distinction drawn by Family Law § 2–201 in the present case is not based on this sort of archaic stereotyping, and is therefore distinguishable from the federal statute at issue in *Califano*.

Appellees cite additionally *Giffin* and *Burning Tree I* in support of their argument. For the reasons stated earlier in this opinion, those cases also are distinguishable from the case at bar.

**29.** *See, e.g., Neifert v. Dep't of Env't*, 395 Md. 486, 504, 910 A.2d 1100, 1111 (2006) ("Although Article 24 does not contain an express equal protection clause, this Court has held that the concept of equal protection is embodied within the Article."); *Frankel v. Bd. of Regents*, 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000) (internal citations omitted); *Governor v. Exxon Corp.*, 279 Md. 410, 438 n. 8, 370 A.2d 1102, 1118 n. 8 (1977), *aff'd*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

simply because, in some manner, it makes reference to race or sex. *See Massage Parlors, Inc. v. Mayor & City Council of Balt.,* 284 Md. 490, 398 A.2d 52 (1979) (upholding the constitutionality, pursuant to Article 46, of a Baltimore City ordinance that prohibited massage parlors from providing treatment simultaneously to persons of the opposite sex in the same room, but declining to reach on procedural grounds a separate challenge to the constitutionality of a regulation promulgated pursuant to the ordinance that allegedly prohibited heterosexual massages as between the masseuse/masseur and client).

In *Loving,* the issue before the Court was the constitutionality of a Virginia statutory scheme prohibiting marriage between non-Caucasians and Caucasians, and providing for criminal penalties for violations. In support of the statute, the State of Virginia argued that, even though reference was made to race in determining who was entitled to marry, it punished equally both participants in the interracial marriage. *Loving,* 388 U.S. at 8, 87 S.Ct. at 1821, 18 L.Ed.2d 1010. The Supreme Court was able to see beyond the superficial neutrality of the legislative enactment, however, and determined that "[t]he fact that Virginia prohibits only interracial marriages involving white persons demonstrates that the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy." *Loving,* 388 U.S. at 11, 87 S.Ct. at 1823, 18 L.Ed.2d 1010. Thus, the Court in *Loving* determined that, although the statute applied on its face equally to all races, the underlying purpose was to sustain White Supremacy and to subordinate African–Americans and other non-Caucasians as a class. The reasoning behind this conclusion was based, at least in part, on the fact that "[w]hile Virginia prohibits whites from marrying any nonwhite . . . , Negroes, Orientals, and any other racial class may intermarry without statutory interference." *Loving,* 388 U.S. at 11 n. 11, 87 S.Ct. at 1823 n. 11, 18 L.Ed.2d 1010.[30]

---

**30.** Although the Supreme Court in *McLaughlin* did not hold expressly that the latent purpose behind the cohabitation statute at issue was

"The test to evaluate whether a facially gender-neutral statute discriminates on the basis of sex is whether the law 'can be traced to a discriminatory purpose.'" *Baker*, 744 A.2d at 880 n. 13 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)). And while "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States," *Loving*, 388 U.S. at 11, 87 S.Ct. at 1823, 18 L.Ed.2d 1010, the primary purpose behind Article 46 is to frustrate state action that separates men and women into discrete classes for disparate treatment as between the sexes. Absent some showing that Family Law § 2–201 was "designed to subordinate either men to women or women to men as a class," *Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 11 ("This is not the kind of sham equality that the Supreme Court confronted in *Loving;* the statute there ... was in substance anti-black legislation."), we find the analogy to *Loving* inapposite. *See also, e.g., Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185, 187 (1971) (determining that "Virginia's antimiscegenation statute, prohibiting interracial marriages, was invalidated solely on the grounds of its patent racial discrimination."). Because there is no evidence in the record before us that the Legislature intended with Family Law § 2–201 to differentiate between men and women as classes on the basis of some misconception regarding gender roles in our society, we conclude that the ERA does not mandate that the State recognize same-sex marriage based on the analogy to *Loving. See In re Kandu*, 315 B.R. 123, 143 (Bankr.W.D.Wash.2004) ("There is no evidence, from the voluminous legislative history or otherwise, that DOMA's

---

based on White Supremacy, the reasoning in that case is exceedingly similar to that employed in *Loving*. The Court held that

[b]ecause the section applies only to a white person and a Negro who commit the specified acts and because no couple other than one made up of a white and a Negro is subject to conviction upon proof of the elements comprising the offense it proscribes, we hold [the statute] invalid as a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment.

*McLaughlin*, 379 U.S. at 184, 85 S.Ct. at 284, 13 L.Ed.2d 222.

purpose is to discriminate against men or women as a class."); *Andersen*, 138 P.3d at 989; *Baker v. Vermont*, 744 A.2d at 880 n. 13 (concluding that the evidence on the record before the court did not "demonstrate that the authors of the marriage laws excluded same-sex couples because of incorrect and discriminatory assumptions about gender roles or anxiety about gender-role confusion"); *Singer v. Hara*, 11 Wash.App. 247, 522 P.2d 1187, 1191–92 (1974) ("[There] is no analogous sexual classification involved in the instant case because appellants are not being denied entry into the marriage relationship because of their sex; rather, they are being denied entry into the marriage relationship because of the recognized definition of that relationship as one that may be entered into only by two persons who are members of the opposite sex."), *review denied*, 84 Wash.2d 1008 (1974).[31]

## II. Standards of Constitutional Review for Article 24 Challenges based on the Concepts of Substantive Due Process and Equal Protection.

In addition to Appellees' claim that Family Law § 2–201 discriminates on the basis of sex in violation of Article 46, the same-sex couples seeking to marry challenged Family Law § 2–201 as violative of Article 24 of the Maryland Declaration of Rights.[32] Appellees' Article 24 challenge has three facets: (1) Family Law § 2–201 should be subject to strict scrutiny under principles of equal protection[33] because it

---

**31.** Judge Raker, in her Concurring and Dissenting Opinion, apparently concurs with the foregoing analysis and conclusion that the Maryland statute is not violative of Article 46 (the Equal Rights Amendment) of the Maryland Declaration of Rights.

**32.** Article 24 of the Declaration of Rights provides

[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

**33.** As *delineated* previously, there is no *express equal protection* provision found within Article 24. Article 24 "embodies[, however,] the concept of equal protection of the laws to the same extent as the Equal

discriminates on the basis of sexual orientation, a classification that the Appellees claim is suspect or quasi-suspect; (2) Article 24 mandates that strict scrutiny be applied to Family Law § 2–201 because the statute prevents same-sex couples from exercising their fundamental rights to marry while allowing, at the same time, opposite-sex couples to do so; and (3) the statute burdens unconstitutionally the exercise of the same-sex couples' fundamental due process rights to marry.

Before proceeding, we pause to reiterate the three levels of constitutional scrutiny employed in our jurisprudence when a legislative enactment is challenged under either the due process or equal protection concepts embedded in Article 24. As we explained in *Waldron*, "[t]he top tier of [constitutional] review contemplates that when a statute creates a distinction based upon clearly 'suspect'[34] criteria, or when that enactment infringes upon personal rights or interests deemed to be 'fundamental,' then the legislative product must withstand a rigorous, 'strict scrutiny.'" 289 Md. at 705–06, 426 A.2d at 941; *Hornbeck*, 295 Md. at 641, 458 A.2d at 781;

---

Protection Clause of the Fourteenth Amendment." *Murphy*, 325 Md. at 353–54, 601 A.2d at 107–08 (citations omitted); *Neifert v. Dep't of Env't*, 395 Md. 486, 504, 910 A.2d 1100, 1111 (2006); *Frankel v. Bd. of Regents*, 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000) (internal citations omitted); *Bd. of Supervisors of Elections of Prince George's County v. Goodsell*, 284 Md. 279, 293 n. 7, 396 A.2d 1033, 1040 n. 7 (1979); *U.S. Mortgage Co. v. Matthews*, 167 Md. 383, 395, 173 A. 903, 909 (1934), *rev'd on other grounds*, 293 U.S. 232, 55 S.Ct. 168, 79 L.Ed. 299 (1934) (determining that Article 24 should be construed at least to the extent of the Fourteenth Amendment). Thus, even though the Fourteenth Amendment and Article 24 are independent of each other and capable of being interpreted differently, U.S. Supreme Court cases construing the Fourteenth Amendment are highly persuasive with regard to our interpretation of Article 24. *Murphy*, 325 Md. at 354, 601 A.2d at 108; *Waldron*, 289 Md. at 705, 426 A.2d at 941 (citations omitted); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 640, 458 A.2d 758, 781 ("[D]ecisions of the Supreme Court interpreting the Equal Protection Clause of the federal constitution are persuasive authority....").

**34.** The criteria by which we determine whether a statute draws a "suspect classification" or infringes on a "fundamental" right are discussed *infra*.

*Wheeler v. State*, 281 Md. 593, 601, 380 A.2d 1052, 1057 (1977) ("Equal protection analysis requires strict scrutiny of a legislative classification when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."). When utilizing this most-demanding standard of constitutional review, we deem unconstitutional a challenged legislative classification unless the distinction formed by it is "necessary to promote a compelling governmental interest." *Hornbeck*, 295 Md. at 641, 458 A.2d at 781; *Goodsell*, 284 Md. at 286, 396 A.2d at 1037 (quoting *Wheeler*, 281 Md. at 601, 380 A.2d at 1057); *see also City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). In other words, the statute must be justified by a compelling state interest, and drawn sufficiently narrowly that it is the least restrictive means for accomplishing that end. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 16–17, 93 S.Ct. 1278, 1287–88, 36 L.Ed.2d 16 (1973). To no one's great surprise, classifications subject to strict scrutiny rarely survive the legal glare. *Hargrove v. Bd. of Trustees of Md. Retirement Sys.*, 310 Md. 406, 428, 529 A.2d 1372, 1383 (1987) (explaining that the constitutionality of a particular classification often depends on the level of review under which it is analyzed because a statute subject to strict scrutiny is "nearly always struck down under an analysis that [has historically been] 'strict in theory and fatal in fact' ") (quoting *Waldron*, 289 Md. at 707–08, 426 A.2d at 942 (citations omitted)); *see also Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 317–27, 96 S.Ct. 2562, 2568–73, 49 L.Ed.2d 520 (1976) (Marshall, J. Dissenting).

 In contrast, we generally employ the least exacting and most deferential standard of constitutional review when the legislative action under review neither interferes significantly[35] with a fundamental right nor implicates a sus-

---

**35.** For an in-depth discussion of whether a particular statute interferes "significantly" with a fundamental right, *see Koshko v. Haining*, 398

pect classification. Under this "rational basis" level of scrutiny, the classification will pass constitutional muster so long as it is "rationally related to a legitimate governmental interest." *Murphy,* 325 Md. at 355–56, 601 A.2d at 108; [36] *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."). In other words, we will uphold the statute under rational basis review "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational." *Id.* (citations omitted). Statutes reviewed pursuant to this level of scrutiny are presumed constitutional, "and will be invalidated only if the classification is clearly arbitrary." *Murphy,* 325 Md. at 356, 601 A.2d at 108; *Whiting–Turner Contracting Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985) (holding that a statute reviewed under the "rational basis" test "enjoys a strong presumption of constitutionality, [and] can be invalidated only if the classification is without any reasonable basis and is purely arbitrary"); *Waldron,* 289 Md. at 707, 426 A.2d at 942 (holding that a statute will be upheld generally unless the classification is "wholly irrelevant to the achievement of the

---

Md. 404, 431–38, 921 A.2d 171, 186–91 (2007) (holding that the Maryland grandparent visitation statute worked a "direct and substantial interference" upon parental rights with respect to the court-ordered visitation with their children by the grandparents). *See also Hornbeck,* 295 Md. at 653, 458 A.2d at 788 (holding that "the heightened review test is not applicable in [that] case, because ... there has been no *significant interference* with, infringement upon, or deprivation of the underlying right to take advantage of a [right to education]") (emphasis added).

**36.** Although this Court has articulated over the years several derivations of the "rational basis" titling of this standard, the application of the constitutional standard has been the same across all derivations.

State's objective") (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961) and *McDonald v. Bd. of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969)). "[A] classification [subject to rational basis review] having some reasonable basis need not be made with mathematical nicety and may result in some inequality" so long as the state can produce any conceivable "state of facts" to justify the distinction. *Whiting–Turner,* 304 Md. at 352, 499 A.2d at 185; *City of New Orleans,* 427 U.S. at 303, 96 S.Ct. at 2517, 49 L.Ed.2d 511 ("[R]ational distinctions may be made with substantially less than mathematical exactitude."); *Baker v. Nelson,* 191 N.W.2d at 187 ("'Abstract symmetry' is not demanded by the Fourteenth Amendment."). A statute subject to rational review often passes constitutional muster. *Hargrove,* 310 Md. at 428, 529 A.2d at 1383 (explaining that legislation subject to rational basis review almost always has received "minimal scrutiny in theory and virtually none in fact") (quoting *Waldron,* 289 Md. at 707–08, 426 A.2d at 942 (citations omitted)).

 A third level of review has arisen to leaven the rigid two-tiered constitutional framework by which courts review the constitutionality of government action. *See Waldron,* 289 Md. at 708–10, 426 A.2d at 942–44. A "heightened" level of scrutiny, otherwise known as "intermediate scrutiny," is triggered when the challenged action creates a classification "which ha[s] been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which ha[s] not [yet] been deemed to involve suspect classes or fundamental rights." *Murphy,* 325 Md. at 357–60, 601 A.2d at 109–11 (explaining the Supreme Court's evolving application of "heightened scrutiny" or "rational basis with bite" to certain "intermediate" classifications);[37] *Hargrove,* 310 Md. at 428,

---

**37.** As explained in *Murphy,* 325 Md. at 358–60, 601 A.2d at 109–10, the Supreme Court described these intermediate classifications in various ways over the years, ranging from subjecting the statute to "heightened scrutiny," *see Plyler v. Doe,* 457 U.S. 202, 218 n. 16, 102 S.Ct. 2382, 2395 n. 16, 72 L.Ed.2d 786 (1982); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976); *Mississippi University for*

529 A.2d at 1383 (explaining the evolution of the traditional two-tiered approach into the current three-tiered constitutional framework); *Waldron,* 289 Md. at 709–11, 426 A.2d at 943–44 (explaining the Supreme Court's treatment of sex-based classifications as "an active review of legislation not implicating rights previously determined to be 'fundamental' or involving classifications held to be 'suspect.' ").[38] This middle-tier scrutiny may be implicated to review a "quasi-suspect" classification. *City of Cleburne,* 473 U.S. at 440–42, 105 S.Ct. at 3254–55, 87 L.Ed.2d 313. In order to survive this intermediate level of scrutiny, the statute in question "must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Murphy,* 325 Md. at 358, 601 A.2d at 110 (quoting *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976)); *Thomas v. Dep't of Labor, Licensing, & Regulation,* 170 Md.App. 650, 668–69, 908 A.2d 99, 109–10 (2006).

---

*Women v. Hogan,* 458 U.S. 718, 723, 102 S.Ct. 3331, 3335, 73 L.Ed.2d 1090 (1982), to application of "rational basis with bite." *See, e.g., City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). *See also* D. Stewart, *A Growing Equal Protection Clause?,* 71 A.B.A. J. (October) 108, 112 (1985) (quoting Victor Rosenblum, G. Pettinga, *Rational Basis With Bite: Intermediate Scrutiny by Any Other Name,* 62 IND. L.J. 779 (1987)). Although referred to by different names and employing differently phrased levels of constitutional review, the practical differences between the two appear slight.

**38.** Maryland, in light of the ERA, applies a strict scrutiny standard to statutes carving classifications based on sex whereas the Supreme Court applies intermediate scrutiny to sex-based governmental action. There are other areas, however, to which the Supreme Court has applied this intermediate level of scrutiny. Those specific areas triggering heightened scrutiny will be discussed *infra.*

### III. Equal Protection under Article 24 of the Declaration of Rights

*A. A Statute That Discriminates on the Basis of Sexual Orientation Does Not Trigger Strict or Heightened Scrutiny.*

■ While Family Law § 2–201 does not draw a distinction based on sex, the legislation does differentiate implicitly on the basis of sexual preference. "Those who prefer relationships with people of the opposite sex and those who prefer relationships with people of the same sex are not treated alike, since only opposite-sex relationships may gain the status and benefits associated with marriage." *Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 11. *See Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("While it is true that the law [making it criminal for two consenting adults to engage in homosexual sodomy in the privacy of their own home] applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the statute] is targeted at more than conduct. It is instead directed toward gay persons as a class.") (O'Connor, J., concurring). That Family Law § 2–201 draws a distinction based on sexual orientation is undisputed. The actual controversy here, therefore, is what level of constitutional scrutiny should be applied to a statute that treats citizens differently on that basis (i.e., whether sexual orientation constitutes a suspect or quasi-suspect class, thereby triggering one of the heightened levels of scrutiny iterated above). *Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 11. We find that sexual orientation is neither a suspect nor quasi-suspect class, and Family Law § 2–201 therefore is subject to rational basis review. We explain.

■ There is no brightline diagnostic, annunciated by either this Court or the U.S. Supreme Court, by which a suspect or quasi-suspect class may be recognized readily. There are, however, several indicia of suspect or quasi-suspect classes that have been used in Supreme Court cases to determine whether a legislative classification warrants a more exacting constitutional analysis than that provided by rational

**278**

basis review. These factors include: (1) whether the group of people disadvantaged by a statute display a readily-recognizable, "obvious, immutable, or distinguishing characteristics ..."[39] that define the group as a "discrete and insular minorit[y];"[40] (2) whether the impacted group is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process;"[41] and (3) whether the class of people singled out is "subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities [to contribute meaningfully to society]."[42] We have

---

**39.** *Lyng v. Castillo*, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986); *Frontiero*, 411 U.S. at 686, 93 S.Ct. at 1770, 36 L.Ed.2d 583 ("[S]ince sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility ....'") (quoting *Weber v. Aetna Cas. & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1407, 31 L.Ed.2d 768 (1972)); *see also* Janet E. Halley, *Sexual Orientation and the Politics of Biology: A Critique of the Argument from Immutability*, 46 STAN. L.REV. 503, 507, 507 n. 11 (1994) ("[I]mmutability is not a requirement but a *factor.*") (citing *Bowen v. Gilliard*, 483 U.S. 587, 602–03, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987)); *Lyng*, 477 U.S. at 638, 106 S.Ct. at 2729, 91 L.Ed.2d 527).

**40.** *United States v. Carolene Prod. Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938); *see also Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976); *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Graham v. Richardson*, 403 U.S. 365, 371–72, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971).

**41.** *Mass. Bd. of Retirement*, 427 U.S. at 313, 96 S.Ct. at 2567, 49 L.Ed.2d 520 (quoting *San Antonio School District*, 411 U.S. at 28, 93 S.Ct. at 1294, 36 L.Ed.2d 16).

**42.** *Mass. Bd. of Retirement*, 427 U.S. at 313, 96 S.Ct. at 2567, 49 L.Ed.2d 520; *Frontiero*, 411 U.S. at 686, 93 S.Ct. at 1770, 36 L.Ed.2d 583 (determining that sex-based classifications trigger heightened scrutiny, and that "the sex characteristic frequently bears no relation to ability to perform or contribute to society"). Even though Article 46 mandates that we apply strict scrutiny to gender-based classifications,

identified a similar, although not as comprehensive, set of criteria by which we may analyze allegedly new suspect classes. *Waldron,* 289 Md. at 706, 426 A.2d at 941–42 (describing a suspect class as "a category of people who have 'experienced a history of purposeful unequal treatment' or been 'subjected to unique disabilities on the basis of stereotypical characteristics not truly indicative of their abilities.' ") (*quoting Mass. Bd. of Retirement,* 427 U.S. at 313, 96 S.Ct. at 2566, 49 L.Ed.2d 520). Because Article 24 is construed at least to the same extent as the Fourteenth Amendment, *Murphy,* 325 Md. at 354, 601 A.2d at 108; *Waldron,* 289 Md. at 705, 426 A.2d at 941 (citations omitted); *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. at 640, 458 A.2d at 781, we find useful in our analysis those additional criteria used by the Supreme Court in assessing claims of a new suspect or quasi-suspect classification.

Although the Supreme Court has characterized repeatedly as suspect classes distinctions based on race,[43] alienage,[44] and national origin,[45] the Court has not addressed expressly whether sexual orientation is considered suspect, thereby implicating strict or heightened scrutiny. *See Romer v. Evans,* 517 U.S. 620, 631–32, 116 S.Ct. 1620, 1627–28, 134 L.Ed.2d 855 (1996) (stating that "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end," and invalidating the statute at issue under rational basis review); *In re Kandu,* 315 B.R. at 144 (explaining that the Supreme Court, in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), did not address

this factor nonetheless is useful in determining whether a particular classification warrants heightened scrutiny.

**43.** *E.g., Loving,* 388 U.S. at 11, 87 S.Ct. at 1823.

**44.** *Graham,* 403 U.S. at 372, 91 S.Ct. at 1852, 29 L.Ed.2d 534.

**45.** *Oyama v. California,* 332 U.S. 633, 644–46, 68 S.Ct. 269, 274–75, 92 L.Ed. 249 (1948); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944).

whether the Texas statute making it a crime to engage in consensual same-sex intimate conduct drew a suspect or quasi-suspect classification, but rather invalidated the Texas statute on the basis that it did not reasonably further a legitimate government interest); *Andersen*, 138 P.3d at 976 (same). The closest any Justice has come to suggesting a view on the issue is found in *Rowland v. Mad River Local School Dist.*, 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1376–77, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from the denial of *certiorari* ), where Justice Brennan stated in his dissent to the denial of *certiorari* that "homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely ... to reflect deep-seated prejudice rather than ... rationality."

The majority of other courts, both federal and state, that have addressed the issue hold that gay, lesbian, and bisexual persons neither are members of suspect nor quasi-suspect classifications. *See, e.g., Selland v. Perry*, 905 F.Supp. 260 (D.Md.1995), *aff'd*, 100 F.3d 950 (4th Cir.1996) (applying Maryland law in order to uphold the constitutionality of the military's "Don't Ask, Don't Tell" provisions regarding homosexuality, and determining that equal protection does not mandate strict scrutiny); *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 573 (9th Cir.1990) ("[H]omosexuals are not a suspect or quasi-suspect classification."); *In re Kandu*, 315 B.R. at 143–44 (following the Ninth Circuit's decision in *High Tech Gays,* and determining that the *Lawrence* Court, while "indicating a shift in the Supreme Court's treatment of same-sex couples," did not declare same-sex couples a suspect or quasi-suspect class for the purposes of equal protection analysis) (quoting *Lawrence*, 539 U.S. at 579–81, 123 S.Ct. at 2485, 156 L.Ed.2d 508 (O'Connor, J., concurring) (applying a rational basis standard of constitutional review to the Texas sodomy statute prohibiting sexual conduct between two persons of the same sex)); *Wilson v. Ake*, 354 F.Supp.2d 1298, 1307 (2005) ("[H]omosexuality is not a suspect class that would require subjecting [the Florida Defense of Marriage Act] to strict scrutiny under the Equal Protection

Clause.") (quoting *Lofton v. Sec. of Dep't of Children and Fam. Servs.*, 358 F.3d 804, 818 (2004) (holding *post-Lawrence* that homosexuality is not a suspect class), *cert. denied*, 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005)); *Andersen*, 138 P.3d at 973–76 (explaining post-*Lawrence* that sexual orientation is not a suspect class and distinguishing the cases cited by the same-sex couples); *Singer*, 522 P.2d at 1196.[46] We shall join those courts and hold that sexual orientation has not come of age as a suspect or quasi-suspect classification.[47]

---

**46.** Appellees cite *Tanner v. Oregon*, 157 Or.App. 502, 971 P.2d 435, 447 (1998), and *Children's Hospital & Med. Ctr. v. Bonta*, 97 Cal.App.4th 740, 118 Cal.Rptr.2d 629, 650 (2002), as authorities finding sexual orientation to be a suspect basis for classification. In *Tanner*, the Oregon Court of Appeals stated:

> [W]e have no difficulty concluding that [lesbian and gay people] are members of a suspect class. Sexual orientation, like gender, race, alienage, and religious affiliation is widely regarded as defining a distinct, socially recognized group of citizens, and certainly it is beyond dispute that homosexuals in our society have been and continue to be the subject of adverse social and political stereotyping and prejudice.

*Tanner*, 971 P.2d at 447.

Reliance on these two cases is misplaced because both are distinguishable from the instant case or unpersuasive. *Tanner* involved an analysis pursuant to Oregon's privileges and immunities clause, and does not compel a similar finding under our equal protection jurisprudence. *See Andersen*, 138 P.3d at 975 ("The [privileges and immunities clause] analysis bears little resemblance to the analysis that applies under the equal protection clause."). *Children's Hospital* likewise is distinguishable. While the California appellate court in that case stated that sexual orientation is a suspect classification subject to strict scrutiny, the issues did not pertain even remotely to gay and lesbian equal protection. Rather, the case involved a constitutional challenge to disparate reimbursement between in-state and out-of-state hospitals providing services under California's Medi-Cal system. The court tendered its suspect classification observation only in passing and without the benefit of any sort of supporting authority. *Id.* (distinguishing *Children's Hospital* on the ground that it stated "only in passing, without authority, that the issue before [the California intermediate appellate court] did not relate to a suspect class 'such as race or sexual orientation.' ").

**47.** We note that some cases upon which Appellants and other jurisdictions' decisions have relied, were based, in part, on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). *See e.g., High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (1990) (stating that, because sexual intimacy between same-sex

1. *While there is a history of purposeful unequal treat-
ment of gay and lesbian persons, and homosexual
persons are subject to unique disabilities not truly
indicative of their abilities to contribute to society, we
shall not hold that gay and lesbian persons are so
politically powerless that they constitute a suspect
class.*

Homosexual persons have been the object of societal preju-
dice by private actors as well as by the judicial and legislative
branches of federal and state governments. Gay, lesbian, and
bisexual persons likewise have been subject to unique disabili-
ties not truly indicative of their abilities to contribute mean-
ingfully to society. For a significant period of American
history, homosexual persons generally were not the object of
regulatory focus because sexual and gender orientations dif-
fering from "traditional" sexual preferences were not well
conceptualized by the public until after the Civil War. WILLIAM
N. ESKRIDGE, JR., GAYLAW: CHALLENGING THE APARTHEID OF THE
CLOSET 1 (1999) (recounting in great detail the genesis of the
treatment of gay, lesbian, bisexual, and transgender persons
in American society); *Lawrence,* 539 U.S. at 568–69, 123 S.Ct.
at 2478–79, 156 L.Ed.2d 508 (describing succinctly the early
history of laws directed at homosexual conduct, and explaining
that the "concept of the homosexual as a distinct category of
person did not emerge until the late 19th century") (citations

---

partners can be criminalized, sexual orientation can not be a suspect or
quasi-suspect classification). We do not associate ourselves with the
reasoning employed in those portions of the opinions, and they carry no
precedential value to the extent of their reliance on *Bowers.* Other
portions of those cases upon which we rely, however, contain reasoning
independent of *Bowers* and are persuasive in our analysis of the equal
protection issue before us.

That *Bowers* was overturned by *Lawrence,* furthermore, does not
compel recognition of sexual orientation as a suspect classification, as
Appellees suggest. As our judicial peers in other jurisdictions have
noted, the Court in *Lawrence* evaluated the Texas sodomy law on the
basis that it did not comport even with rational basis review, but did
not evaluate the statute in such a way that declared gay, lesbian, and
bisexual persons as suspect classifications. *See In re Kandu,* 315 B.R.
at 143–44; *Andersen,* 138 P.3d at 975–76.

omitted). Before 1900, regulation of gay, lesbian, bisexual, and transgender persons focused on the criminalization of "gender inversion," which included, but was not limited to, cross-dressing, prostitution, obscenity, public lewdness, and indecent exposure. ESKRIDGE, *supra*, at 13–14, 27–37. Many citizens viewed people who cross-dressed or otherwise deviated from the "traditional" gender roles as heretics, degenerates, or psychopaths. *Id.* at 17–18.

By the turn of the twentieth century, most medical professionals accepted the "degeneracy" theory of homosexuality. Patricia A. Cain, *Litigating for Lesbian and Gay Rights: A Legal History,* 79 VA.L.REV. 1551, 1555 (1993). This theory was based primarily on the notion that homosexuality was an inheritable genetic trait, and that the "disease" could be treated through "aversion therapy, castration, and other radical 'cures,' rather than decriminalization." *Id.* at 1555, 1555 n. 21 (citing JOHN D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES 15 (1983); DAVID F. GREENBERG, THE CONSTRUCTION OF HOMOSEXUALITY 397–433(1988); JONATHON, KATZ, GAY AMERICAN HISTORY 129–207 (rev. ed 1992)); *see* ESKRIDGE, JR., *supra,* at 50 (quoting U.S. Army Surgeon General, "Disposition of Overt Cases of Homosexuality," Army Bulletin No. 66, April 1943, pt. E, at 83 (1943) (explaining that rather than court-martial those who engage in single-sex sodomy, homosexual persons should be "reclaimed" through medical treatment)). Those who spoke out publicly in favor of gay and lesbian rights during the "Red Scare" of the late 1910s to early 1920s were branded as communists, denaturalized, and deported to the Soviet Union. Cain, *supra,* at 1555–56. In the 1950s, the Senate Investigations Subcommittee of the Committee on Expenditures in the Executive Department found that "homosexuals and other sex perverts" were unsuitable for employment by the federal government primarily because "[t]hose who engage[d] in overt acts of perversion lack[ed] the emotional stability of normal persons. In addition there [was, according to the Subcommittee,] an abundance of evidence to sustain the conclusion that indulgence in acts of sex[ual] perversion weaken[ed] the moral fiber of an individual to a degree that he [was] not suitable for a position of responsibili-

ty." Cain, *supra*, at 1565–66 (citing SUBCOMM. FOR THE COMM'N OF EXPENDITURE IN THE EXEC. DEP'T, INTERIMREPORT ON THE EMPLOYMENT OF HOMOSEXUALS AND OTHER SEX PERVERTS IN GOVERNMENT, S. Doc. No. 241, 81st Cong., 2d Sess. 4 (1950)) (hereinafter "INTERIM REPORT ON THE EMPLOYMENT OF HOMOSEXUALS"). Homosexuals were furthermore deemed security risks because of their susceptibility to blackmail. Cain, *supra*, at 1566 (citing INTERIM REPORT ON THE EMPLOYMENT OF HOMOSEXUALS, at 3).

The 1946 elections saw the beginning of a national homosexual "Kulturkampf," a period spanning from 1946 to 1961, in which it is believed that as many as a million gay and lesbian persons were prosecuted criminally under statutes aimed at prohibiting consensual same-sex adult intercourse (both public and private), kissing, holding hands, or other forms of "public lewdness." ESKRIDGE, JR., *supra*, at 60–67. Some states, namely New Jersey, Florida, California, and New York, prohibited establishments with state-issued liquor licenses from knowingly serving alcohol to homosexual persons. ESKRIDGE, JR., *supra*, at 78–80. In the wake of *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and until the Supreme Court's decision in *Lawrence v. Texas*, it was not unconstitutional under the Fourteenth Amendment for a state to enact legislation making it a crime for two consenting adults of the same sex to engage in sexual conduct in the privacy of their home. *See Lawrence*, 539 U.S. at 575, 123 S.Ct. at 2482, 156 L.Ed.2d 508 ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres.").

As stated by the Surgeon General,

[O]ur culture often stigmatizes homosexual behavior, identity and relationships. These anti-homosexual attitudes are associated with psychological distress for homosexual persons and may have a negative impact on mental health, including a greater incidence of depression and suicide, lower self-acceptance and a greater likelihood of hiding sexual orientation.... In their extreme form, these nega-

tive attitudes lead to [anti-gay] violence. Averaged over two dozen studies, 80 percent of gay men and lesbians had experienced verbal or physical harassment on the basis of their orientation, 45 percent had been threatened with violence, and 17 percent had experienced a physical attack.

U.S. Dep't of Health & Human Servs., *The Surgeon General's Call to Action to Promote Sexual Health and Responsible Sexual Behavior* (9 July 2001) (letter from the Surgeon General), *at* http://www.surgeongeneral.gov/library/sexualhealth/call.html.

It is clear that homosexual persons, at least in terms of contemporary history, have been a disfavored group in both public and private spheres of our society. The State, furthermore, has not provided evidence to the contrary in the present case, arguing instead that, because every other jurisdiction, both before and after *Lawrence*, rejected the notion that homosexuals are a suspect class, so should Maryland. While other jurisdictions' dispositions of equal protection claims similar to the one advanced in the present case are persuasive and reinforce our own analysis, we do not accept them simply as conclusive. This Court nevertheless finds that, in light of the other indicia used by this Court and the Supreme Court in addressing equal protection claims, a history of unequal treatment does not require that we deem suspect a classification based on sexual orientation.[48] We instead view the circumstances as a whole in order to determine whether sexual

---

**48.** Appellees cite to several annual reports compiled by the Maryland Commission on Human Relations documenting yearly total reported instances of hate crimes and discrimination in the areas of employment, public accommodations, and housing. Of the total 511 hate-related incidents reported to the Commission for the 2006 fiscal year, 350 were race-based, while 37 were based on sexual orientation. MD COMM'N ON HUMAN RELATIONS, 2006 Annual Report 18 (2006), *at* http://www.mchr.state.md.us/annrep2006.pdf. We find equally important, however, other statistics reported by the Commission in recent Annual Reports. In the 2005 Annual Report, the Commission included a table displaying the total reported instances of discrimination in housing, employment, and public accommodations according to various characteristics, including race, sex, sexual orientation, age, retaliation, disability, religion,

orientation constitutes a protected classification meriting a more exacting level of constitutional review.

In spite of the unequal treatment suffered possibly by Appellees and certainly a substantial portion of other citizens similarly situated, we are not persuaded that gay, lesbian, and bisexual persons are so politically powerless that they are entitled to "extraordinary protection from the majoritarian political process." To the contrary, it appears that, at least in Maryland, advocacy to eliminate discrimination against gay, lesbian, and bisexual persons based on their sexual orientation has met with growing successes in the legislative and executive branches of government.[49] Maryland statutes protect against discrimination based on sexual orientation in several areas of the law, including public accommodation,[50] employment,[51] housing,[52] and education.[53]

---

familial status, and national origin. MD. COMM'N ON HUMAN RELATIONS, 2005 Annual Report 13–15 (2005), *at* http://www.mchr.state.md.us/2005 finalannualreport.pdf. The report states that there were 25 alleged instances of discrimination based on sexual orientation, compared to 117 cases based on age and 99 cases based on disability. Neither of these classifications are considered suspect yet, either under Supreme Court or this Court's precedent.

**49.** For an in-depth discussion of the legislative and regulatory developments in Maryland addressing discrimination based on sexual orientation, see generally *Something Old, Something New, Something Borrowed, Something Long Overdue: The Evolution of a "Sexual Orientation–Blind" System in Maryland and the Recognition of Same–Sex Marriage*, 35 U. BALT. L.REV. 73, 75–92 (2005). While the goal of the article apparently was to highlight the legal landscape in Maryland regarding sexual orientation, and its probable amenability to the recognition of same-sex marriage, the trends presented there illustrate the evolving political influence that gay, lesbian, and bisexual individuals are exercising. *See also* AMER. ASSOC. OF LAW LIBRARIES, SOCIAL RESPONSIBILITIES SPECIAL INTEREST SECTION, STANDING COMMITTEE ON LESBIAN AND GAY ISSUES, *Introduction* of SEXUAL ORIENTATION AND THE LAW: A RESEARCH BIBLIOGRAPHY SELECTIVELY ANNOTATING LEGAL LITERATURE THROUGH 2005, at XXV("In the last twelve years, the exponential increase in judicial opinions and legislation regarding [Lesbian, Gay, Bisexual, and Transsexual] issues has been accompanied by a growth in favorable decisions and legislative enactments.").

**50.** MD.CODE (Supp.2004), art. 49B, §§ 5(b), 8(a).

**51.** MD.CODE (2003), art. 49B §§ 16; *Id.* at § 14 ("It is hereby declared to be the policy of the State of Maryland, in the exercise of its police

In addition to the statutory framework in place, several state and local regulations prohibit discrimination on the basis of sexual orientation.[54] *See, e.g.,* MD.CODE (2004), Health Occ. § 19–311(6) (prohibiting sexual orientation discrimination by social workers); MD.CODE (2003), art. 29 §§ 1–107, 3–102(h)(1) (prohibiting sexual orientation discrimination on the part of the Washington Suburban Sanitary Commission, and prohibiting the use of discriminatory employment practices by any contractor engaged by the Commission); MD. REGS.CODE tit. 1 §§ 04.07.04(A)(7)(d)(viii), 04.07.05(A)(2)(p) (2004) (prohibiting discrimination on the basis of sexual orientation in the administration of the Residential Child Care Program); MD. REGS.

power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management union relations regardless of ... sexual orientation."); MD. REGS.CODE tit. 1, § 01.01.1995.19(I)(A)(11) (2004) (prohibiting expressly in Maryland discrimination in state employment on the basis of sexual orientation); *see also* 35 U. BALT. L.REV. 73, *supra,* at 87 (citing *Acanfora v. Bd. of Educ.,* 359 F.Supp. 843, 853 (D.Md.1973) (holding that the sexual orientation of a teacher is not a proper grounds to deny employment), *aff'd on other grounds,* 491 F.2d 498 (4th Cir. 1974)).

**52.** MD.CODE (2003), art. 49B, §§ 22–24; *Id.* at § 19 ("It is the policy of the State of Maryland to provide for fair housing throughout the State of Maryland, to all its citizens, regardless of ... sexual orientation.").

**53.** MD. REGS.CODE tit. 13A, § 01.04.03 ("All students in Maryland's public schools, without exception and regardless of ... sexual orientation ... have the right to educational environments that are: A. Safe; B. Appropriate for academic achievement; and C. Free from any form of harassment.").

**54.** The statutes and regulations that follow in the main text are extracted from the briefs supplied by the parties and amici, and constitute only a portion of the anti-discrimination measures found within the State of Maryland's statutes and regulations. For a full description of the various state and local enactments that prohibit discrimination on the basis of sexual orientation, *see* 35 U. BALT. L.REV. 73, *supra,* at 86–90, 86 n. 111 (cataloging extensively Maryland regulations that eliminated sexual orientation discrimination in the administration of numerous public assistance programs and community development initiatives, and that prohibit such discrimination in the regulation of various business occupations and professions throughout the State).

CODE tit. 1 §§ 05.03.09(A)(2), 05.03.15(C)(2) (prohibiting the consideration of either the adoptive parent's or adoptive child's sexual orientation during the application or placement stage of a private adoption); MD. REGS.CODE tit. 5 § 04.11.18(A) (2005) (prohibiting discrimination on the basis of sexual orientation by entities involved with, or contractors engaged by, the Special Housing Opportunities Program); MD. REGS.CODE tit. 10 § 18.06.03(A)(6) (2004) (providing that it is improper for health care providers rendering services under the AIDS Drug Assistance Program to consider sexual orientation when determining whether to provide such services); MD. REGS. CODE tit. 10 § 42.03.03(B)(5) (2005) (prohibiting discrimination on the basis of sexual orientation by licensed social workers); MD. REGS.CODE tit. 10 § 10.43.03(D)(5) (2005) (same, in the context of chiropractors and chiropractic assistants licensed to practice in Maryland); MD. REGS.CODE tit. 14 § 29.04.09(C)(1) (2004) (forbidding discrimination in the administration of the Maryland Heritage Areas Loan Program).

Evolutionary legal developments highlighting changing views toward gay, lesbian, bisexual, and transgender persons are not limited to statutory and regulatory enactments. In terms of Supreme Court jurisprudence, one of the most important cases is *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). This case dealt with a Colorado voter-adopted amendment to the State's Constitution that "preclude[d] all legislative, executive, or judicial action at any level of state or local government designed to protect the status of persons based on their 'homosexual, lesbian or bisexual orientation, conduct, practices or relationship.'" *Romer*, 517 U.S. at 620, 116 S.Ct. at 1621–22, 134 L.Ed.2d 855. In other words, the amendment sought to preclude the Colorado legislature from enacting any statute that provided for protection from discrimination on the basis of sexual orientation. The Court struck down the statute as unconstitutional, under rational basis review, as a violation of the Fourteenth Amendment. In *Lawrence*, 539 U.S. at 565, 560, 123 S.Ct. at 2476, 2475, 156 L.Ed.2d 508, the Court overturned *Bowers v. Hardwick* and concluded that the Fourteenth Amendment to the U.S. Consti-

tution forbids the criminalization of sexual conduct by two persons of the same sex in the privacy of their own homes. In neither *Romer* nor *Lawrence*, however, did the Supreme Court state that homosexual persons constituted a suspect class. The Court instead applied rational basis review to both of the statutes at issue.

The body of Maryland appellate opinions addressed to the rights and interests of gay, lesbian, bisexual, and transgender persons is substantial. *Boswell v. Boswell*, 352 Md. 204, 237–238, 721 A.2d 662, 678 (1998) (holding that, in the context of visitation rights of a non-custodial parent, "[this Court] make[s] no distinctions as to the sexual preference of the non-custodial parent whose visitation is being challenged. The only relevance that a parent's sexual conduct or lifestyle has in the context of a visitation proceeding of this type is where that conduct or lifestyle is clearly shown to be detrimental to the children's emotional and/or physical well-being"); *State v. Smullen*, 380 Md. 233, 844 A.2d 429 (2004) (extending battered spouse syndrome to abusive situations within same-sex couples); *North v. North*, 102 Md.App. 1, 12, 648 A.2d 1025, 1031 (1994) (deciding that the sexual orientation of a non-custodial parent is not a proper basis for the denial of visitation rights, and placing emphasis on whether such visitation rights were in the "best interests of the child" and whether there was a showing of actual harm to the child by granting visitation, rather than focusing on the "perceived harms" to the child of exposing it to a homosexual lifestyle); *Gestl v. Frederick*, 133 Md.App. 216, 244–45, 754 A.2d 1087, 1102–03 (2000) (determining that the trial court was required to exercise jurisdiction over a child visitation lawsuit brought by the biological mother's former same-sex partner under the Uniform Child Custody Jurisdiction Act); *Lapides v. Trabbic*, 134 Md.App. 51, 54, 758 A.2d 1114, 1115 (2000) (rejecting a father's tort cause of action against his ex-wife's same-sex domestic partner on the basis that she interfered with and caused harm to his relationship with his daughter to which he had joint custody); *S.F. v. M.D.*, 132 Md.App. 99, 102, 110, 751 A.2d 9, 10, 14–15 (2000) (holding that the former domestic partner of a biological

mother has standing to seek visitation of a child conceived by in vitro fertilization performed during the tenure of their partnership).[55]

While gay, lesbian, and bisexual persons in recent history have been the target of unequal treatment in the private and public aspects of their lives, and have been subject to stereotyping in ways not indicative of their abilities, among other things, to work and raise a child, recent legislative and judicial trends toward reversing various forms of discrimination based on sexual orientation underscore an increasing political coming of age. The relevant decisions from other jurisdictions recognize this. *Andersen,* 138 P.3d at 974–75 ("The enactment of provisions providing increased protection to gay and lesbian individuals in [the State] shows that as a class gay and lesbian persons are not powerless but, instead, exercise increasing political power. Indeed, the recent passage of the amendment [in Washington prohibiting discrimination on the basis of sexual orientation] is particularly significant. . . . We conclude that plaintiffs have not established that they satisfy the [political powerlessness] prong of the suspect classification test."); *see also High Tech Gays,* 895 F.2d at 573–74 (concluding, independent of reliance on *Bowers,* that, "[w]hile we do agree that homosexuals have suffered a history of discrimination, we do not believe that they meet the other criteria [for being a suspect or quasi-suspect classification]," and determining that "legislatures have addressed and continue to address the discrimination suffered by homosexuals on account of their sexual orientation though the passage of anti-discrimination legislation. Thus, homosexuals are not without political power . . .").[56]

---

**55.** For a comprehensive list of Supreme Court, other Federal and State appellate court cases adjudicating gay and lesbian rights from 1981 to 2000, *see* DANIEL R. PINELLO, GAY RIGHTS AND AMERICAN LAW 167–213 (2003).

**56.** The irony is not lost on us that the increasing political and other successes of the expression of gay power works against Appellees in this part of our analysis of the level of scrutiny to be given the statute under review.

2. *Evidence that homosexuality is an immutable characteristic.*

The term "immutability" defines a human characteristic that is determined "solely by the accident of birth," *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770, 36 L.Ed.2d 583 (explaining that "sex, like race and national origin, is an immutable characteristic [that is] determined solely by the accident of birth," and that defines a particular group), or that the possessor is "powerless to escape or set aside." *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 360, 98 S.Ct. 2733, 2784, 57 L.Ed.2d 750 (1978) (quoting *Weber v. Aetna Cas. & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972)). *See also Plyler v. Doe,* 457 U.S. 202, 216–17 n. 14, 102 S.Ct. 2382, 2394–95 n. 14, 72 L.Ed.2d 786 (1982) ("Legislation imposing special disabilities upon groups disfavored by virtue of circumstances beyond their control suggests the kind of 'class or caste' treatment that the Fourteenth Amendment was designed to abolish."). Based on the scientific and sociological evidence currently available to the public, we are unable to take judicial notice that gay, lesbian, and bisexual persons display readily-recognizable, immutable characteristics that define the group such that they may be deemed a suspect class for purposes of determining the appropriate level of scrutiny to be accorded the statute in the present case.

Appellees rely on *Hernandez–Montiel v. I.N.S.,* 225 F.3d 1084, 1093 (9th Cir.2000), *overruled on other grounds by, Thomas v. Gonzales,* 409 F.3d 1177 (9th Cir.2005), for the proposition that sexual orientation is a suspect classification because it is defined by a characteristic that people "should not be required to change because [it is] fundamental to . . . individual identities or consciences." The Ninth Circuit indeed held there that "[s]exual orientation and sexual identity are immutable; [and that] they are so fundamental to one's identity that a person should not be required to abandon them." *Hernandez–Montiel,* 225 F.3d at 1093 (indexing numerous studies that have concluded that sexual orientation is determined at an early age and engrained in an individual's personality). Despite the Ninth Circuit's conclusion in that

case that sexual orientation is an immutable characteristic, that court since has declared that homosexual persons do not constitute a suspect classification. *See Andersen,* 138 P.3d at 974 (citing *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1137 (9th Cir.2003) (holding, pre-*Lawrence,* "homosexuals are not a suspect or quasi-suspect class, but are a definable group entitled to rational basis scrutiny for equal protection purposes") (quoting *High Tech Gays,* 895 F.2d at 573–74)).

Beyond their reliance on *Hernandez–Montiel* and two Maryland cases that discuss, in the abstract, inherently suspect classifications and immutability, *see Ehrlich v. Perez ex rel. Perez,* 394 Md. 691, 718–19, 908 A.2d 1220, 1236–37 (2006) (discussing alienage as an inherently suspect classification); *In re Heilig,* 372 Md. 692, 697–710, 816 A.2d 68, 71–79 (2003) (discussing the concept of gender in the context of transsexuals and how, as medically possible, the outward and physical manifestations of gender may be changed), Appellees point neither to scientific nor sociological studies, which have withstood analysis for evidentiary admissibility, in support of an argument that sexual orientation is an immutable characteristic.[57]

---

**57.** No party addresses in its brief the immutability of sexual orientation and the implications of an answer to that query in determining the correct level of constitutional review to be applied to Family Law § 2–201. The issue of the immutability of sexual orientation, however, is the subject of a multitude of recent studies and nationwide debate. *See* J. Michael Bailey & Richard C. Pillard, *A Genetic Study of Male Sexual Orientation,* 48 ARCHIVES GEN'L PSYCHIATRY 1089, 1093 (1991) (studying the similarities in sexual orientation between twin, non-twin, and adopted siblings, and concluding that identical twins are more likely than other types of siblings to have a similar homosexual orientation); Dean H. Hamer, Stella Hu, Victoria L. Magnuson, Nan Hu & Angela M.L. Pattatucci, *A Linkage Between DNA Markers on the X Chromosome and Male Sexual Orientation,* 261 SCIENCE 321 (1993) (finding evidence that there is a connection between male sexual orientation and a particular gene found on the X chromosome and suggesting that male sexual orientation may be linked to maternal relatives); Simon LeVay, *A Difference in Hypothalamic Structure Between Heterosexual and Homosexual Men,* 253 SCIENCE 1034–37 (1991) (finding that the interstitial nuclei of the anterior hypothalamus (INAH) 3, one of four cell groups found within the anterior hypothalamus region of the brain, is twice as large in heterosexual men as compared to homosexual men, and

concluding that, at least in men, a heterosexual brain is structurally dimorphic from a homosexual brain). These reports, considered three of the most important in the field, however, are not without challenge. Their imperfections and limitations are well-documented. *See generally* Janet E. Halley, *Sexual Orientation and the Politics of Biology: A Critique of the Argument from Immutability*, 46 STAN L.REV. 503, 529–46 (1994) (reviewing the limitations and flaws within the leading studies on the link between biology and sexual orientation); Ingrid Wickelgren, *Discovery of the "Gay Gene" Questioned*, 284 SCIENCE 571 (1999); Eliot Marshall, *NIH's "Gay Gene" Study Questioned*, 268 SCIENCE 1841 (1995). Other studies have found contrary indicia and have concluded that culture and environment, at least in part, play a factor in the development of an individual's sexual orientation. *See, e.g.*, Dean H. Hamer, et al., *Genetics and Male Sexual Orientation*, 285 SCIENCE 803a (1999) ("Sexual orientation is a complex trait that is probably shaped by many different factors, including multiple genes, biological, environmental, and socio cultural influences."); J. Michael Bailey, Michael P. Dunne, Nicholas G. Martin, *Genetic and Environmental Influences on Sexual Orientation and its Correlates in an Australian Twin Sample*, 78(3) J. OF PERSONALITY & SOC. PSYCHOL. 524 (2000). Even the authors, most notably Simon LeVay, have indicated that the biological studies do not establish that biology is the primary indicator of sexual orientation. LeVay, *supra*, at 1036 ("The discovery that a nucleus differs in size between heterosexual and homosexual men illustrates that sexual orientation in humans is amenable to study at the biological level, and this discovery opens the door to studies of neurotransmitters or receptors that might be involved in regulating this aspect of personality. Further interpretation of the results of this study must be considered speculative. In particular, the results do not allow one to decide if the size of INAH 3 in an individual is the cause or the consequence of that individual's sexual orientation, or if the size of INAH 3 and sexual orientation co-vary under the influence of some third, unidentified variable."). We by no means are able to form any sort of merits-driven conclusion based on the forgoing studies. We note only that there does not appear to be a consensus yet among "experts" as to the origin of an individual's sexual orientation.

Based on our research, no studies currently available to the public have been subjected to rigorous analysis under the *Frye–Reed* standard in order to determine the scientific reliability of the methodology, principles, and resultant conclusions of the foregoing studies for the purposes of evidentiary admissibility. *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923) (requiring that expert testimony is admissible only when it is determined by the trial judge that the deduction is generally accepted in the particular field in which it belongs); *Reed v. State*, 283 Md. 374, 389, 391 A.2d 364, 373 (1978) (adopting in the State of Maryland the "general acceptance" rule annunciated in *Frye*); *Hutton v. State*, 339 Md. 480, 494 n. 10, 663 A.2d 1289, 1295 n. 10 (1995); *see Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 327, 923 A.2d 939, 946 (2007); *see also* Committee Note to Md. Rule 5–702 ("[R]equired scientific foundation for the admission of novel scientific techniques or principles is left to development through case law."). Nor were we able to locate any analyses of the studies under the

In the absence of some generally accepted scientific conclusion identifying homosexuality as an immutable characteristic, and in light of the other indicia used by this Court and the Supreme Court in defining a suspect class, we decline on the record in the present case to recognize sexual orientation as an immutable trait and therefore a suspect or quasi-suspect classification. *See Andersen,* 138 P.3d at 974; *In re Marriage Cases,* 49 Cal.Rptr.3d 675, 714 (Cal.App.1st Dist.2006), review granted, 53 Cal.Rptr.3d 317, 149 P.3d 737 (2006). The majority of other jurisdictions that have addressed comparable equal protection challenges reviewed similar statutes under rational basis analysis. *See In re Kandu,* 315 B.R. at 143–44; *Wilson,* 354 F.Supp.2d at 1307; *Lofton,* 358 F.3d at 818, *cert. denied,* 543 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005); *Andersen,* 138 P.3d at 973–76; *Singer,* 522 P.2d at 1196.

**IV. The Right to Same–Sex Marriage is Not so Deeply Rooted in the History and Tradition of this State or the Nation as a Whole Such That it Should be Deemed Fundamental.**

 Appellees contend next that Family Law § 2–201 is subject to strict scrutiny because it burdens significantly their fundamental right to marry guaranteed by the due process protections of Article 24. First defined federally by the Supreme Court in 1937, fundamental rights are those privileges and immunities that are "so rooted in the traditions and conscience of our people" that they are considered "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)

---

*Daubert/Kumho Tire/Joiner* standard for admissibility applied in the federal courts and certain of our sister state court systems. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *superceded by* FED.R.EVID. 702; *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167,1174–75, 143 L.Ed.2d 238 (1999) (holding that the basic gate-keeping obligations imposed by the U.S. Supreme Court, in *Daubert,* upon a federal trial judge applies not only to "scientific" testimony, but all expert testimony); *General Elec. Co. v. Joiner,* 522 U.S. 136, 143, 118 S.Ct. 512, 517–18, 139 L.Ed.2d 508 (1997) (holding that a trial judge's ruling regarding admissibility of scientific evidence is reviewable only for an abuse of discretion).

(quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)); *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997) (defining fundamental rights as those privileges that are "objectively, 'deeply rooted in this Nation's history and tradition,' ... and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' ") (quoting *Palko,* 302 U.S. at 325–26, 58 S.Ct. at 152, 82 L.Ed. 288); *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (defining fundamental rights as those liberty interests that are "deeply rooted in this Nation's history and tradition") (plurality opinion).

We employ a very similar definition for determining what constitutes a fundamental right for state constitutional analysis. *Sites v. State,* 300 Md. 702, 716, 481 A.2d 192, 199 (1984) (defining fundamental rights as those that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental or implicit in the concept of ordered liberty"); *Waldron,* 289 Md. at 715, 426 A.2d at 947 (characterizing the rights protected by Article 24 as "those recognized as vital to the history and traditions of the people of this State"); *Samuels v. Tschechtelin,* 135 Md.App. 483, 537, 763 A.2d 209, 238 (2000) (quoting *Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. at 2268, 138 L.Ed.2d 772). In determining whether an asserted liberty interest constitutes a fundamental right, we look not to our "personal and private notions" of what is fundamental, but rather to the "traditions and [collective] conscience of our people." *Griswold v. Connecticut,* 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring). Our task in the present case, therefore, is to determine objectively whether the right to marry another person of the same sex is so deeply rooted in the history and tradition of this State, as well as the Nation as a whole, that "neither liberty nor justice would exist if it were sacrificed." *Glucksberg,* 521 U.S. at 721, 117 S.Ct. at 2268, 138 L.Ed.2d 772.

## A. The Right at Stake must be Clearly and Precisely Identified.

It is undisputed that the right to marry, in its most general sense, is a fundamental liberty interest that goes to the core of what the U.S. Supreme Court has called the right to "personal autonomy." *See, e.g., Planned Parenthood of S.E. Pa. v. Casey,* 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992) ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."). This right to personal privacy was recognized formally by the U.S. Supreme Court in *Griswold* where it struck down, as an intrusion upon the constitutionally protected right to marital privacy, a ban on the use of contraceptives by married heterosexual couples. The Court reasoned that there are zones of privacy created by the guarantees of the Bill of Rights that serve "as [a] protection against all government invasions 'of the sanctity of a man's home and the privacies of life.'" *Griswold,* 381 U.S. at 484, 85 S.Ct. at 1681, 14 L.Ed.2d 510 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). Other rights considered fundamental under this general right to personal autonomy are those decisions relating to child-bearing,[58] child-rearing and education,[59] intimate association and sexual intimacy,[60] the right to use contraceptives,[61]

---

58. *Carey v. Population Services Int'l,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) ("The decision whether or not to beget or bear a child is at the very of this cluster of constitutionally protected choices."); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (invalidating a Texas law that prohibited abortions on the basis that a woman has a Due Process right to make fundamental decisions affecting her body).

59. *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

60. *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (invalidating a Texas statute that criminalized private sexual intimacy by consenting same-sex couples).

61. *Eisenstadt v. Baird,* 405 U.S. 438, 454, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (extending the reasoning employed in *Griswold* to

the right to refuse unwanted lifesaving medical treatment,[62] and, as stated before, the right to marriage.[63] The rights to personal autonomy embrace just a few of the rights that the Supreme Court has deemed fundamental. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (the right to move from state to state); *Kramer v. Union Free School Dist.,* 395 U.S. 621, 627, 89 S.Ct. 1886, 1889–90, 23 L.Ed.2d 583 (1969) (the right to vote); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (the right to equal access to appeal).

Determination of whether there is a fundamental right to enter into a same-sex marriage, however, does not end with a brief invocation of the cases outlining the importance of marriage generally and the other liberty interests that make

---

invalidate a law under the Fourteenth Amendment that prohibited the distribution of contraceptive devices to unmarried persons).

**62.** *Cruzan v. Mo. Dep't of Health,* 497 U.S. 261, 278–79, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224 (1990) (holding that every person possesses a constitutionally protected right to withdraw from unwanted life-saving medical treatment).

**63.** It is beyond doubt that the right to marry is a fundamental liberty interest protected by the Constitution. *See e.g., Turner v. Safley,* 482 U.S. 78, 95, 96–97, 107 S.Ct. 2254, 2265, 2265–66, 96 L.Ed.2d 64 (1987) (holding unconstitutional a Missouri regulation that prohibited inmates from marrying, absent approval by the prison superintendent after a finding that there were compelling reasons for the marriage, even though the right to marry, as with many other constitutional rights, is restricted substantially as a result of incarceration); *Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978) ("[T]he right 'to marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause ....") (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)); *Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971) ("[M]arriage involves interests of basic importance in our society."); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113–14, 86 L.Ed. 1655 (1942) (describing marriage as "fundamental to the very existence of the [human] race."); *see also Skinner,* 316 U.S. at 541, 62 S.Ct. at 1113–14, 86 L.Ed. 1655 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

up the fundamental rights panorama of personal autonomy. Before determining the fundamental nature of an asserted liberty interest, the right at stake should be defined precisely. *Samuels,* 135 Md.App. at 537, 763 A.2d at 238 ("[A]nalysis of an alleged substantive due process violation 'must begin with careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' ") (quoting *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (in turn quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)); *Glucksberg,* 521 U.S. at 721, 117 S.Ct. at 2268, 138 L.Ed.2d 772 ("[W]e have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest.")(internal citations omitted)); *see also Glucksberg,* 521 U.S. at 722–26, 728, 117 S.Ct. at 2269, 138 L.Ed.2d 772 (stating that the asserted liberty interest at issue in the case was framed more properly as the "right to commit suicide with another's assistance" rather than the broadly-stated "liberty to choose how to die" or the "right to choose a humane, dignified death," and determining that there existed no fundamental right to assisted suicide even though the right to refuse lifesaving medical treatment was deeply rooted in our Nation's history) (distinguishing *Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 278–80, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224 (1990)); *Lewis v. Harris,* 188 N.J. 415, 908 A.2d 196, 207 (2006) (same); *In re Marriage Cases,* 49 Cal.Rptr.3d at 701 (holding that an asserted right must be "concrete and particularized, rather than abstract and general") (citations omitted). Once the asserted liberty interest is identified clearly, we determine objectively whether it is deeply rooted in the traditions, history, and conscience of the people of Maryland and the Nation as a whole.

Appellees argue that we should not be concerned with whether the Court should recognize a new fundamental right to same-sex marriage, but instead should focus on whether the existing fundamental right to marriage should be *extended* to include same-sex couples. Specifically, Appellees seek a dec-

laration that the right to marry encompasses the right to marry a person of one's choosing without interference from the government, even if the other person is of the same sex. They argue further that, "in assessing history and tradition, the proper inquiry is *what* has historically been enjoyed (e.g., the right to marry), not *who* has historically enjoyed it (e.g., people in heterosexual relationships)." A substantially similar argument has been made to our peers in other jurisdictions in the course of confronting same-sex marriage challenges. *See, e.g., Wilson v. Ake,* 354 F.Supp.2d 1298, 1305 (M.D.Fla.2005) ("Plaintiffs argue that their right to marry someone of the same sex is a fundamental right that is guaranteed by the Fourteenth Amendment's Due Process Clause."); *Standhardt v. Superior Court of State,* 206 Ariz. 276, 77 P.3d 451, 458 (App.2003); *Dean v. Dist. of Columbia,* 653 A.2d 307, 333 (D.C.App.1995); *Jones v. Hallahan,* 501 S.W.2d 588, 590 (Ky. App.1973); *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185, 186 (1971); *Andersen,* 138 P.3d at 976–79. Each of these appellate courts, when presented with the argument, rejected it. For the reasons stated here, we join those courts and hold that the issue is framed more properly in terms of whether the right to choose same-sex marriage is fundamental.

In support of their argument, Appellees rely principally on *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding that the fundamental right to marriage encompasses the right marry the person of one's choosing, even if that person is of a different race); *Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 785, 28 L.Ed.2d 113 (1971); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); and, through reference to other cases that cite it, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113–14, 86 L.Ed. 1655 (1942). We find that, while these cases certainly establish generally the fundamental nature of the right to marry, they do not represent a compelling basis to extend the fundamental right to include same-sex marriage. All of the cases infer that the right to marry enjoys its fundamental status due to the male-female

nature of the relationship and/or the attendant link to fostering procreation of our species. We explain.

Appellees rely on *Loving* for the proposition that, despite the long history of prohibition against interracial marriages, the Supreme Court declared in that case that the right to marry was constitutionally guaranteed to different-race couples just as it was available to single-race couples, *Loving,* 388 U.S. at 12, 87 S.Ct. at 1823, 18 L.Ed.2d 1010, thereby declaring that the proper inquiry in the case was whether the right itself had been historically enjoyed rather than who had historically enjoyed it. We disagree.

The basis for the Supreme Court's decision as to the interracial couples' due process challenge was that "[m]arriage is one of the 'basic civil rights of man,' *fundamental to our very existence and survival."* *Id.* (emphasis added) (citing *Skinner,* 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1655 (*"Marriage and procreation* are fundamental to the very existence and survival of the race.")) (emphasis added). As our peers on other courts have stated, "[w]hether the Court [in *Skinner*] viewed marriage and procreation as a single indivisible right, the least that can be said is that it was obviously contemplating unions between men and women when it ruled that the right to marry was fundamental. This is hardly surprising inasmuch as none of the United States sanctioned any other marriage configuration at the time." *Baehr,* 852 P.2d at 56; *Standhardt,* 77 P.3d at 458 (stating that "[i]mplicit in *Loving* and predecessor opinions is the notion that marriage, often linked to procreation, is a union forged between one man and one woman," and concluding that, "while *Loving* expanded the traditional scope of the fundamental right to marry by granting interracial couples unrestricted access to the state-sanctioned marriage institution, that decision was anchored to the concept of marriage as a union involving persons of the opposite sex."); *Dean,* 653 A.2d at 332–33 (holding that the right to marriage is deemed fundamental because of its link to procreation).

Language of similar import appears throughout the Supreme Court's jurisprudence establishing as fundamental the right to marry. The Court commented in *Maynard v. Hill,* 125 U.S. 190, 211, 8 S.Ct. 723, 729, 31 L.Ed. 654 (1888), that "[marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and society, without which there would be neither civilization nor progress." In *Zablocki,* the Supreme Court reasoned that "[i]t is not surprising that the decision to marry has been placed in the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships.... [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of family in our society." 434 U.S. at 386, 98 S.Ct. at 681, 54 L.Ed.2d 618 (upholding the fundamental right to marry for those in non-compliance with child support obligations). In the course of doing so, the Court explained in detail the genesis of the fundamental status accorded marriage:

Long ago, in *Maynard v. Hill,* 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888), the Court characterized marriage as "the most important relation in life," [125 U.S. at 205, 8 S.Ct. at 726, 31 L.Ed. 654], and as "the foundation of the family and of society, without which there would be neither civilization nor progress," [125 U.S. at 211, 8 S.Ct. at 729, 31 L.Ed. 654]. In *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court recognized that the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause, [262 U.S. at 399, 43 S.Ct. at 626, 67 L.Ed. 1042], and in *Skinner v. Oklahoma ex rel. Williamson, supra,* ... marriage was described as "fundamental to the very existence and survival of the race," [316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1655].

*Zablocki,* 434 U.S. at 384, 98 S.Ct. at 680, 54 L.Ed.2d 618; *see also Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, 56 (1993). In *Boddie,* 401 U.S. at 376, 381–82, 91 S.Ct. at 785, 788, 28

L.Ed.2d 113, the Supreme Court declared that "marriage involves interests of basic importance in our society." 401 U.S. at 376, 91 S.Ct. at 785, 28 L.Ed.2d 113 (citing generally *Skinner, Loving,* and *Meyer*). In light of that fundamental nature of marriage, the Court invalidated a statute that authorized the State of Connecticut to deny access to the courts to indigent citizens seeking to obtain a divorce, solely because they were unable to pay the requisite court fees. *Boddie,* 401 U.S. at 381–82, 91 S.Ct. at 788, 28 L.Ed.2d 113. Thus, virtually every Supreme Court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation, which necessarily and biologically involves participation (in ways either intimate or remote) by a man and a woman. *Andersen,* 138 P.3d at 978 ("Nearly all United States Supreme Court decisions declaring marriage to be a fundamental right expressly link marriage to fundamental rights of procreation, childbirth, abortion, and child-rearing.").

The one exception is *Turner v. Safley.* In that case, the Supreme Court struck down as unconstitutional a Missouri Division of Corrections regulation that precluded an inmate from marrying unless he or she received permission from the superintendent, and only upon a finding that there was a "compelling reason" for the marriage. *Turner,* 482 U.S. at 78, 107 S.Ct. at 2256–57, 96 L.Ed.2d 64. The term "compelling reason" was not defined by the regulation, but prison officials testified at trial that the only reason deemed compelling was the pregnancy of the woman to be married or the birth of a child out of wedlock. *Turner,* 482 U.S. at 82, 107 S.Ct. at 2258, 96 L.Ed.2d 64. The Court concluded that the fundamental right to marriage recognized in *Zablocki* applied to prison inmates just as it applied to non-incarcerated individuals. *Turner,* 482 U.S. at 95, 107 S.Ct. at 2265, 96 L.Ed.2d 64. Among several reasons given for application of *Zablocki* to the issues at bar was that "most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated." *Turner,* 482 U.S. at 96, 107 S.Ct.

at 2265, 96 L.Ed.2d 64. The Court reasoned additionally that marriage often serves as a precondition to certain tangible and intangible benefits, including the legitimization of children born out of wedlock. *Id.* It is true that the reasons given in support of the fundamental right of inmates to marry were not linked in express terms to procreation and, indeed, some of the reasons given were wholly independent of procreation. Whatever the reasons given for granting to those couples the right to marry, however, it is clear that the Court was contemplating marriage between a man and woman when it declared unconstitutional the Missouri regulation. The case involved challenges by opposite sex couples, and a number, although not all, of the reasons given in support of the right to marry applied only to opposite sex couples, i.e., consummation of the marriage and legitimization of children born outside the marital relationship. *Turner* does not persuade us to frame the inquiry in the present case as Appellees wish. *See Andersen,* 138 P.3d at 979.[64]

 It is beyond doubt that the right to marry, in the abstract, is a fundamental right recognized by both the Federal and this State's Constitutions. While we deem fundamental this latitudinously-stated right to marry, it is nevertheless a

---

**64.** Appellees rely additionally on *Griswold,* 381 U.S. at 486, 85 S.Ct. at 1682, 14 L.Ed.2d 510, and *Eisenstadt,* 405 U.S. at 453–54, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) for the proposition that the Supreme Court looks to what was enjoyed historically rather than who historically enjoyed it. They reason that in *Eisenstadt* the Court did not rely on history and tradition to conclude that unmarried couples were entitled to the right of sexual privacy and the use of contraceptives. Overlooking the fact that the case did not involve directly the right to marriage and that it was decided on equal protection grounds, *Eisenstadt,* 405 U.S. at 454, 92 S.Ct. at 1038, 31 L.Ed.2d 349, we nevertheless deem it distinguishable. As with the other cases cited *supra,* the decision was based on the right to produce children. The Court in *Eisenstadt* reasoned that "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453–54, 92 S.Ct. at 1038, 31 L.Ed.2d 349 (citations omitted). The ability to bear or beget children is inherently a characteristic requiring at some level the participation of a man and a woman (at least until science demonstrates otherwise).

**304**

public institution that historically has been subject to the regulation and police powers of the State.[65] *Henderson v. Henderson,* 199 Md. 449, 458–59, 87 A.2d 403, 409 (1952) ("The State has the sovereign power to regulate marriages, and accordingly can determine who shall assume and who shall occupy the matrimonial relation within its borders."); [66] *see also* Md.Code Ann. (1957, 2006 Repl.Vol.), Family Law Article, §§ 2–201 to 2–407, 2–409, 2–410 (delineating the requirements for a valid marriage in the State of Maryland) (unless otherwise noted, all references in this portion of the opinion are to the Family Law Article of the Annotated Code of Maryland).

---

65. We note, however, that this police power is not absolute. In regards to social and economic regulation, the Legislature may,

> in the exercise of what is usually called its police power, [ ] regulate or restrict the freedom of the individual to act, when such regulation or restraint is essential to the protection of the public safety, health, or morals. That power, however, is itself subject to the restraints imposed by constitutions which the whole people have adopted and approved as the supreme law of the land.
>
> (Thus), while the legislature may, in the proper exercise of the State's police power, classify the persons to whom a prescribed regulation found to be necessary to the public welfare may apply ..., or determine whether certain classes of acts may be regulated ..., nevertheless the exercise of the power must have some real and substantial relation to the public welfare ..., and the legislature may not, under the cloak of the power, exercise a power forbidden by the Constitution, or take away rights and privileges expressly guaranteed by it.

*Waldron,* 289 Md. at 718–19, 426 A.2d at 948–49 (quoting *Dasch v. Jackson,* 170 Md. 251, 262–64, 183 A. 534, 538–39 (1936)). We note that marriage is subject to the police power of the State not to employ the sort of circular reasoning urged by the State that Family Law § 2–201 is constitutional automatically, but rather to illustrate that the General Assembly and this Court have not always couched the right to marry in its most abstract sense.

66. Unfortunate dicta appears in *Henderson* declaring void any marriage within Maryland between Caucasian and African–American persons. 199 Md. 449, 459, 87 A.2d 403, 409 (1952). This objective is obviously invalid in light of the Supreme Court's subsequent holdings in *Loving.* The point of our allusion here to *Henderson,* however, is as an illustration that the State of Maryland may not be compelled to recognize a marriage performed in another state if that foreign marriage is repugnant to Maryland's public policy (interracial marriage was against the public policy of Maryland at the time *Henderson* was decided). *Id.* The

In that vein, whether a particular person may marry often has depended on *who* historically has enjoyed the right. Indeed, the fundamental right to marry is not absolute. Under Maryland law, a minor may not marry if the minor is under the age of 15. Family Law § 2–301(c). If the child is 15 years old, he or she may not marry unless consent is given by a parent or guardian *and* the clerk issuing the marriage license is supplied with documentation that the female to be married is either pregnant or has given birth. Family Law § 2–301(b). If the child is 16 or 17 years of age, he or she may not marry unless there is consent obtained from a parent or guardian *or,* in the case of woman, documentation is given indicating that the woman to be married is pregnant or has given birth. Family Law § 2–301(a); *see also Picarella v. Picarella,* 20 Md.App. 499, 510–11, 316 A.2d 826, 833–34 (1974). Limitations of this type on marriage are rooted in the common law. *See* 24 Op. Att'y Gen'l 482 (1939) (describing the age limits placed on marriage at common law). Individuals within a certain degree of lineal or collateral consanguinity may not marry. Family Law § 2–202. In order for a marriage to be valid within the State, the parties to it must be mentally competent such that "there [is] an understanding and appreciation of what the ceremony was that was being gone through with, and what were the legal consequences naturally deducible therefrom." *Montgomery v. U'Nertle,* 143 Md. 200, 207, 122 A. 357, 360 (1923); *Elfont v. Elfont,* 161 Md. 458, 471, 157 A. 741, 746 (1932) ("[T]o render a marriage invalid because of insanity on the part of one of the parties to the contract, it must be shown clearly and convincingly that such party was unable to understand the nature of the contract of marriage and to appreciate the legal consequences naturally deducible therefrom."). Bigamous relationships are likewise subject to regulation by the State, and any marriage stemming from such a relationship is considered void. *Roth v. Roth,* 49 Md.App. 433, 436, 433 A.2d 1162, 1164 (1981) (voiding a

---

discredited portion of *Henderson* does not affect the continuing and vital principle that marriage is subject to the police power of the State.

marriage when one of the parties has a still-living spouse from a previous marriage where no decree of divorce from the previous marriage has been issued); *Donnelly v. Donnelly,* 198 Md. 341, 346–47, 84 A.2d 89, 92 (1951); *see* Family Law § 2–402(b) (requiring in the application for a marriage license disclosure by the parties of the marital status of each party). We are not aware of any case from Maryland, the U.S. Supreme Court, or elsewhere domestically in which the issue has been framed in terms of whether the fundamental right to marry encompasses, for example, "the fundamental right to marry a person of one's choosing without government interference, even if that other person is lineally and directly related to the citizen asserting their fundamental right to marry," such that strict scrutiny was deemed the appropriate standard of constitutional review to analyze the relevant statute.

The principle of defining precisely the asserted liberty interest is not limited to the analytical context of marriage. When the scope of an asserted liberty interest becomes relevant to determining the fundamental nature of that right, we have sought to define narrowly that right and identify precisely the group asserting the liberty interest. In *Suessmann v. Lamone,* 383 Md. 697, 862 A.2d 1 (2004), for example, unaffiliated registered voters filed suit in the Circuit Court for St. Mary's County "seeking declaratory and injunctive relief from the allegedly unconstitutional exclusion of unaffiliated voters from the Democratic and Republican Parties' primary elections for circuit court judicial candidates." 383 Md. at 704, 862 A.2d at 5. Judges were chosen in a general election to which the judges gained access by securing placement on the ballot through victory in either of the primary elections held by the Democratic and Republican parties. *Suessmann,* 383 Md. at 704–05, 862 A.2d at 5. The State argued in that case, and we agreed, that "the mere fact a law imposes a burden on the right to vote does not mean the law must be subjected to strict scrutiny." *Suessmann,* 383 Md. at 729–30, 862 A.2d at 20. Rather than framing the constitutional issue in terms of the generally stated fundamental right to vote, we reviewed the election laws narrowly, and in terms of whether "the State

ha[d] deprived [the plaintiffs] of the right to vote *in the primary elections of a party to which they [did] not belong."* *Suessmann,* 383 Md. at 731, 862 A.2d at 21. This method of framing the asserted liberty interest is not inconsistent with that taken by various other courts addressing the issue. *See, e.g., In re Marriage Cases,* 49 Cal.Rptr.3d at 702 ("Constitutionally protected fundamental rights need not be defined so broadly that they will inevitably be exercised by everyone."); *see also Glucksberg,* 521 U.S. at 722–26, 728, 117 S.Ct. at 2269, 138 L.Ed.2d 772 (framing the asserted liberty interest as the "right to commit suicide with another's assistance" rather than the more abstractly-stated "liberty to choose how to die" or "right to choose a humane, dignified death," and determining that, even though the right to refuse lifesaving medical treatment was deeply rooted in our Nation's history, there existed no fundamental right to assisted suicide); *see also Glucksberg,* 521 U.S. at 727–28, 117 S.Ct. at 2271, 138 L.Ed.2d 772 ("That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected."); *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,* 495 F.3d 695, 701 n. 5 (D.C.Cir.2007) (determining, pursuant to Glucksberg, that the issue was framed properly as to "whether terminally ill patients have a fundamental right to experimental drugs that have passed Phase I clinical testing," rather than the broadly-asserted right "to try to save one's life" proposed by the terminally ill patients and adopted by the dissent); *Eschenbach,* 495 F.3d 695, 701 n. 5 (D.C.Cir.2007) ("If the asserted right is so broad that it protects a person's efforts to save his life, it might subject to strict scrutiny any government action that would affect the means by which he sought to do so, no matter how remote the chance of success.").

Our task, therefore, is to determine whether the right to same-sex marriage is so deeply embedded in the history, tradition, and culture of this State and Nation that it should be deemed fundamental. We hold that it is not.

*B. There is No Fundamental Right Requiring the State to Sanction Same–Sex Marriage*

It is well-established that the concepts of equal protection and due process embodied in Article 24, similar to the Fourteenth Amendment, are viewed as somewhat flexible and dynamic in order to accommodate advancements in the contemporary political, economic, and social climate. As we have stated,

> while the principles of the Constitution are unchangeable, in interpreting the language by which they are expressed it will be given a meaning which will permit the application of those principles to changes in the economic, social, and political life of the people, which the framers did not and could not foresee. Thus, while we may not depart from the Constitution's plain language, we are not bound strictly to accept only the meaning of the language at the time of adoption. . . . Thus, we construe the Constitution's provisions to accomplish in our modern society the purposes for which they were adopted by the drafters.

*Benson v. State*, 389 Md. 615, 632–33, 887 A.2d 525, 535 (2005) (citations omitted); *see also Lawrence*, 539 U.S. at 579, 123 S.Ct. at 2484, 156 L.Ed.2d 508 ("As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."). Mere acquiescence for any length of time, however, will not serve as an adequate foundation for the constitutionality of a particular legislative enactment. We therefore consider the current economic, political, and social climate in order to determine whether same-sex marriage is a fundamental right.

There is no doubt that the legal landscape surrounding the rights of homosexual persons is evolving. A trend toward gay, lesbian, and bisexual persons gaining more rights seems evident within Maryland, *see generally Something Old, Something New, Something Borrowed, Something Long Overdue: The Evolution of a "Sexual Orientation–Blind" System in Maryland and the Recognition of Same–Sex Marriage*, 35 U. BALT. L.REV. 73, 75–92 (2005) (cataloging recent trends toward

equality for lesbian, gay, bisexual, and transsexual persons and its potential impacts on the constitutionality of same-sex marriage in Maryland), as well as in the laws of the Nation as a whole. *Lawrence*, 539 U.S. at 575, 579, 123 S.Ct. at 2482, 2484, 156 L.Ed.2d 508 (overruling *Bowers* and declaring that the continued viability of the precedent allowing states to criminalize private consensual sexual intimacy between members of the same sex "demeans the lives of homosexual persons."); *Romer*, 517 U.S. at 623–24, 632, 116 S.Ct. at 1623, 1627, 134 L.Ed.2d 855 (invalidating on the grounds that it "impos[ed] a broad and undifferentiated disability on a single named group" an amendment to the Colorado Constitution that made it illegal for the legislature to pass laws prohibiting discrimination against gay, lesbian, and bisexual persons on account of their sexual orientation); *see also* Amer. Assoc. of Law Libraries, Social Responsibilities Special Interest Section, Standing Committee on Lesbian and Gay Issues, *Introduction* of Sexual Orientation and the Law: A Research Bibliography Selectively Annotating Legal Literature Through 2005, at XXV (discussing the exponential increase in recent years of case law and legislative enactments granting to lesbian, gay, bisexual, and transsexual persons rights never before enjoyed). Despite this expanding library of statutory and judicial authorities acknowledging a growing awareness of the need to protect gay, lesbian, and bisexual persons in broader society, acceptance alone does not require that the State or we recognize the asserted fundamental right that Appellees seek.

The breadth of precedent, particularly *Romer* and *Lawrence*, falls short of establishing as deeply rooted the concept of same-sex marriage. In *Romer*, while the Supreme Court held that it was unconstitutional for Colorado to amend its constitution to preclude state legislative enactments protecting from discrimination based on sexual orientation, the Court did so on the basis of equal protection. The Court determined, furthermore, that a "disadvantage imposed [that] is born of animosity toward the class of persons affected," thereby reflecting "a bare ... desire to harm a politically unpopular

group[,] cannot constitute a *legitimate* governmental interest." *Romer*, 517 U.S. at 634–35, 116 S.Ct. at 1629, 134 L.Ed.2d 855 (citations omitted). The Supreme Court concluded that the asserted state interests in protecting other citizens' freedom of association "who have personal or religious objections to homosexuality," and the "interest in conserving resources to fight discrimination against other groups," *Romer*, 517 U.S. at 635, 116 S.Ct. at 1629, 134 L.Ed.2d 855, was insufficient even for rational basis review. Beyond the principle that no state may pass laws or state constitutional amendments that prohibit any and all state or local government action designed to protect homosexual persons as a named class, *Romer*, 517 U.S. at 624, 116 S.Ct. at 1623, 134 L.Ed.2d 855, nothing within the language of this landmark case establishes as deeply rooted the concept of same-sex marriage.

Nor does *Lawrence* establish as deeply rooted the right to same-sex marriage. First, while the Court in that case overturned *Bowers* and declared unconstitutional the Texas statute on the basis that "[the law and traditions in the past half century] show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex," *Lawrence*, 539 U.S. at 571–72, 123 S.Ct. at 2480, 156 L.Ed.2d 508, it did so on what appears to be rational basis review. 539 U.S. at 579, 123 S.Ct. at 2484, 156 L.Ed.2d 508 ("The Texas statute furthers no *legitimate* state interest which can justify its intrusion into the personal and private life of the individual.") (emphasis added). Nor did the Court in that case state expressly that the right to sexual intercourse between two individuals of the same-sex was fundamental. *Lawrence*, 539 U.S. at 586, 123 S.Ct. at 2488, 156 L.Ed.2d 508 (Scalia, J., dissenting) ("Though there is discussion of 'fundamental proposition[s],' ..., and 'fundamental decisions,' ..., nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right' under the Due Process Clause; nor does it subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy *were* a 'fundamental right.' "). If the Court in *Lawrence* was unwilling to declare that the right of

two persons of the same sex to engage in sexual intimacy was deeply rooted in history and tradition, we are not disposed to accept that the *Lawrence* Court intended to confer such status on the public recognition of an implicitly similar relationship. *See Standhardt*, 77 P.3d at 457 ("If the Court did not view such an intimate expression of the bond securing a homosexual relationship to be a fundamental right, we must reject any notion that the Court intended to confer such status on the right to secure state-sanctioned recognition of such a union.").

Indeed, the Supreme Court in *Lawrence*, after declaring unconstitutional the Texas statute that forbade same-sex intimate conduct, held that

> [t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. *It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.* The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

*Lawrence*, 539 U.S. at 578–79, 123 S.Ct. at 2484, 156 L.Ed.2d 508 (emphasis added). *Lawrence* does not establish a fundamental right to same-sex marriage. Several of the holdings by other courts that have addressed the issue are in accord. *See, e.g., Standhardt*, 77 P.3d at 456–57 (determining that the Supreme Court's holding in *Lawrence* cannot be interpreted to provide for same-sex marriage); *Wilson*, 354 F.Supp.2d at

1307 ("[T]he Supreme Court's Decision in *Lawrence* cannot be interpreted as creating a fundamental right to same-sex marriage."); *Andersen*, 138 P.3d at 979 (distinguishing *Lawrence* on similar grounds).

We are unwilling to hold that a right to same-sex marriage has taken hold to the point that it is implicit in the concept of ordered liberty or deeply rooted in the history and tradition of Maryland. *Glucksberg*, 521 U.S. at 721, 117 S.Ct. at 2268, 138 L.Ed.2d 772. Even a quick glance at the laws of Maryland indicate that this State has long regarded marriage as a union between a man and a woman. The consanguinity statute, for example, addresses only those marriages with a certain degree of blood relation as between members of the opposite sex. Family Law § 2–202. The statutory scheme regulating dealings between spouses refers to the parties in terms of a "married woman" and "her husband." Family Law §§ 4–201 to 4–205. Family Law § 4–301, furthermore, involves liabilities for, and protection from, the obligations of a spouse. The statute addresses only those liabilities as between "husband" and "wife." These are only a few of the examples of Maryland family law statutes that recognize sex-specific language when referring to the marital relationship. The point is that despite the long-established presence of Family Law § 2–201, the laws of our State historically, and continue to, employ sex-specific language that reflects Maryland's adherence to the traditional understanding of marriage as between a man and woman.

In spite of the changing attitudes about what constitutes a "nuclear family," Congress, as well as nearly every state in the Nation, has taken legislative action or otherwise enacted constitutional amendments limiting explicitly the institution of marriage to those unions between a man and a woman.[67]

---

**67.** 1 U.S.C.A. § 7 (1996) ("In determining the means of any Act of Congress, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or wife."); Alaska Const. art. I, § 25; Ark. Const. amend. 83, § 1; Ga. Const. art. I, § IV, ¶¶ I; Haw. Const. art. I, § 23; Kan. Const. art. XV, § 16; Ky. Const.

With the exception of Massachusetts, virtually every court to have considered the issue has held that same-sex marriage is not constitutionally protected as fundamental in either their state or the Nation as a whole. *Standhardt,* 77 P.3d at 465 ("[A]lthough many traditional views of homosexuality have been recast overtime in our state and Nation, the choice to marry a same-sex partner has not taken sufficient root to receive constitutional protection as a fundamental right."); *Lewis,* 908 A.2d at 211 ("Despite the rich diversity of this State, the tolerance and goodness of its people, and the many recent advances made by gays and lesbians toward achieving social acceptance and equality under the law, we cannot find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people ... that it ranks as a fundamental right."); *Dean,* 653 A.2d at 332–33 (declaring summarily that same-sex marriage is not deeply rooted in history and tradition); *Baehr,* 852 P.2d at 57 (concluding that there is no fundamental right to same-sex marriage); *Baker v. Nelson,* 191 N.W.2d at 186 ("The institution of marriage as a union of man and woman ... is as old as the book of Genesis."); *In re Kandu,* 315 B.R. at 140 (holding that there is no fundamental right to same-sex marriage based on the Supreme Court's cautionary statements that courts should "exercise the utmost care" in establishing a new fundamental

---

§ 233a; LA. CONST. art. XII, § 15; MICH. CONST. art. I, § 25; MISS. CONST art. 14, § 263A; MO. CONST. art. I, § 33; MONT CONST. art. XIII, § 7; NEB. CONST. art. I, § 29; NEV.CONST. art. I, § 21; N.D. CONST. art. XI, § 28; OHIO CONST. art. XV, § 11; OKLA. CONST. art. II, § 35; OR. CONST art. XV, § 5a; TEX. CONST art. I, § 32; UTAH CONST. art. I, § 29; ALA.CODE § 30–1–19; ARIZ REV.STAT. § 25–101; CAL. FAM.CODE § 308.5 (West); COLO.REV.STAT. § 14–2–104; CONN. GEN.STAT. § 45a–727a; DEL.CODE ANN. tit. 13, § 101; FLA. STAT. § 741.212; IDAHO CODE § 32–201 (Michie); 750 ILL. COMP. STAT. 5/201, 5/212; IND.CODE § 31–11–1–1; IOWA CODE § 595.2; ME.REV STAT. ANN. tit. 19–A, §§ 650, 701; MINN. STAT. §§ 517.01, 517.03; N.H. REV. STAT. ANN. §§ 457:1, 457:2; N.J. STAT. ANN. 37:1–1, –3; N.M. STAT. ANN. § 40–1–18 (Michie); N.Y. Dom. Rel. Law §§ 51–1, 51–1.2 (McKinney); 23 PA. CONS.STAT. §§ 1102, 1704; R.I. GEN. LAWS §§ 15–1–1, 15–1–2, 15–2–1; S.C. CODE ANN. § 20–1–15 (Law.Co-op.); S.D. CODIFIED LAWS § 25–1–1 (Michie); TENN.CODE ANN. § 36–3–113; VT. STAT. ANN. tit. 15, § 8; VA CODE ANN. §§ 20–45.2, 20–45.3 (Michie); WASH. REV.CODE § 26.04.020(1)(c); W. VA CODE § 48–2–104(c); WIS. STAT §§ 765.001(2), 765.01; WYO STAT ANN § 20–1–101 (Michie).

liberty interest); *Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 9 ("The right to marry someone of the same sex, however, is not 'deeply rooted'; it has not even been asserted until relatively recent times."); *Andersen,* 138 P.3d at 979 ("That some laws provide [protections to gay and lesbian persons] shows change is occurring in our society, but community standards at this time do not show a societal commitment to inclusion of same-sex marriage as part of the fundamental right to marry."); *but see Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 961 (2003) ("Because the statute does not survive rational basis review, we do not consider the [same-sex couples'] arguments that this case merits strict scrutiny."). While the opinions of other courts in the Nation are not conclusive with regard to the present case, even when they constitute an overwhelming majority, their reasoning and analysis are instructive as they provide a sampling of the current socio-political climate in which we make our determination whether the asserted right is fundamental.

We are not unmindful of the fact that the relationships gay, lesbian, and bisexual persons seek to enter involve intimate and private decisions that extend to the core of the right to personal autonomy. Those decisions do not necessarily require us or the State to recognize formally those relationships in the form of State-sanctioned marriage. That a liberty interest such as the argued-for right to marry a person of the sex of one's choosing, even if assumed to be important, does not render automatically fundamental that liberty interest. *Glucksberg,* 521 U.S. at 727–28, 117 S.Ct. at 2271, 138 L.Ed.2d 772; *Hornbeck,* 295 Md. at 649, 458 A.2d at 786 ("Whether a claimed right is fundamental does not turn alone on the relative desirability or importance of that right."). When dealing in the realm of due process, furthermore, we are hesitant to recognize new fundamental rights, especially when the Supreme Court has either failed or declined to do so. "[W]here social or economic legislation [such as the regulation of marriage] is involved, ... [we] have generally avoided labeling a right as fundamental so as to avoid activating the

exacting strict scrutiny standard of review." *Hornbeck*, 295 Md. at 650, 458 A.2d at 786. As the Supreme Court stated, "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' ... lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court." *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2268, 138 L.Ed.2d 772 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)). With these principles in mind, and in light of Maryland's history of limiting marriage to those unions between members of the opposite sex, coupled with the policy choices of nearly every other state in the Nation, we do not find that same-sex marriage is so deeply rooted in this State or the country as a whole that it should be regarded at this time as a fundamental right.

### V. Family Law § 2–201 Comports with Notions of Rational Basis Review.[68]

 Because Family Law § 2–201 does not discriminate on the basis of sex, burden significantly a fundamental right, or otherwise draw a classification based on suspect or quasi-suspect criteria, rational basis review is the correct standard of constitutional review under which we consider the Maryland marriage statute. Under that standard,

> the State[ ] [is afforded] a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended

---

**68.** Judge Raker agrees that rational basis review is the appropriate standard to apply to analysis of Appellees' Article 24 argument (Raker dissent, op. at 328–29, 932 A.2d 637–38), whether viewed in support of a claim that gay and lesbian couples should have a right to marry in Maryland or, as Judge Raker supplies for Appellees, an alternate claim of relief that they should be granted civil union, domestic partners registration, or some other relief short of marriage.

only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. [The General Assembly is] presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*McGowan*, 366 U.S. at 425–26, 81 S.Ct. at 1105, 6 L.Ed.2d 393; *Murphy*, 325 Md. at 355, 601 A.2d at 108 ("[A] court 'will not overturn' the classification 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude the [governmental] actions were irrational."). Rational basis review "does [not] authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam)); *Md. Aggregates Ass'n, Inc. v. State*, 337 Md. 658, 655 A.2d 886 (1995) (" '[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.' ") (citations omitted). Thus, Family Law § 2–201 is presumed constitutional, and the burden is on Appellees to establish the unconstitutionality of the statute. *Whiting–Turner Contracting Co.*, 304 Md. at 352, 499 A.2d at 185 (holding that a statute reviewed under the "rational basis" test "enjoys a strong presumption of constitutionality, [and] can be invalidated only if the classification is without any reasonable basis and is purely arbitrary"). This burden requires Appellees to " 'negative every conceivable basis which might support [the statute],' whether or not the basis has a foundation on the record." *Heller*, 509 U.S. at 320–21, 113 S.Ct. at 2643, 125 L.Ed.2d 257 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)).

■ Appellants offer in support of Family Law § 2–201 two primary governmental interests: (1) the State has a legitimate interest in maintaining and promoting its police powers over the traditional institution of marriage and its binary, opposite-sex nature; and (2) the State has a legitimate interest in encouraging marriage between two members of the opposite sex, a union that is uniquely capable of producing offspring within the marital unit. We shall consider these interests, as necessary, in order to determine first, whether either (or both) is sufficient to justify the distinction made in Family Law § 2–201, and secondly, whether the means fit sufficiently the ends sought by the statute.

We agree that the State's asserted interest in fostering procreation is a legitimate governmental interest. As one of the fundamental rights recognized by the Supreme Court as a matter of personal autonomy, procreation is considered one of the most important of the fundamental rights. *Skinner,* 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1655 (*"Marriage and procreation* are fundamental to the very existence and survival of the race.") (emphasis added); *Zablocki,* 434 U.S. at 386, 98 S.Ct. at 681, 54 L.Ed.2d 618 ("It is not surprising that the decision to marry has been placed in the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. . . . [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of family in our society."); *Meyer,* 262 U.S. at 399, 43 S.Ct. at 626, 67 L.Ed. 1042 (recognizing that the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause). In light of the fundamental nature of procreation, and the importance placed on it by the Supreme Court, safeguarding an environment most conducive to the stable propagation and continuance of the human race is a legitimate government interest.

The question remains whether there exists a sufficient link between an interest in fostering a stable environment for procreation and the means at hand used to further that goal,

i.e., an implicit restriction on those who wish to avail themselves of State-sanctioned marriage. We conclude that there does exist a sufficient link. As stated earlier in this opinion, marriage enjoys its fundamental status due, in large part, to its link to procreation. *Loving,* 388 U.S. at 12, 87 S.Ct. at 1823, 18 L.Ed.2d 1010 ("Marriage is one of the 'basic civil rights of man,' *fundamental to our very existence and survival.*") (emphasis added); *Skinner,* 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1655 (*"Marriage and procreation* are fundamental to the very existence and survival of the race."); *Maynard,* 125 U.S. at 211, 8 S.Ct. at 729, 31 L.Ed. 654 ("[Marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and society, without which there would be neither civilization nor progress."). This "inextricable link" between marriage and procreation reasonably could support the definition of marriage as between a man and a woman only, because it is that relationship that is capable of producing biological offspring of both members (advances in reproductive technologies notwithstanding). Acceptance of this notion is found in the clear majority of opinions of the courts that have considered the issue. *See Standhardt,* 77 P.3d at 458 ("Implicit in *Loving* and predecessor opinions is the notion that marriage, often linked to procreation, is a union forged between one man and one woman."); *Dean,* 653 A.2d at 332–33 (holding that the right to marriage is deemed fundamental because of its link to procreation); *Singer,* 522 P.2d at 1197 ("[M]arriage is so clearly related to the public interest in affording a favorable environment for the growth of children that we are unable to say that there is not a rational basis upon which the state may limit the protection of its marriage laws to the legal union of one man and one woman."); *Andersen,* 138 P.3d at 982–83 ("But as *Skinner, Loving,* and *Zablocki* indicate, marriage is traditionally linked to procreation and survival of the human race. Heterosexual couples are the only couples who can produce biological offspring of the couple."); *Baker v. Nelson,* 191 N.W.2d at 186 ("The institution of marriage as a union of man and woman, uniquely

involving the procreation and rearing of children within a family, is as old as the book of Genesis.") (citing *Skinner*, 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. 1655).

■ Appellees urge in response, quite convincingly, that Family Law § 2–201 is not related rationally to the governmental objective of fostering optimal relationships for procreation because it is at once over-inclusive and under-inclusive. Appellees argue that it is overinclusive because children may be born *into* same-sex relationships through alternative methods of conception, including surrogacy, artificial insemination, in vitro fertilization, and adoption. The statute is also under-inclusive, according to Appellees, because not all opposite-sex couples choose to bear children, or are able to do so because of infertility or otherwise. Lastly, Appellees posit that the marriage statute is not linked sufficiently to the interests in procreation because allowing same-sex couples to marry will not impact interests in procreation in that "[o]pposite-sex couples will continue to bring children into their families through 'traditional' procreation regardless of whether same-sex couples are permitted to marry." [69]

---

**69.** Judge Battaglia's dissent, in response to the State's assertion that it has an interest in marriage "as an institution of transcendent importance to social welfare," posits that, "until the recent advances in assisted reproductive technology, there was a close[,] albeit imperfect fit[,] between opposite-sex marriage and the inherent biological fact that reproduction of our species could result only from the sexual union of a man and a woman.... The correspondence between opposite-sex marriage and biological necessity has never been more tenuous than it is today." Judge Battaglia's Dissent, op. at 418, 932 A.2d at 691. In that vein, the dissent argues that

[t]he phenomena of assisted reproduction and same sex marriage are so new and radical that there exists no evidence thus far to support or refute the asserted link [between reproduction and the State's asserted interest in marriage as an "institution of transcendent importance to social welfare"] and its concomitant external effects. Thus far, courts that have weighed this argument favorably have done so under rational basis review. The State's contention that the same-sex marriage ban arises organically from the nature of marriage itself, and that the much later codification accomplished by [Family Law § ] 2–201 merely clarifies society's compelling interest in "the historic family unit as a mechanism for protecting the progeny of biological unions," actually asserts the State interest in promoting an orderly,

There is some merit to these arguments. There appears to be a trend towards the gradual erosion of the "traditional" nuclear family in today's society to the extent that the classic family structure, consisting of a mother, father, and children born to them during the marriage, is less and less the norm.

stable society. On the present state of the record, I believe neither party has explored this issue in the depth appropriate to an issue of such permanent, transcendent magnitude.
Judge Battaglia's Dissent, op. at 420, 932 A.2d at 692–93 (citations omitted). As such, Judge Battaglia and Chief Judge Bell would remand, pursuant to Maryland Rule 8–604(d) ("If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court"), in order to conduct an evidentiary hearing regarding what it refers to as "the State's unrebutted contention regarding the broad societal interest in retaining traditional marriage." *Id.*

In ordering a remand for the purposes of additional evidentiary hearings, a Court exercising appellate jurisdiction must explain expressly its reasons for doing so. Md. Rule 8–604(d)(1). The problem with remanding in the present case lies in the fact that neither the record nor the briefs of the litigants reflect a dispute of material fact of the kind imagined by the dissent. Although Appellees argue generally that the distinction made by Family Law § 2–201 is over-inclusive and, at the same time, under-inclusive, they do not point to an evidentiary conflict necessitating remand for the purpose of an evidentiary hearing and resolution of a factual dispute. Appellees instead assert that they are entitled to summary judgment by virtue of what they deem to be a flaw fatal in the constitutionality of the marriage statute.

If this Court were to accept the reasoning of Judge Battaglia's dissent and reverse the grant of summary judgment, pursuant to Maryland Rule 2–501(a), (f) (providing that a motion for summary judgment may be granted only when there exists on the record no genuine disputes of material facts and the movant is entitled to judgment as a matter of law), we essentially would be recognizing in the record an illusory dispute of fact fatal to the grant of summary judgment when one does not exist. This we should decline to do. *See Haas v. Lockheed Martin Corp.*, 396 Md. 469, 478, 914 A.2d 735, 740 (2007) (holding that, when reviewing a circuit court's grant of summary judgement, "[w]e consider, *de novo*, first, *whether a material fact was placed in genuine dispute,* thus requiring a trial, and ... whether the Circuit Court was legally correct in granting summary judgment.") (citing *Livesay v. Baltimore County*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004)) (emphasis added); *Neifert v. Dep't of Env't*, 395 Md. 486, 910 A.2d 1100 (2006) ("*In reviewing a grant of summary judgment, we independently review the record to determine whether the parties properly generated a dispute of material fact* and, if not, whether the moving party is entitled to judgment as a

In 2000, of the 104.7 million households counted by the U.S. Census Bureau, only 55.3 million of them were composed of married couple households. Jason Fields & Lynne M. Casper, U.S. Census Bureau, *America's Families and Living Arrangements: March 2000,* Current Population Reports, P20–537, at 1 (2001), *available at* http://www.census.gov/prod/2001 pubs/p20–537.pdf (hereinafter *"America's Families 2000 "*). Of those 104.7 million households, only 24.1 percent were represented by the nuclear family (married couples with their own children). *Id.* at 3. This number represented a drastic decline from 40 percent of all households in 1970. *Id* The percentage of married opposite-sex households without children, however, remained constant from 1970 to 2000 at approximately 29 percent of all households in the United States. *Id.* As of 2000, therefore, there were just as many married households in the United States without marital children as those households with marital children. The period of time from 1970 to 1990, furthermore, saw an increase in births among unmarried women, "raising the proportion of children living with a single parent." *Id.* at 4 (quoting Amara Bachu, U.S. Census Bureau, *Trends in Premarital Childbearing: 1930–1994,* Current Population Reports, P23–197 (1999)). In 2000, there were 10 million single-mother families in the United States (up from 3 million in 1970), and 2 million single-father families (up from 393,000 in 1970). *Id.* at 6–7, 8.

The statistics are not limited to households in which children live with one or both biological/genetic parents. Indeed, reports from the U.S. Census Bureau show that of the 72.1 million children in the United States in 2000, only 68 percent live in a married couple family home. Terry Lugalia, Julia Overturf, U.S. Census Bureau, *Children and the Households They Live In: 2000,* CENSR–14, at 8 (2004), *available at* http://www.census.gov/prod/2004pubs/censr–14.pdf (hereinafter *"Children and the Households They Live In "*). Four million, four hundred thousand children (6.1% of the total

---

matter of law.") (citing *Livesay,* 384 Md. at 9, 862 A.2d at 38) (emphasis added).

children in the United States) lived with one or both grandparents, whereas 5.9 million children lived with someone other than a biological/genetic parent. *Id.* at 2, 3. *See also* Brent Bennett, et al., *To Grandmother's House We Go: Examining Troxel, Harrold, and the Future of Third–Party Visitation,* 74 U. Cin. L.Rev. 1549, 1553 (2006). In 2000 and closer to home, according the Census Bureau, 67 percent of all children in Baltimore lived outside of a married couple household, while 25.7 percent of all children lived with someone other than a biological/genetic parent. The City ranked in the top five nationwide in both of these categories. *Children and the Households They Live In, supra,* at 18. Thus, reasonable doubt exists that the traditional model of what constitutes a family does not constitute the majority of households any longer.

A legislative enactment reviewed under a rational basis standard of constitutional review need not be drawn with mathematical exactitude, and may contain imperfections that result in some degree of inequality. *Piscatelli v. Bd. of Liquor License Comm'rs,* 378 Md. 623, 644–45, 837 A.2d 931, 944 (2003) ("[A] state does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'") (citations omitted); *Whiting–Turner,* 304 Md. at 352, 499 A.2d at 185 ("[A] classification [subject to rational basis review] having some reasonable basis need not be made with mathematical nicety and may result in some inequality"). Looking beyond the fact that any inquiry into the ability or willingness of a couple actually to bear a child during marriage would violate the fundamental right to marital privacy recognized in *Griswold,* 381 U.S. at 484–86, 493, 85 S.Ct. at 1681, 14 L.Ed.2d 510, the fundamental right to marriage and its ensuing benefits are conferred on opposite-sex couples not because of a distinction between whether various opposite-sex couples actually procreate, but rather because of the *possibility* of procreation. In such a

situation, so long as the Legislature has not acted wholly unreasonably in granting recognition to the only relationship capable of bearing children traditionally within the marital unit, we may not "substitute [our] social and economic beliefs for the judgment of legislative bodies...." *Md. Aggregates Ass'n, Inc. v. State,* 337 Md. 658, 655 A.2d 886 (1995); *see also Heller,* 509 U.S. at 321, 113 S.Ct. at 2643, 125 L.Ed.2d 257 ("[C]ourts are compelled under rational-based review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.' ") (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). In light of the deference owed to the General Assembly under rational basis review, we shall not declare Family Law § 2–201 unconstitutional, even though it may be under—or over-inclusive, or otherwise create a distinction based on imperfectly drawn criteria.[70,71]

---

**70.** Because we find that the State's interest in fostering procreation sufficient to sustain Family Law § 2–201, we need not address the alternative, and rather circular, justification offered by Appellants based on the State's interest in maintaining its police power over the social institution of marriage.

**71.** Judge Raker's dissent, which follows closely the legal reasoning employed by the New Jersey Supreme Court in *Lewis v. Harris,* 188 N.J. 415, 908 A.2d 196 (N.J.2006), essentially rests on two strata: (1) the Due Process Clause of Article 24 of the Maryland Declaration of Rights; and (2) the Equal Protection Clause embodied in Article 24. *See, e.g., State v. Good Samaritan Hospital of Md., Inc.,* 299 Md. 310, 326 n. 7, 473 A.2d 892, 900 n. 7 (1984) ("The Maryland Constitution does not contain an express equal protection clause; the concept of equal protection is, however, embodied in Article 24 of the Declaration of Rights.") (citing *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 616, 458 A.2d 758 (1983)).

In line with the majority opinion here, Judge Raker's dissent posits initially that, even though Maryland's citizenry is a diverse and tolerant group, and there exists in Maryland precedent and statutory authority that evidence increasing social acceptance of homosexual persons, the same-sex couples do not have a fundamental right to marry. Despite the absence of a fundamental right of same-sex couples to marry, however, the dissent reasons additionally that Article 24's equal protec-

tion guarantee mandates that same-sex couples otherwise be afforded the various rights and benefits currently available under Maryland law only to opposite-sex couples. Dissent op. at 351–52, 932 A.2d at 651; *see also Lewis*, 908 A.2d at 200. In that vein, the dissent concludes essentially that the General Assembly must either amend Family Law § 2–201 to allow same-sex couples to marry, or create a substitute scheme under which same-sex couples may enjoy the same rights and benefits, as well as bear the same obligations, as married opposite-sex couples. Judge Raker's Concurring and Dissenting Opinion, op. at 356, 932 A.2d at 654; *see also Lewis*, 908 A.2d at 200.

We disagree with Judge Raker's dissent for, other than the reasons advanced in the body of the majority opinion, the simple reason that Appellees here expressly disavowed any present desire to obtain the alternate relief she proposes. Ordinarily in Maryland, a court, whether trial or appellate, does not fashion relief where the record reflects that the parties to be benefitted repudiated expressly the proposed relief.

Appellees, in this record, cited a number of "intangible protections of marriage for themselves and especially for their children." One such benefit relates to the sense of dignity that would accompany recognition of same-sex marriage in Maryland. Appellees refer, not only to the dignity that may be felt by the same-sex couples themselves, but also to their children in that the children, if their same-sex parents were able to marry, would "feel proud of who they are and where they come from." One Appellee stated, in support of Appellees' motion for summary judgment, that "[t]he legal sanction of [their] relationship through the institution of civil marriage would greatly diminish the stigma that [their] daughters will otherwise bear, simply because their parents are a same-sex couple." Another Appellee noted that she "suffer[s] dignitary harm on account of the fact that the law effectively requires [her] to choose between [her] life in Maryland and [her] relationship with [her partner], simply because [they] are not recognized as spouses."

Several Appellees iterated, in support of their motion for summary judgment, that the grant of benefits of marriage without actually recognizing same-sex marriage only would perpetuate the dignitary harm that they now claim to experience. Charles Blackburn wrote that "anything short of civil marriage for same-sex couples would perpetuate second-class citizenship for lesbian and gay families. While we respect the freedom of religious organizations to decline to perform religious wedding ceremonies for same-sex couples, we believe that such religious freedom cannot prevent our state from recognizing our relationship. We believe that, rather than undermining the institution of marriage, a commitment such as our[s] honors it. We believe that we, too, are entitled to the dignity and respect that marriage bestows." Steven Palmer wrote that he and his partner "[s]till risk discrimination fostered by the stigmatizing message about the worth of [their] relationship that [their] government sends to [the] community by excluding [them] from marriage." Finally, Patrick Wojahn wrote that "[m]ost of all, [he and his partner] wish for [their] relationship to enjoy that same social recognition as well as legal recognition as the relationships of [their] heterosexual peers. [Their] relationship can attain this level of respect only through the institution of marriage."

## VI. Conclusion

Because Family Law § 2–201 does not abridge the fundamental right to marriage (as we understand that right), does not discriminate on the basis of sex in violation of Article 46, and does not otherwise implicate a suspect or quasi-suspect class, the marriage statute is subject to rational review. As such, it carries a strong presumption of constitutionality. Under rational review, "[w]here there are 'plausible reasons' for [the General Assembly's] action, 'our inquiry is at an end.' . . . [Rationale basis review] is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that the judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313–14, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (citations omitted). In declaring that the State's legitimate interests in fostering procreation and encouraging the traditional family structure in which children are born are related reasonably to the means employed by Family Law § 2–201, our opinion should by no means be read to imply that the General Assembly may not grant and recognize for homosexual persons civil unions or the right to marry a person of the same sex.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; STAY VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO DECLARE CONSTITUTIONAL THE STATUTE AT ISSUE AND TO DENY INJUNCTIVE RELIEF TO APPELLEES. COSTS TO BE PAID BY APPELLEES.**

---

Thus, notwithstanding the statements of Appellees' counsel at oral argument that Family Law § 2–201 denies same-sex couples that *"full citizenship that is constitutionally guaranteed to them, no less than all other Marylanders,"* (emphasis added), Appellees appear to have disavowed, both impliedly and expressly, the alternate remedy Judge Raker would offer. Her dissent attempts to bestow upon Appellees the benefits of marriage, without actually granting them the right to marry, proposing exactly that which Appellees in the present case expressly chose not to seek in this litigation.

RAKER, J., Concurs in Part and Dissents.

BELL, C.J., and BATTAGLIA, J., Dissent.

RAKER, J., concurring in part and dissenting, in which BELL, C.J., joins in part:

I respectfully concur and dissent. Appellees assert that Maryland excludes them and their children from the protections unique to marriage solely because the person whom they love is a person of the same sex. Appellees seek the right to marry, understanding that a civil marriage license entitles married couples to a vast array of economic and social benefits and privileges—the rights of marriage—as well as other intangible benefits. Because in my view entitlement to the rights of marriage and the right to marry are distinct issues, I analyze them separately.

I would adopt the same analysis that the Supreme Court of New Jersey embraced in *Lewis v. Harris*, 188 N.J. 415, 908 A.2d 196 (2006), in which same-sex couples sued state officials, seeking both a declaration that New Jersey's laws banning same-sex marriage violated the equal protection guarantees of the New Jersey Constitution as well as injunctive relief compelling the State to grant them marriage licenses. The New Jersey Court noted that the legal battle in the case had been waged over one overarching issue—the right to marry. The court rejected this "all-or-nothing" approach. *Id.* at 206. Instead, the court distinguished between the right to marry, on the one hand, and the *rights* of marriage on the other hand. *Id.* Specifically, the court considered appellees' equal protection claim to consist of two components: whether committed same-sex couples have a constitutional right to the benefits and privileges afforded to married heterosexual couples, and, if so, whether they have a constitutional right to have their relationship recognized by the name marriage. I view the instant case before this Court in the same way, *i.e.*, the issue presented as having two components.[1] I would hold that

---

1. The majority analyzes whether appellees have a constitutional right to have their relationships recognized by the name marriage, but fails to

denying rights and benefits to committed same-sex couples that are given to married heterosexual couples violates the equal protection guarantee of Article 24 of the Maryland Declaration of Rights.[2] As did the State of New Jersey, I would find that "to comply with this constitutional mandate, the Legislature must either amend the marriage statutes to include same-sex couples or create a parallel statutory structure, which will provide for, on equal terms, the rights and benefits enjoyed and burdens and obligations borne by married couples." *Harris*, 908 A.2d at 200.

The Vermont Supreme Court reached the same conclusion and adopted a similar approach. *Baker v. State*, 170 Vt. 194, 744 A.2d 864 (1999). Like the New Jersey plaintiffs, (and the Maryland plaintiffs), the Vermont plaintiffs "sought injunctive and declaratory relief designed to secure a marriage license,

---

consider whether appellees are entitled to the same benefits, rights and privileges afforded to married heterosexual couples. I write separately to address only this latter issue.

**2.** Article 24 of the Maryland Declaration of Rights states "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Although Article 24 does not contain an express equal protection clause, this Court has held that the same concept of equal treatment is embodied in the due process requirement of Article 24 of the Declaration of Rights. *Frankel v. Board of Regents*, 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000) (quoting *Renko v. McLean*, 346 Md. 464, 482, 697 A.2d 468, 477 (1997)). United States Supreme Court cases applying the Equal Protection Clause of the Fourteenth Amendment are binding on this Court when applying that clause and are persuasive when we undertake to interpret and apply Article 24 of the Declaration of Rights. *Id.* at 313, 761 A.2d at 332. We reiterate that each provision is independent, however, and a violation of one is not necessarily a violation of the other. *See, e.g., Dua v. Comcast*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002). It is well accepted that this Court may apply a more stringent standard of review as a matter of state law under Maryland's equivalent to the Equal Protection Clause. *See Minnesota v. Clover Leaf Creamery Company*, 449 U.S. 456, 461–63 n. 6, 101 S.Ct. 715, 722–23 n. 6, 66 L.Ed.2d 659 (1981).

their claims and arguments here have focused primarily upon the consequences of official exclusion from the statutory benefits, protections, and security incident to marriage under Vermont law." *Id.* at 886. Although the Vermont decision is based upon the Common Benefits Clause of the Vermont Constitution, the court-ordered remedy for the deprivation of rights protected by the State Constitution makes eminent sense. The court held as follows:

> "We hold that the State is constitutionally required to extend to same-sex couples the common benefits and protections that flow from marriage under Vermont law. Whether this ultimately takes the form of inclusion within the marriage laws themselves or a parallel 'domestic partnership' system or some equivalent statutory alternative, rests with the Legislature. Whatever system is chosen, however, must conform with the constitutional imperative to afford all Vermonters the common benefit, protection, and security of the law."

*Baker,* 744 A.2d at 867.[3]

## I.

Under Maryland's traditional equal protection jurisprudence, a legislative classification which does not discriminate

---

**3.** The Vermont court made clear that the Legislature could and should fashion the appropriate remedy, stating as follows:

> "We hold only that plaintiffs are entitled under Chapter I, Article 7, of the Vermont Constitution to obtain the same benefits and protections afforded by Vermont law to married opposite-sex couples. We do not purport to infringe upon the prerogatives of the Legislature to craft an appropriate means of addressing this constitutional mandate, other than to note that the record here refers to a number of potentially constitutional statutory schemes from other jurisdictions. These include what are typically referred to as 'domestic partnership' or 'registered partnership' acts, which generally establish an alternative legal status to marriage for same-sex couples, impose similar formal requirements and limitations, create a parallel licensing or registration scheme, and extend all or most of the *same* rights and obligations provided by the law to married partners. See Report, Hawaii Commission on Sexual Orientation and the Law (Appendix D–1B) (1995) (recommending enactment of 'Universal Comprehensive Domestic Partnership Act' to establish equivalent licensing and

on the basis of sex, burden significantly a fundamental right, or otherwise draw a classification based on suspect or quasi-suspect criteria may be sustained if the classification is rationally related to a legitimate governmental interest. *See, e.g., Broadwater v. State,* 306 Md. 597, 603, 510 A.2d 583, 585–86 (1986) (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254 87 L.Ed.2d 313 (1985)); *Ehrlich v. Perez,* 394 Md. 691, 716–17, 908 A.2d 1220, 1235 (2006). In consideration of the majority's analysis, I agree that rational basis is the proper standard for reviewing Family Law § 2–201.

As the majority notes, a statute subject to rational basis review will be upheld generally unless the classification is "wholly irrelevant to the achievement of the State's objective." *Attorney General v. Waldron,* 289 Md. 683, 707, 426 A.2d 929, 942 (1981) (*quoting McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961) and *McDonald v. Bd. of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969)). Furthermore, a classification subject to rational basis review may result in some inequality so long as the state can produce any conceivable "state of facts" to justify the

---

eligibility scheme and confer upon domestic partners 'the same rights and obligations under the law that are conferred on spouses in a marriage relationship') (emphasis added); C. Christensen, *If Not Marriage? On Securing Gay and Lesbian Family Values by a 'Simulacrum of Marriage',* 66 Fordham L.Rev. 1699, 1734–45 (1998) (discussing various domestic and foreign domestic partnership acts); A. Friedman, *Same–Sex Marriage and the Right to Privacy: Abandoning Scriptural, Canonical, and Natural Law Based Definitions of Marriage,* 35 How. L.J. 173, 217–20 n. 237 (1992) (reprinting Denmark's 'Registered Partnership Act'); see generally, Note, *A More Perfect Union: A Legal and Social Analysis of Domestic Partnership Ordinances,* 92 Colum. L.Rev. 1164 (1992) (discussing local domestic partnership laws); M. Pedersen, *Denmark: Homosexual Marriage and New Rules Regarding Separation and Divorce,* 30 J. Fam. L. 289 (1992) (discussing amendments to Denmark's Registered Partnership Act); M. Roth, *The Norwegian Act on Registered Partnership for Homosexual Couples,* 35 J. Fam. L. 467 (1997) (discussing Norway's Act on Registered Partnership for Homosexual Couples). We do not intend specifically to endorse any one or all of the referenced acts, particularly in view of the significant benefits omitted from several of the laws." *Baker v. State,* 170 Vt. 194, 744 A.2d 864, 886–87 (1999).

distinction. *Whiting–Turner Contracting Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985); *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

It is incorrect, however, to presume that rational basis review is effectively no review at all, particularly where vital personal interests are affected by a statutory classification.[4] In Frankel, the Court noted its willingness to strike down, under rational basis review, laws that lack any reasonable justification.[5] *Frankel,* 361 Md. 298, 315, 761 A.2d 324, 333 (2000). We stated as follows:

"We have not hesitated to carefully examine a statute and declare it invalid if we .cannot discern a rational basis for its enactment. 'The vitality of this State's equal protection doctrine is demonstrated by our decisions which, although applying the deferential standard embodied in the rational basis test, have nevertheless invalidated many legislative classifications which impinged on privileges cherished by

---

**4.** Professor Cass Sunstein has documented that the United States Supreme Court has departed from the deferential rational basis standard without defining a new level of scrutiny. *See* Cass Sunstein, *Foreword: Leaving Things Undecided,* 110 HARV. L.REV. 4, 59–61 (1996). These cases include *Romer v. Evans,* 517 U.S. 620, 635, 116 S.Ct. 1620, 1628–29, 134 L.Ed.2d 855 (1996) (holding Colorado statute that banned state or local laws forbidding sexual-orientation discrimination was not rationally related to legitimate governmental objective), *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 450, 105 S.Ct. 3249, 3259–60, 87 L.Ed.2d 313 (1985) (applying rational basis review, Court invalidated zoning discrimination against mentally retarded as based on "irrational prejudice"), and *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 2825–26, 37 L.Ed.2d 782 (1973) (invalidating regulation that excluded nonfamily members of household from food stamp program). In each of these decisions, the Court employed a highly contextual, fact-based analysis balancing private rights and public interests even while ostensibly applying minimal rational basis review.

**5.** We noted that, "such invalid regulations have often imposed economic burdens, in a manner tending to favor some Maryland residents over other Maryland residents." *Frankel,* 361 Md. at 315, 761 A.2d 324 (quotations omitted) (citing *Maryland Aggregates v. State,* 337 Md. 658, 672 n. 9, 655 A.2d 886, 893 n. 9 (1995)).

our citizens.' " [6]

*Id.,* at 315, 761 A.2d at 333 (quoting *Verzi v. Baltimore County,* 333 Md. 411, 419, 635 A.2d 967, 971 (1994)). In practice, we have reviewed closely a legislative classification when important personal interests of distinct groups of Maryland residents are at stake or when legislation distributes benefits and burdens unequally between residents of the State.[7] With this equal protection jurisprudence in mind, I turn to whether appellees are entitled to the same benefits, rights and privileges afforded to married heterosexual couples.

## II.

Maryland's marriage law, Family Law § 2–201, entitles only opposite-sex couples to the rights of marriage. Md.Code (1984, 2006 Repl.Vol.), § 2–201 of the Family Law Article. As

---

**6.** *See Lawrence v. Texas,* 539 U.S. 558, 580, 123 S.Ct. 2472, 2485, 156 L.Ed.2d 508 (2003) (O'Connor, J., concurring) ("We have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships.").

**7.** *See, e.g., Frankel,* 361 Md. 298, 761 A.2d 324 (striking down, on rational basis review, tuition policy discriminating against certain in-state residents); *Verzi v. Baltimore County,* 333 Md. 411, 635 A.2d 967 (1994) (striking down, on rational basis review, ordinance discriminating against tow operators without a place of business in the county); *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981) (striking down, on rational basis review, statute discriminating against retired judge practitioners); *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372 (1993) (striking down, on rational basis review, zoning ordinance discriminating against university student tenants); *Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973) (striking down, on rational basis review, statute discriminating against cosmetologists); *Bruce v. Dir., Chesapeake Bay Aff.,* 261 Md. 585, 276 A.2d 200 (1971) (striking down, on rational basis review, statute discriminating against out-of-county crabbers and oystermen); *City of Balto. v. Charles Ctr. Parking,* 259 Md. 595, 271 A.2d 144 (1970) (striking down, on rational basis review, ordinance discriminating against painted signs); *Md. Coal Etc. Co. v. Bureau of Mines,* 193 Md. 627, 69 A.2d 471 (1949) (striking down, on rational basis review, mining statute discriminating against non-exempt counties); *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936) (striking down, on rational basis review, statute discriminating against paper-hangers); *Havre de Grace v. Johnson,* 143 Md. 601, 123 A. 65 (1923) (striking down, on rational basis review, an ordinance discriminating against out-of-city automobiles for hire).

a result of the classification in § 2–201, two similarly situated classes of people are established: committed same-sex couples and married opposite-sex couples. The State asserts that the classification is rationally related to a legitimate governmental interest in encouraging marriage between two members of the opposite sex as a means of fostering a stable environment for procreation.[8] Appellees, on the other hand, assert that the distinction between same-sex couples and opposite-sex couples does not rationally further the State's interest in child welfare.

### A. Current Laws—Rights and Limits

In order to determine whether Maryland's marriage law is rationally related to a legitimate governmental interest, it is first necessary to review how the Maryland statutory, regulatory, and case law has evolved to expand rights to gays and lesbians. It is highly significant that throughout this State, based on statutes and ordinances, discrimination against gays and lesbians is not tolerated or acceptable. As I will outline, discrimination on the basis of sexual orientation is against the law in this State. This context is important for analyzing whether the State's proffered interest is legitimate, and whether the State's means fit sufficiently the ends sought by the statute.

### 1. Rights

Over the past decade, Maryland has sought to eliminate discrimination based on sexual orientation and to reduce the disparate treatment of people based on sexual orientation, particularly in the areas of family law, criminal law, and anti-discrimination legislation.

Starting in the mid–1990's, Maryland appellate courts rejected the notion that homosexual individuals should be treat-

---

**8.** To reiterate, I do not address whether same-sex partners have the right to define their relationship by the name of marriage or whether the State has a legitimate interest in protecting the traditional institution of marriage by name. In this dissent, I analyze solely whether same-sex couples are entitled to the same rights of marriage that are provided in Maryland to heterosexual partners.

ed differently than heterosexual individuals when determining parental rights. Specifically, Maryland courts have rejected the notion that a person is unfit for visitation rights because of his or her sexual orientation. *Boswell v. Boswell,* 352 Md. 204, 237–238, 721 A.2d 662, 678 (1998); *North v. North,* 102 Md. App. 1, 15–17, 648 A.2d 1025, 1032–33 (1994). In *North,* the Court of Special Appeals, en banc, held that the trial court abused its discretion in denying a homosexual father overnight visitation rights by focusing on the *perceived harms* of exposing his children to his homosexual lifestyle instead of focusing on the proper question of whether visitation was in the best interests of his children. *North,* 102 Md.App. at 15–17, 648 A.2d at 1032–33. This Court has held subsequently that the sexual preference of the non-custodial parent whose visitation is being challenged is not relevant, and that restrictions on visitation should be reviewed under the best interests of the child standard. *Boswell,* 352 Md. at 236–238, 721 A.2d at 678. Indeed, we noted in *Boswell* that the "only relevance that a parent's sexual conduct or lifestyle has in the context of a visitation proceeding of this type is where that conduct or lifestyle is clearly shown to be detrimental to the children's emotional and/or physical well-being." *Id.* at 237–38, 721 A.2d at 678.

Maryland appellate courts have not considered sexual orientation as a factor when determining third party custody rights. In a custody dispute between two homosexual women, the Court of Special Appeals held that the trial court was required to exercise jurisdiction over a child visitation lawsuit brought by the biological mother's former same-sex partner under the Uniform Child Custody Jurisdiction Act, even if Tennessee was the more convenient forum. *Gestl v. Frederick,* 133 Md.App. 216, 244–45, 754 A.2d 1087, 1102–03 (2000). The court noted that the former partner, who was not a biological parent, would lack standing to bring an action in Tennessee absent a finding that parental custody would result in substantial harm to the child, whereas Maryland law entitled the third party an opportunity to show that exceptional circumstances existed that would make it in the child's best interests to grant

her custody.[9] *Id.* The sexual orientation of the individuals raising the custody claim was not a relevant factor in the court's holding—the former same-sex partner was viewed as any other third party who had a role in the child's life and could show exceptional circumstances. *See, e.g., Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003) (affirming grant of custody to grandparents); *Dietrich v. Anderson,* 185 Md. 103, 116, 43 A.2d 186 (1945) (denying father's petition for custody when child had been living with foster parents for five years); *Pastore v. Sharp,* 81 Md.App. 314, 322, 567 A.2d 509, 513 (1989), *cert. denied,* 319 Md. 304, 572 A.2d 182 (1990) (finding exceptional circumstances when child had been in custody of third party for two of his five years, child had become attached to third party, and his future would lack stability and certainty if placed with the natural mother); *Newkirk v. Newkirk,* 73 Md.App. 588, 595, 535 A.2d 947, 950–51 (1988) (finding exceptional circumstances in awarding custody of teenage children to half-brother, rather than natural father).

Although the issue of same-sex adoption has not been addressed by this Court, Maryland law does not appear to

---

**9.** This Court stated recently that "where private third parties are attempting to gain custody of children from their natural parents, the trial court must first find that both natural parents are unfit to have custody of their children or that extraordinary circumstances exist which are significantly detrimental to the child remaining in the custody of the parent or parents, before a trial court should consider the "'best interests of the child' standard as a means of deciding the dispute." *McDermott v. Dougherty,* 385 Md. 320, 325, 869 A.2d 751, 754 (2005); *see also Shurupoff v. Vockroth,* 372 Md. 639, 662, 814 A.2d 543, 557 (2003) ("[W]hen the dispute is between a parent and a third party, it is presumed that the child's best interest lies with parental custody. If there is a sufficient showing that the parent is unfit, however, or that exceptional circumstances exist which would make parental custody detrimental to the child's best interest, the presumption is rebutted and custody should not be given to the parent, for, in either situation, parental custody could not possibly be in the child's best interest. So long as the best interest of the child remains the definitive standard and there is any reasonable alternative, it defies both logic and common sense to place a child in the custody of anyone, including a parent, when either that person is unfit to have custody or such action, because of exceptional circumstances, would be detrimental to the child's best interest.")

preclude same-sex couple adoptions. The plain language of Family Law § 5–3A–29 permits any adult to adopt.[10] Md. Code (1984, 2006 Repl.Vol.), § 5–3A–29 of the Family Law Article. Thus, the statute does not appear to distinguish between the adoption of children by homosexuals or same-sex couples.[11] Individuals in a same-sex relationship may adopt, even though currently they are not allowed to marry under Maryland law, because there is no requirement that an adult seeking to adopt a child be married. Md.Code (1984, 2006 Repl.Vol.), § 5–349(b) (stating that a petition for adoption may not be denied "solely because the petitioner is single or unmarried."). In traditional adoptions and single-person adoptions, a child is adopted by one or two new parents and all legal relationships with prior parents are terminated. Maryland also recognizes "second-parent adoptions," where a child with one parent is adopted by a second parent without severing the prior-existing parental relationship.[12] *Id.* § 5–

---

**10.** The statutory requirements for adoption do not specifically address sexual orientation. Section 5–3A–29 of the Family Law Article of the Maryland Code sets forth the requirements as follows:

(a) *Age*—Any adult may petition a court for an adoption under this subtitle.

(b) *Minimum period of placement*—A petitioner may petition for adoption of a child 180 days or more after a child placement agency places the child with the petitioner.

(c) Marital status—(1) If a petitioner under this section is married, the petitioner's spouse shall join in the petition unless the spouse:

(i) is separated from the petitioner under a circumstance that gives the petitioner a ground for annulment or divorce; or

(ii) is not competent to join in the petition.

(2) If the marital status of a petitioner changes before entry of a final order, the petitioner shall amend the petition accordingly.

Md.Code (1984, 2006 Repl.Vol.), § 5–3A–29 of the Family Law Article.

**11.** Other states expressly prohibit adoptions by gays and lesbians. *See* FLA.STAT.ANN. § 63.042(3) (West 2005) ("No person eligible to adopt under this statute may adopt if that person is a homosexual."); MISS. CODE ANN. § 93–17–3(5) (2004 & Supp.2006) ("Adoption by couples of the same gender is prohibited."); UTAH CODE ANN. § 78–30–9(3)(a) (2002) ("The Legislature specifically finds that it is not in a child's best interest to be adopted by a person or persons who are cohabiting in a relationship that is not a legally valid and binding marriage under the laws of this state.").

**12.** *See In re Petition of D.L.G. & M.A.H.,* No. 95–179001/CAD, 2 MFLM Supp.21 (1997) (Cir. Ct. Balt. City, June 27, 1996). According to www.

331(b)(2) (adoption without prior termination of parental rights). Maryland's trial courts have granted same-sex couples "second-parent adoptions" and have noted that such adoptions are in the best interests of the child. *See In re Petition of D.L.G. & M.A.H.*, No. 95–179001/CAD, 2 MFLM Supp. 21 (1997) (Cir. Ct. Balt. City, June 27, 1996); Letter from Kathryn M. Rowe, Assistant Att'y Gen., Office of the Att'y Gen., Sharon Grosfeld, Delegate, Maryland Gen. Assemb. (June 9, 2000). Thus, sexual orientation is not a factor in adoption proceedings in Maryland, and the children adopted by same-sex couples are treated under Maryland law in the same way as children adopted by a heterosexual or married couple.

Maryland has acted to protect gays and lesbians in the area of criminal law. The General Assembly has amended Maryland's hate crime statutes to prohibit committing a crime upon a persons or property because of sexual orientation. *See* Md.Code (2002, 2006 Cum.Supp.), §§ 10–301 to 10–306 of the Criminal Law Article.

Maryland has addressed the decriminalization of sexual acts for both heterosexual and homosexual couples. In *Schochet v. State*, 320 Md. 714, 580 A.2d 176 (1990), this Court held that Maryland's statute criminalizing "unnatural or perverted sexual practices" did not encompass private, consensual, noncommercial, heterosexual activity between adults.[13] *See* Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 554. In 1998, a Maryland circuit court extended the *Schochet* ruling to hold that the

---

thetaskforce.org, Maryland is one of 15 states where trial courts have granted "second-parent adoptions." Second–Parent Adoption in the U.S. (2007), http://www.thetaskforce.org/downloads/reports/issue_maps/2nd_parent_adoption_5_07_color.pdf. Only three states provide for second-parent adoptions by statute. *See* CONN. GEN.STAT. 45a–724(3) (2005); VT.STAT.ANN. tit. 15A, § 1–102(b) (2002); 2007 Colo. Sess. Laws 837.

13. A jury had convicted Schochet of participating in the unnatural or perverted sexual practice of fellatio under the Md.Code (1957, 1987 Rep. Vol.), Art. 27 § 554. *Schochet v. State*, 320 Md. 714, 718, 580 A.2d 176, 178 (1990). *Schochet* did not directly address homosexual acts. *See id.*

"unnatural or perverted sexual practices" statute, § 554, did not encompass consensual, noncommercial, heterosexual *or homosexual* activity. *See Williams v. Glendening*, No. 98036031/CL–1059, 1998 WL 965992 (Md.Cir.Ct. Oct. 15, 1998). It is worth noting that the defendant State of Maryland specifically argued that § 554 should be construed so as not to apply to private, consensual, non-commercial homosexual activity because any other interpretation "gives rise to an equal protection question." *Id.* at *6. The Circuit Court held that "[i]t cannot be doubted ... that there would be an equal protection violation if acts, considered not criminal when committed by a heterosexual couple, could be prosecuted when practiced by a homosexual couple. There is simply no basis for the distinction." [14] *Id.* at *7. Thus, four years prior to the U.S. Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), which invalidated Texas' homosexual sodomy law, Maryland's courts and executive branch had already determined that private, consensual, non-commercial sex is non-criminal.[15]

Maryland public policy prohibits discrimination based on sexual orientation in public accommodation, housing, and employment. *See Anti-discrimination Act*, 2001 Md. Laws Chap. 340. The Anti-discrimination Act of 2001 bans discrimination based on sexual orientation, defined as "the identifica-

---

**14.** Interestingly, although this Court has not opined on *Williams*, the Maryland Office of the Attorney General issued an Advice Letter to Delegate Sue Hecht on October 29, 1999 stating that, "although *Williams* is a circuit court decision, the Court of Appeals would likely reach the same conclusion." *See* Advice Letters, ADVICE AND LEGISLATION QUARTERLY NEWS, Office of the Attorney General, October–December 1999, at 2–3, *available at* http://www.oag.state.md.us/Opinions/news/99–4.htm.

**15.** The American Civil Liberties Union reports that The Office of the Attorney General, in a consent decree signed on January 19, 1999, agreed to both not appeal *Williams v. Glendening*, No. 98036031/CL–1059, 1998 WL 965992 (Md.Cir.Ct. Oct. 15, 1998) and not enforce Maryland's sodomy statute. *See* In Historic Settlement with ACLU, Maryland Clears Last of its Sodomy Laws From the Books, (1991), http://aclu.org/lgbt/discrim/11991prs19990119.html; *see also* Scott Calvert, *Ruling on Gays Stirs Up Emotions*, BALT. SUN, June 28, 2003, at 1A.

tion of an individual as to male or female homosexuality, heterosexuality, or bisexuality."[16] *Id.* The Act states that it, "may not be construed to authorize or validate a marriage between two individuals of the same-sex" and it "may not be construed to require or prohibit an employer to offer health insurance benefits to unmarried domestic partners," but the Act as a whole firmly establishes that Maryland's public policy prohibits adverse treatment based on sexual orientation. *Id.*

There are a multitude of other state-wide laws and regulations that prohibit discrimination based on sexual orientation in a variety of categories. It is unlawful for social workers, judges, and the Washington Suburban Sanitary Commission, for example, to discriminate based on sexual orientation. Md. Code (1981, 2005 Repl. Vol, 2006 Cum.Supp.), § 19–311 of the Health and Occupations Article; Md. Rule 16–813 Canon 3A ("A judge shall perform the duties of judicial office ... impartially, and without having or manifesting bias or prejudice, including bias or prejudice based on ... sexual orientation...."); Md.Code (1957, 2002 Repl. Vol), Art. 29, § 1–107. Maryland has regulated several other areas to further the goal of sexual orientation equality.[17]

---

**16.** Maryland is one of twenty-one jurisdictions that have passed sexual orientation nondiscrimination laws. *See* Thetaskforce.org, State Non-discrimination Laws in the U.S. (2007), http://www.thetaskforce.org/downloads/reports/issue_maps/non_discrimination_07_07_color.pdf. The other jurisdictions are: California, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Maine, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, Nevada, Oregon, Rhode Island, Washington, Wisconsin, Vermont.

**17.** *See Gregory Care, Something Old, Something New, Something Borrowed, Something Long Overdue: The Evolution of a "Sexual Orientation–Blind" Legal System in Maryland and the Recognition of Same–Sex Marriage,* 35 U. BALT. L.REV. 73 at n. 111 (2006) ("Md.Code Regs. 01.01.1995.19(I)(A)(11) (2004) (executive order to establish an equal employment opportunity program for state government to ensure personnel actions taken "without regard to ... [s]exual orientation"); *id.* 01.04.04.04(B)(7) (2004) (requiring the board of directors of Residential Child Care Programs to ensure that such programs do not discriminate on the basis of sexual orientation); *id.* 05.04.11.18(A) (2005) (prohibiting sexual orientation discrimination by sponsors or contractors in the Special Housing Opportunities Program); *id.* 05.05.02.14(A) (2005)

(prohibiting sexual orientation discrimination in the Multi–Family Housing Revenue Bond Financing Program); *id.* 05.17.01.10(A) (2005) (prohibiting sexual orientation discrimination by sponsors in the Community Legacy Program); *id.* 07.03.03.07(I)(9)(b) (2004) (deeming quitting a job because of sexual orientation discrimination as good cause for purposes of the Family Investment Program); *id.* 07.03.08.02(B)(1)(h) (2004) (same in Emergency Assistance to Families with Children program); *id.* 07.03.16.08(D)(2) (2004) (same in Refugee Cash Assistance program); *id.* 07.05.03.09(A)(2) (2004) (prohibiting private child placement agencies from denying an application because of the applicant's or the adoptive child's sexual orientation); *id.* 07.05.03.15(C)(2) (2004) (prohibiting the delay or denial of the placement of an adoptive child because of the adoptive parent or child's sexual orientation); *id.* 10.18.06.03(A)(6) (2004) (requiring Maryland AIDS Drug Assistance Program providers to provide services without regard to sexual orientation); *id.* 10.26.03.03(D)(5) (2004) (prohibiting licensees of the Board of Acupuncture from discriminating on the basis of sexual orientation); *id.* 10.34.10.06(A)(1) (2004) (prohibiting pharmacists from discriminating on the basis of sexual orientation); *id.* 10.41.02.04(E) (2005) (prohibiting licensees of the Board of Examiners for Audiologists, Hearing Aid Dispensers, and Speech–Language Pathologists from discriminating on the basis of sexual orientation); *id.* 10.42.03.03(B)(5) (2005) (prohibiting licensed social workers from discriminating on the basis of sexual orientation); *id.* 10.43.14.03(D)(5) (2005) (prohibiting licensed chiropractors and registered chiropractic assistants of the Board of Chiropractic Examiners from discriminating on the basis of sexual orientation); *id.* 10.43.18.03(D)(5) (2005) (prohibiting licensed massage therapists of the Board of Chiropractic Examiners from discriminating on the basis of sexual orientation); *id.* 10.46.02.01(A)(1) (2005) (prohibiting licensees of the Board of Occupational Therapy Practice from discriminating on the basis of sexual orientation); *id.* 10.47.01.07(C) (2005) (prohibiting a program administered under the Alcohol and Drug Abuse Administration from discriminating on the basis of sexual orientation); *id.* 10.51.04.01(C)(2)(x) (2005) (prohibiting providers of Maryland Primary Care from discriminating on the basis of sexual orientation); *id.* 10.53.01.01(D)(5) (2005) (prohibiting an electrologist from discriminating on the basis of sexual orientation); *id.* 10.58.03.05(A)(2)(b) (2005) (prohibiting a counselor or therapist certified or licensed by the Board of Professional Counselors and Therapists from discriminating on the basis of sexual orientation); *id.* 11.02.04.02(A) (2005) (mandating that departmental actions of the Department of Transportation not discriminate on the basis of sexual orientation); *id.* 11.07.06.13 (2005) (mandating that proposals @submitted to the Transportation Public–Private Partnership Program may not be subjected to discrimination on the basis of sexual orientation); *id.* 11.15.29.02(E)(6) (2005) (permitting the rejection of motor vehicle registration plates which "[c]ommunicates a message of any kind about" sexual orientation); *id.* 13A.01.04.03 (2005) (guaranteeing a safe, adequate, and harassment-free educational environment for students without regard to sexual orientation in Maryland's public

Many Marylanders are similarly and further protected by county or municipal laws. Howard County, Prince George's County, Baltimore City, Montgomery County, and Anne Arundel County have ordinances that, in some form, prohibit sexual orientation discrimination. Howard County Code § 12.200 (2007) (prohibiting discrimination based on sexual orientation generally); *Id.* § 12.207 (prohibiting housing discrimination); *Id.* § 12.208 (prohibiting employment discrimination); *Id.* § 12.209 (prohibiting discrimination by law enforcement personnel); *Id.* § 12.210 (prohibiting public accommodation discrimination); *Id.* § 12.211 (prohibiting financing discrimination); *Id.* § 19.513 (prohibiting discrimination in use of "open space areas"); Prince George's County Code § 2–210 (2003) (prohibiting housing discrimination); *Id.* § 2–231.01 (prohibiting commercial real estate discrimination); *Id.* § 5A–117 (prohibiting cable service discrimination); *Id.* § 10A–122 (prohibiting discrimination in award of contracts); *Id.* § 16–101 (prohibiting discrimination based on sexual orientation in the personnel system of the County); Baltimore City Code art. 4, § 3–1 (2000) (prohibiting employment discrimination); *Id.* § 3–2 (prohibiting public accommodations discrimination); *Id.* § 3–3 (prohibiting education discrimination); *Id.* § 3–4 (prohibiting health and welfare agency discrimination); *Id.* § 3–5 (prohibiting housing discrimination); *Id.* art. 5, § 31–3 (providing for an annual review of licensed medical service providers to certify that they do not deny service on the basis of sexual orientation); *Id.* art. 19, § 23–2 (providing for the tracking of hate crimes motivated by the victim's sexual orientation);

---

schools); *id.* 14.27.02.03(B) (2004) (calling for the implementation of an equal employment opportunity program in the Maryland Environmental Service to administer the human resources policies and provisions without discriminating on the basis of sexual orientation); *id.* 14.29.04.09(C)(1) (2004) (prohibiting borrowers from the Maryland Heritage Areas Loan Program from discriminating on the basis of sexual orientation); *id.* 14.30.04.04(B)(3)(e)(i) (2004) (requiring election petitions of employee organizations for the State Higher Education Labor Relations Board to certify that they accept members without

Montgomery County Code § 27–1 (2004); *Id.* § 8A–15 (prohibiting cable service discrimination); *Id.* § 27–11 (prohibiting public accommodations discrimination); *Id.* § 27–12 (prohibiting housing discrimination); *Id.* § 27–16 (prohibiting commercial real estate discrimination); *Id.* § 27–19 (prohibiting employment discrimination); *Id.* § 27–22 (prohibiting discrimination through intimidation); *Id.* app. D, § 6.19 (prohibiting sexual orientation discrimination by licensees granted licenses by the Board of Licensing Commission); Code of Montgomery County Regulations § 21.02.18.04 (2004) (prohibiting discrimination by fire rescue personnel); *Id.* § 27.26.01.01 (including crimes committed against a person because of their sexual orientation as "hate crimes"); *Id.* § 33.07.01.05 (prohibiting employment discrimination in county operations); Anne Arundel County Code § 10–8–111 (2005) (prohibiting cable service discrimination).

Amongst these counties, Montgomery County is unique because it has extended certain employment benefits to the same-sex domestic partners of County employees—rights previously only enjoyed by heterosexual couples through the civil contract of marriage.[18] *See* Employee Benefits Equity Act of

---

regard to sexual orientation); 27:23 Md. Reg. 2130 (Nov. 17, 2000) (executive order for commission to study sexual orientation discrimination in Maryland).")

18. Certain requirements must be met for a couple to qualify as a domestic partnership. Section 33–22(c)(1) of the County Code provides:

"(c) *Requirements for domestic partnership.* To establish a domestic partnership, the employee and the employee's partner must . . .
"(1) satisfy all of the following requirements:
"(A) be the same sex . . .;
"(B) share a close personal relationship and be responsible for each other's welfare;
"(C) have shared the same legal residence for at least 12 months;
"(D) be at least 18 years old;
"(E) have voluntarily consented to the relationship, without fraud or duress;
"(F) not be married to, or in a domestic partnership with, any other person;
"(G) not be related by blood or affinity in a way that would disqualify them from marriage under State law if the employee and partner were . . . opposite sexes;
"(H) be legally competent to contract; and

1999 (the "Act"), Montgomery County Code § 33–22 (2004) (providing certain insurance and financial benefits to same-sex domestic partnerships); *Id.* § 52–24 (extending tax exemption for property transfers to same-sex couples). The Act, generally, extends benefits, such as health, leave, and survivor benefits comparable to those afforded the spouses of County employees, to the domestic partners of County employees, including those benefits available "under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the federal Family and Medical Leave Act, and other federal laws that apply to County employment benefits." *Id.* at § 33–22(b).

This Court upheld the constitutionality of the Montgomery County Act. *See Tyma v. Montgomery County,* 369 Md. 497, 801 A.2d 148 (2002) (holding that a home rule county does not exceed its local lawmaking authority or otherwise undermine State and federal law by providing benefits to the domestic partners of its employees). We held that the Act did not implicate Maryland's marriage laws. *Id.* at 514–15, 801 A.2d at 158. Instead, we determined that the County had demonstrated a valid public purpose for extending employment benefits, namely "recruit[ing] and retain[ing] qualified employees and ... promot[ing] employee loyalty." *Id.* at 512, 801 A.2d at 157. Thus, under this State's home rule authority, Montgomery County was within its right to provide for the health and welfare of the County not already provided for by the public general law. Md.Code (1957, 1985 Repl.Vol., 2001 Cum.Supp.), Art. 25A, § 5(S).

---

"(I) share sufficient financial and legal obligations to satisfy subsection (d)(2)."

Section (d) addresses the acceptable evidence of domestic partnership. Pursuant to subsection (d)(1), such evidence consists of either "an affidavit signed by both the employee and the employee's partner under penalty of perjury" or an official copy of the domestic partner registration, and under subsection (d)(2), evidence that the employee and partner share certain of several enumerated items, such as a joint lease, *see* § 33–22(d)(2)(A), or checking account, *see* § 33–22(d)(2)(C), that may document a domestic partnership.

## B. Limitations

Despite Maryland's recent statutory, regulatory, and case law that has evolved to equalize some legal protections of heterosexuals and homosexuals, same-sex couples are denied the protection of hundreds of laws simply because they are not yet entitled to the rights and benefits flowing from marriage. Appellees have directed us to over 425 statutory protections that are afforded to married couples and, as a result, to their children under state law, protections that appellees are denied.[19] *See* EQUALITY MARYLAND., MARRIAGE INEQUALITY IN THE STATE OF MARYLAND (2006), http://www.equalitymaryland.org marriage/marriage_inequality_in_maryland.pdf. I briefly examine the extent to which these laws continue to restrict committed same-sex couples from enjoying the full benefits and privileges available through marriage, unlike similarly situated heterosexual couples.[20]

Health related benefits are among the rights afforded to married couples but denied to committed same-sex couples. A spouse is automatically entitled to act as a surrogate regarding health care decisions necessary for an incapacitated spouse absent the existence of an appointed guardian. Md.Code (1982, 2005 Repl.Vol., 2006 Cum.Supp.), § 5–605 of the

---

**19.** As the majority notes, there are literally over a thousand federal rights, responsibilities, and privileges granted to married couples, but denied to same-sex couples. *See* A.B.A. SEC. OF FAM. L., *A White Paper: An Analysis of the Law Regarding Same–Sex Marriage, Civil Unions, and Domestic Partnerships,* 38 FAM. L.Q. 339, 366 n. 98 (citing U.S. GEN. ACCOUNTING OFFICE, GA O Rep. No. 04–4353R, Defense of Marriage Act: Update to Prior Report (2004), *available at* http://www.gao.gov/new. items/d04353r.pdf). The majority notes correctly, in footnote 6 of their opinion, that "[a]lthough disposition of the present case would have no effect on Appellees' eligibility for those federal benefits under the Federal Defense of Marriage Act, it illustrates the current regulatory landscape regarding same-sex marriage and the marital benefits from which Appellees are excluded."

**20.** It is not practical to fully discuss here the privileges that are provided to married individuals and denied to committed same-sex couples. For a full description *see* EQUALITY MARYLAND., MARRIAGE INEQUALITY IN THE STATE OF MARYLAND (2006), http://www.equalitymaryland. org /marriage/marriage_inequality_in_maryland.pdf.

Health–General Article. A spouse may share a room in health care facility. *Id.* § 19–344(h). A spouse is also permitted to secure health insurance for the other spouse. Md.Code (1997, 2003 Repl.Vol., 2006 Cum.Supp.), § 12–202 of the Insurance Article. Same-sex couples do not enjoy these automatic protections.

Married individuals benefit also from certain default provisions associated with the death of a spouse. A surviving spouse automatically has the right to arrange for the final disposition of the body of a decedent spouse in absence of written instructions. Md.Code (1982, 2005 Repl.Vol., 2006 Cum.Supp.), § 5–509 of the Health–General Article. A spouse is exempt from inheritance tax on benefits plans or real property passed on by the decedent. Md.Code (1988, 2004 Repl.Vol., 2006 Cum.Supp.), § 7–203 of the Tax General Article. A spouse is entitled to a family allowance of $5,000, which is exempt from and has priority over all claims against the estate. Md.Code (1974, 2001 Repl.Vol., 2006 Cum.Supp.), § 3–201 of the Estates and Trusts Article. A spouse may bring a cause of action for the wrongful death of a spouse. Md.Code (1974, 2006 Repl.Vol.), § 3–904 of the Courts and Judicial Proceedings Article. Furthermore, health insurance providers are required to continue coverage for surviving spouses. Md.Code (1997, 2006 Repl.Vol., 2006 Cum.Supp.), § 15–407 of the Insurance Article. Same-sex couples must incur the expense of attempting to gain and to protect these rights through wills and other legal instruments.

Beyond the realm of health and death benefits, married couples enjoy the right to freely transfer joint ownership in property to a spouse without having to pay transfer or recordation tax. Md.Code (1986, 2001 Repl.Vol., 2006 Cum.Supp.), §§ 12–108, 13–403 of the Tax–Property Article. Married couples may own property as tenants by the entirety, Md.Code (1974, 2003 Repl.Vol., 2006 Cum.Supp.), § 4–204 of the Real Property Article, which can, for example, protect the property from forfeiture in certain circumstances. Md.Code (2001, 2001 Repl.Vol., 2006 Cum.Supp.), § 12–103 of the Criminal Procedure Article. In judicial proceedings, married individuals may

not be compelled to testify against their spouse or to disclose confidential communications. Md.Code (1974, 2006 Repl.Vol.), § 9–105 of the Courts and Judicial Proceedings Article. One spouse cannot be compelled to testify against a defendant spouse as an adverse witness unless the charge involves child abuse or assault in which the spouse is a victim. *Id.* § 9–106. In the area of education, dependent children and spouses of armed forces members further benefit under Maryland law because they are exempt from paying non-resident tuition at a public institution of higher education. Md.Code (1978, 2006 Repl.Vol.), § 15–106.4 of the Education Article.

The statutes determining relationships between child and parent are particularly relevant. Maryland Code (1974, 2001 Repl.Vol., 2006 Cum.Supp.), § 1–206 of the Trusts and Estates Article states as follows:

"(a) A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in § 1–207,[21] a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.

"(b) A child conceived by artificial insemination of a married woman with the consent of her husband is the legitimate child of both of them for all purposes. Consent of the husband is presumed."

Although a child conceived by artificial insemination of a married woman can automatically be the legitimate child of both individuals in the marriage, a same-sex couple must go through the process of second-parent adoption, which necessarily involves a period of some delay.

It cannot be argued that same-sex couples are not denied significant benefits accorded to heterosexual couples. It is clear that there are significant differences in the benefits provided to married couples and same-sex couples in the areas

---

**21.** Md.Code (1974, 2001 Repl.Vol., 2006 Cum.Supp.), § 1–207 of the Estates and Trusts Article states that an "adopted child shall be treated as a natural child of his adopting parent or parents."

of taxation, business regulation, secured commercial transactions, spousal privilege and other procedural matters, education, estates and trusts, family law, decision-making regarding spousal health care, insurance, labor and employment, child care and child rearing, pensions, and the responsibilities attendant to spousal funeral arrangements. Significantly, the inequities directed to individuals in same-sex couples have an impact on their children. Children in same-sex couple households are treated differently—because their care providers are denied certain benefits and rights—despite comparable needs to children of married couples. Thus, under Maryland's current laws, committed same-sex couples and their children are not afforded the benefits and protections available to heterosexual households.

## 2. Analysis of State's Interests

As the majority notes, the State asserts two rationales in support of the statute governing marriage, Family Law § 2–201. First, the State argues that, "Maryland law preserving the historic definition of marriage to include a man and a woman is eminently reasonable and unquestionably bears a fair and substantial relation to the State's legitimate interest in maintaining and promoting the traditional institution of marriage." This rationale addresses solely the definition of marriage, as opposed to the rights and benefits that flow from marriage. Because I write separately to address the rights and benefits, I do not address this proffered State interest.

The State asserts also that, encouraging "the definition of marriage to include a man and woman is rationally related to a legitimate government interest in providing for the offspring that may result from heterosexual intimacy." Again, my focus is on whether the State may rationally deny same-sex couples the full rights and benefits of marriage in order to foster its asserted interest in a stable environment for procreation and child rearing.[22]

---

22. There is no doubt that the State has a legitimate interest in the welfare of children. The question is whether Family Law § 2–201 rationally furthers this interest.

Under our equal projection jurisprudence, a law will survive rational basis scrutiny, generally, if the distinction it makes rationally furthers a legitimate state purpose. As the majority acknowledges, the classification established in Family Law § 2–201 is both over-inclusive and under-inclusive. The statute is over-inclusive because children may be born into same-sex relationships through alternative methods of conception, including surrogacy, artificial insemination, in vitro fertilization, and adoption. Conversely, the statute is under-inclusive because not all opposite-sex couples choose to procreate, not all opposite-sex couples are able to have children, and many opposite-sex couples utilize the same alternative methods of conception as same-sex couples.[23] We have recognized, however, that a classification subject to rational basis review having "some *reasonable basis* need not be made with mathematical nicety and may result in *some* inequality." *Whiting–Turner*, 304 Md. at 352, 499 A.2d at 185 (emphasis added); *but see Waldron*, 289 Md. at 713–14, 426 A.2d at 946 ("A loose fit between the legislative ends and the means chosen to accomplish those goals, which leaves a significant measure of similarly situated persons unaffected by the enactment, or conversely, which includes individuals within the statute's purview who are not afflicted with the evil the statute seeks to remedy, is intolerable."). The question, in this case, is whether the State has a reasonable basis for its classification in Family Law § 2–201, particularly in light of the extensive inequality that results from the classification and its impacts on vital interests. *See Waldron*, 289 Md. at 704, 426 A.2d at 940 (noting that where a legislative enactment "invades protected rights to life, liberty, property or other interests secured by the fundamental doctrines of our jurisprudence, there is rea-

---

**23.** As noted in *Baker*, 744 A.2d at 881, "it is undisputed that most of those who utilize nontraditional means of conception are infertile *married* couples, and that many assisted-reproductive techniques involve only one of the married partner's genetic material, the other being supplied by a third party through sperm, egg, or embryo donation." (citations omitted).

son to be especially vigilant" in the exercise of rational basis review.)

Maryland public policy supports procreation that occurs in both opposite-sex and same-sex couple environments. Maryland appears to grant adoptions to both homosexual and heterosexual couples, and adoption agencies "may not deny an individual's application to be an adoptive parent because . . . [o]f the applicant's . . . sexual orientation." COMAR 7.05.03.09(A); *see also* COMAR 7.05.03.15(C)(2). Maryland courts also grant second-parent adoptions to same-sex partners and the Department of Health & Mental Hygiene issues birth certificates recognizing same-sex partners as co-parents. Furthermore, Maryland courts must disregard the sexual orientation of each parent in child custody and visitation disputes. *See Boswell*, 352 Md. 204, 721 A.2d 662. These laws do not demonstrate that Maryland has an interest in favoring heterosexual parents over homosexual couples with regard to procreation and child rearing. Indeed, the State specifically treats homosexual couples and heterosexual couples similarly in this context.

Despite the fact that Maryland provides some rights and benefits in the area of procreation to same-sex couples, the State asserts it has a rational basis for excluding same-sex couples from the *full* benefits of marriage. This is not a rational assertion. There is no doubt that the State has a legitimate interest in promoting procreation and child rearing, but it cannot rationally further this interest by only granting the full rights of marriage to opposite-sex couples when it *already* provides some legal protections regarding procreation and child rearing to same-sex couples.[24] Maryland's equal protection jurisprudence requires that a legislative distinction

---

24. Whether a child was conceived through "accidental" heterosexual sex or entered a family after planning by a different or a same-sex couple does not alter the State's interest in encouraging that every child be raised in the most stable setting possible. There is no rational basis for concluding that excluding same-sex couples from the rights of marriage will influence heterosexual couples to have procreative sexual relations only within marriage or to pursue marriage after procreation.

*reasonably* relate to the achievement of a legitimate State interest. *See Murphy v. Edmonds*, 325 Md. 342, 355, 601 A.2d 102, 108 (1992) (noting that "a court will not overturn the classification unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.") (quotations omitted; internal citations omitted). Here, where Maryland has granted *some* rights regarding procreation and child-rearing to same-sex couples, it cannot rationally claim that its interest in providing a stable environment for procreation and child rearing is then actually furthered by the exclusion of same-sex couples from the equal rights and benefits of marriage.[25]

What is striking, in fact, is that the State's proffered interest—providing a stable environment for procreation and child rearing—is actually compromised by denying same-sex families the benefits and rights that flow from marriage. That is, there is not a sufficient link between the State's proffered legitimate interest and the means utilized by the State to further that interest.

The State has determined arbitrarily which benefits may be extended to same-sex couples and the inequality that results is more than merely "some inequality." For example, there is no rational basis why a surviving spouse of a state employee

---

**25.** Maryland's equal protection jurisprudence requires that the legislative *distinction further* a legitimate state interest. Chief Judge Judith Kaye, writing for the dissent in *Hernandez v. Robles*, 7 N.Y.3d 338, 391, 821 N.Y.S.2d 770, 855 N.E.2d 1, 30 (2006), explained as follows:

"Properly analyzed, equal protection requires that it be the legislated *distinction* that furthers a legitimate state interest, not the discriminatory law itself. Were it otherwise, an irrational or invidious exclusion of a particular group would be permitted so long as there was an identifiable group that benefitted from the challenged legislation. In other words, it is not enough that the State have a legitimate interest in recognizing or supporting opposite-sex marriages. The relevant question here is whether there exists a rational basis for *excluding* same-sex couples from marriage, and, in fact, whether the State's interests in recognizing or supporting opposite-sex marriages are rationally *furthered* by the exclusion." (citation omitted).

killed in the performance of his or her duties should be denied payment of a death benefit if the individual is part of a same-sex couple. Md.Code (1994, 2004 Repl.Vol., 2006 Cum.Supp.), § 10–404 of the State Personnel and Pensions Article. A surviving spouse, regardless of sexual orientation, and his or her child or children would benefit from the additional financial security provided from a death benefit. It is rational to presume that such a financial benefit would contribute to a stable environment for procreation and child rearing, regardless of the couples' sexual orientation. Similarly, there is no rational basis for requiring a group life insurance policy to cover a spouse and dependent children in a heterosexual family, when children of same-sex couples would benefit just as much from life insurance. Md.Code (1997, 2006 Repl.Vol., 2006 Cum.Supp.), § 17–209 of the Insurance Article. This disparate treatment of committed same-sex couples, exhibited in a multitude of Maryland laws discussed *supra*, directly disadvantages the children of same-sex couples, and there is no rational basis to allow such disadvantages when the State's proffered interest is to promote a stable environment for procreation and child rearing. Each child raised in a household headed by a same-sex couple in Maryland needs and is entitled to the same legal protections as a child of married parents.

I agree with the Supreme Court of Vermont, which recognized both the multitude and significance of the benefits and protections incident to a marriage. The Vermont Supreme Court stated as follows:

"While other statutes could be added to this list, the point is clear. The legal benefits and protections flowing from a marriage license are of such significance that any statutory exclusion must necessarily be grounded on public concerns of sufficient weight, cogency, and authority that the justice of the deprivation cannot seriously be questioned. Considered in light of the extreme logical disjunction between the classification and the stated purposes of the law—protecting children and 'furthering the link between procreation and child rearing'—the exclusion falls substantially short of this

standard. The laudable governmental goal of promoting a commitment between married couples to promote the security of their children and the community as a whole provides no reasonable basis for denying the legal benefits and protections of marriage to same-sex couples, who are no differently situated with respect to *this goal* than their opposite-sex counterparts. Promoting a link between procreation and childrearing similarly fails to support the exclusion."

*Baker*, 744 A.2d at 884.

The classification in Family Law § 2–201 is significantly over—and under-inclusive, and creates more than merely an imperfect fit between means and ends with regard to the disbursement of the rights and benefits of marriage. Denying same-sex couples the rights and benefits appurtenant to marriage is not a means to legitimately meet the State's interest in furthering procreation and child-rearing. Moreover, the classification creates more than merely "some inequality"—it creates a grossly unequal distribution of benefits and privileges to two similarly situated classes of people. The State has failed to provide a legitimate State interest in denying the protections and responsibilities of marriage that is rationally furthered by the classification in Family Law § 2–201. As discussed, *supra*, this State has demonstrated that it is on a path to providing full equality regardless of sexual orientation, and it is unreasonable and irrational for the State to arbitrarily grant to same-sex couples certain rights and benefits incident to marriage considering the full range of protections and responsibilities that come with marriage. In short, while there may be a legitimate basis for retaining the definition of marriage as one between a man and a woman, there is no legitimate basis for denying committed same-sex couples the benefits and privileges of marriage.

The reality of Maryland today is that heterosexual couples are not the only people that participate in procreation and child rearing. Maryland's laws recognize and promote this reality, and each child raised in a household headed by a committed same-sex couple in Maryland needs and is entitled

to the same legal protections as a child of heterosexual married parents. Thus, in order for the State to rationally further procreation and child rearing, the benefits and rights incident to marriage must be equally available to both committed same-sex and committed opposite-sex couples.

## C. Remedy

The State has not demonstrated a rational relationship between denying committed same-sex couples the benefits and privileges given to their married heterosexual counterparts and the legitimate government purpose of promoting procreation and child-rearing. Under the equal protection guarantee of Article 24 of the Maryland Declaration of Rights, the State must provide committed same-sex couples, on equal terms, the same rights, benefits, and responsibilities enjoyed by married heterosexual couples.

It is up to the General Assembly to meet the equal protection guarantee of Article 24 of the Maryland Declaration of Rights. It is not this Court's role to craft a constitutional statutory scheme, but the General Assembly could satisfy the constitutional mandate by creating a separate statutory structure similar to the civil union or domestic partnership laws present in our sister jurisdictions.[26]

Each state's statutory scheme differs in the rights and benefits granted to same-sex couples,[27] but the schemes are

---

**26.** The focus of this dissent is not on the definition of marriage, but it should be noted that the General Assembly could also act to remedy the current equal protection violations by modifying the definition of marriage in Family Law § 2–201 to include committed same-sex couples. Alternatively, the Legislature could elect to title all partnerships between two people, whether heterosexual or homosexual, as civil unions, domestic partnerships, etc.

**27.** Connecticut, New Jersey, New Hampshire and Vermont, for example, have passed legislation that allows or authorizes civil unions for same-sex couples. *See* CONN. GEN.STAT. §§ 46b–38aa to –38pp (2006 Supp.); 2007–2 N.H.Rev.Stat. Ann. Adv. Legis. Serv. 54 (LexisNexis); N.J. STAT. ANN. § 26:8A–1 to A–12 (West 2007); VT.STAT.ANN. tit. 15, §§ 1201–1207 (2002). California, the District of Columbia, Hawaii, Maine, Oregon, and Washington enacted legislation providing for the

similar in that they afford rights to committed same-sex couples on equal terms with their heterosexual counterparts. The New Jersey experience is important and instructive. On October 25, 2006, the Supreme Court of New Jersey decided *Lewis v. Harris,* 188 N.J. 415, 908 A.2d 196. The Court held that there is not a fundamental right to marriage under the New Jersey Constitution, but that "under the equal protection guarantee of Article I, Paragraph 1 of the New Jersey Constitution, committed same-sex couples must be afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples." *Id.* at 220–21. The Supreme Court of New Jersey stated that the legislature had 180 days to either amend the existing marriage statutes to include same-sex couples, or it could create a separate and parallel statutory structure, such as a civil union, affording same-sex couples all of the same rights and responsibilities as heterosexual married couples. *Id.*

New Jersey's legislature acted and chose to establish civil unions by amending the State's current marriage statute to include same-sex couples. *See* 2006 N.J. Laws 975. In doing so, the legislature stated that it was "continuing its longstanding history of insuring equality under the laws for all New Jersey citizens by providing same-sex couples with the same rights and benefits as heterosexual couples who choose to marry." N.J. Stat. Ann. § 37:1–28(f) (West 2007).

The New Jersey Legislature set forth three requirements that two persons seeking to establish a civil union must meet: (1) not be a party to another civil union, domestic partnership or marriage in New Jersey; (2) be of the same sex; and (3) be at least 18 years of age, with certain exceptions.[28] *Id.* § 37:1–30. Regarding benefits and rights, the New Jersey legislature

registration of domestic partnerships. Cal. Family Code, §§ 297 –299.6 (West 2004); D.C. Code § 32–701 et seq. (2001); Haw.Rev.Stat. 572C–1 et seq. (2006 Supp.); Me.Rev.Stat. Ann. tit. 22, § 2710 (2003); 2007 Or. Laws 168; 2007 Wash. Sess. Laws 616–37.

**28.** Certain marriages or civil unions are prohibited outright, such as those between relatives. *See* N.J. Stat. Ann. § 37:1–1 (West 2007).

stated that "[c]ivil union couples shall have all of the same benefits, protections and responsibilities under law, whether they derive from statute, administrative or court rule, public policy, common law or any other source of civil law, as are granted to spouses in a marriage." *Id.* § 37:1–31(a). The statute specifically notes, for example, that, "[t]he rights of civil union couples with respect to a child of whom either becomes the parent during the term of the civil union, shall be the same as those of a married couple with respect to a child of whom either spouse or partner in a civil union couple becomes the parent during the marriage." *Id.* § 37:1–31(e). Moreover, the statute enumerates a list of "legal benefits, protections and responsibilities of spouses [that] shall apply in like manner to civil union couples, but shall not be construed to be an exclusive list of such benefits, protections and responsibilities." [29] *Id.* § 37:1–32. Finally, the legislature estab-

---

**29.** The non-exclusive list of legal benefits, protections and responsibilities stated in the New Jersey Civil Union statute, N.J. Stat. Ann. § 37:1–32 (West 2007), includes the following:

"a. laws relating to title, tenure, descent and distribution, intestate succession, survivorship, or other incidents of the acquisition, ownership or transfer, inter vivos or at death, of real or personal property, including but not limited to eligibility to hold real and personal property as tenants by the entirety;

"b. causes of action related to or dependent upon spousal status, including an action for wrongful death, emotional distress, loss of consortium, or other torts or actions under contracts reciting, related to, or dependent upon spousal status;

"c. probate law and procedure, including nonprobate transfer;

"d. adoption law and procedures;

"e. laws relating to insurance, health and pension benefits;

"f. domestic violence protections pursuant to the "Prevention of Domestic Violence Act of 1991," P.L.1991, c. 261 (2C:25–17 et seq.) and domestic violence programs;

"g. prohibitions against discrimination based upon marital status;

"h. victim's compensation benefits, including but not limited to compensation to spouse, children and relatives of homicide victims;

"i. workers' compensation benefits pursuant to chapter 15 of Title 34 of the Revised Statutes, including but not limited to survivors' benefits and payment of back wages;

"j. laws relating to emergency and nonemergency medical care and treatment, hospital visitation and notification, and any rights guaranteed to a hospital patient pursuant to P.L.1989, c. 170 (C.26:2H–12.7

lished a Civil Union Review Commission, which it charged with, amongst other things, studying the implementation of the law, evaluating the effect on same-sex couples, their children and other family members of being provided civil unions rather than marriage, and reporting its findings to the Legislature and Governor on a semi-annual basis. *Id.* § 37:1–36.

Under Md. Rule 8–606, the disposition of an appeal is evidenced by the issuance of a mandate by the Clerk of Court in conformance with the opinion, not by the opinion itself. Generally, the mandate—the judgment of the Court—is issued 30 days after the filing of the opinion, but Rule 8–606(b) permits the Court to advance or delay the issuance of the

---

et seq.) or a nursing home resident pursuant to P.L.1976, c. 120 (C.30:13–1 et seq.);

"k. advance directives for health care and designation as a health care representative pursuant to P.L.1991, c. 201 (C.26:2H–53 et seq.);

"l. family leave benefits pursuant to P.L.1989, c. 261 (C.34:11B–1 et seq.);

"m. public assistance benefits under State law, including, but not limited to: Work First New Jersey benefits pursuant to P.L.1997, c. 38 (C.44:10–55 et seq.); medical assistance pursuant to P.L.1968, c. 413 (C.30:4D–1 et seq.); Supplemental Security Income pursuant to P.L.1973, c. 256 (C.44:7–85 et seq.); pharmaceutical assistance pursuant to P.L.1975, c. 194 (C.30:4D–20 et seq.) and P.L.2001, c. 96 (C.30:4D–43 et seq.); hearing aid assistance pursuant to P.L.1987, c. 298 (C.30:4D–36 et seq.); and utility benefits pursuant to P.L.1979, c. 197 (C.48:2–29.15 et seq.) and P.L.1981, c. 210 (C.48:2–29.30 et seq.);

"n. laws relating to taxes imposed by the State or a municipality including but not limited to homestead rebate tax allowances, tax deductions based on marital status or exemptions from realty transfer tax based on marital status;

"o. laws relating to immunity from compelled testimony and the marital communication privilege;

"p. the home ownership rights of a surviving spouse;

"q. the right of a spouse to a surname change without petitioning the court;

"r. laws relating to the making of, revoking and objecting to anatomical gifts pursuant to P.L.1969, c. 161 (C.26:6–57 et seq.);

"s. State pay for military service;

"t. application for absentee ballots;

"u. legal requirements for assignment of wages; and

"v. laws related to tuition assistance for higher education for surviving spouses or children."

mandate and we have, on occasion, exercised this discretion. *See Massey v. Secretary, Dept. of Public Safety and Correctional Services*, 389 Md. 496, 886 A.2d 585 (2005) (Clerk of Court directed to withhold mandate for 120 days in order to give the Secretary of Public Safety and Correctional Services time to comply with the Administrative Procedure Act).

Similar to the situation in New Jersey prior to passage of that State's civil union law, there is an unconstitutional disparity of rights, benefits, and responsibilities between committed same-sex couples and heterosexual couples in Maryland. The constitutional relief to which appellants are entitled would necessarily require the cooperation of the General Assembly. As a result, such relief could not be immediate. The General Assembly should, however, work to create a scheme that safeguards the individual liberties protected by the Maryland Declaration of Rights. In this case, I would retain jurisdiction in this Court and instruct the Clerk to withhold the mandate for 180 days to give the General Assembly time to consider and enact legislation consistent with the views expressed in this dissenting opinion. In my view, the General Assembly should either amend the marriage statutes or enact an appropriate statutory scheme to provide appellees with their full rights under Maryland's equal protection guarantee in a timely manner.

Chief Judge Bell authorizes me to state that he agrees with, and joins this dissenting opinion to the extent that it endorses and advocates that committed same-sex couples are entitled to the myriad statutory benefits that are associated with and flow from marriage. He does not join the part of this opinion that accepts the majority's analysis and determination that rational basis review is the appropriate standard to be applied in this case. *See* Bell, C.J., dissenting opinion.

BATTAGLIA, J., dissenting.

I respectfully dissent. In this case, the majority erroneously relies on the opinion of Chief Judge Robert C. Murphy in *Burning Tree Club, Inc. v. Bainum*, 305 Md. 53, 501 A.2d 817

(1985) (*Burning Tree I* ),[1] as authority to hold that Section 2–201 of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.) ("Only a marriage between a man and a woman is valid in this State."), does not implicate Article 46 of the Maryland Declaration of Rights.[2] Despite the fact that Chief Judge Murphy's opinion did not reflect the view of a majority of this Court *as he so recognized, Burning Tree I,* 305 Md. at 80, 501 A.2d at 830, the majority in the instant case adopts Chief Judge Murphy's reasoning to hold that Section 2–201 benefits and burdens both men and women equally and therefore, escapes strict scrutiny analysis. *Conaway v. Deane,* op. at 254–63, 932 A.2d at 591–97. Contrary to the majority's conclusion, this Court has declined to restrict the scope of Article 46 through the use of the "equal application" approach.[3] In *State v. Burning Tree Club, Inc.,* 315 Md. 254, 293, 554 A.2d 366, 386 (1989) (*Burning Tree II* ), this Court held "that the enactment of legislation which on its face draws classifications based on sex is state action sufficient to invoke the E.R.A.," citing the opinions of a majority of the Court in *Burning Tree I.* Although many of our prior cases implicated government action "directly imposing a burden or conferring a

---

1. There have been three *Burning Tree* cases decided by this Court: *State ex rel. Attorney Gen. v. Burning Tree Club, Inc.,* 301 Md. 9, 481 A.2d 785 (1984) *(Burning Tree); Burning Tree Club, Inc. v. Bainum,* 305 Md. 53, 501 A.2d 817 (1985) (*Burning Tree I* ); and *State v. Burning Tree Club, Inc.,* 315 Md. 254, 554 A.2d 366 (1989) (*Burning Tree II* ). Both the opinion of the trial court and the majority opinion of this Court address only the second and third cases and adopt the designations indicated. In order to prevent confusion, I have adopted the same methodology.

2. Article 46 of the Maryland Declaration of Rights also is known as the Equal Rights Amendment ("ERA").

3. *See Giffin v. Crane,* 351 Md. 133, 149, 716 A.2d 1029, 1037 (1998); *Burning Tree I,* 305 Md. at 70, 501 A.2d at 825 (opinion of Murphy, C.J.). According to the "equal application" approach, the ERA "generally invalidates" governmental action that "imposes a burden on, or grants a benefit to, one sex but not the other one." *Giffin,* 351 Md. at 149, 716 A.2d at 1037. Under this approach, without a denial or abridgment of equal rights under the law "as between men and women," the ERA is not implicated. *Burning Tree I,* 305 Md. at 70, 501 A.2d at 825.

benefit entirely upon either males or females," *Burning Tree I*, 305 Md. at 95, 501 A.2d at 838 (opinion of Eldridge, J.), it would be erroneous, just because of the factual situations heretofore presented, for this Court to hold that the ERA is so narrowly limited, rather than to look to its "language and purpose," which mandate strict scrutiny analysis of Section 2–201. *See, e.g., Giffin v. Crane*, 351 Md. 133, 148–49, 155, 716 A.2d 1029, 1037, 1040 (1998) (applying strict scrutiny to invalidate consideration of whether a parent and child are of the same or opposite sex as a factor in child custody determinations); *Rand v. Rand*, 280 Md. 508, 511–12, 516, 374 A.2d 900, 902–03, 905 (1977) (applying a standard beyond strict scrutiny[4] to require child support obligations be allocated without regard for the sex of the parents).

## I. Determining the Applicable Standard of Review

### A. *Burning Tree I*

#### 1. The Primary Case

In *Burning Tree I*, Stewart Bainum, in his role as taxpayer,[5] and Barbara Renschler, a taxpayer and a woman seeking membership in the Burning Tree Club, a private country club that excluded women, sued the State, the Department of Assessments and Taxation, and the Club, seeking a declaratory judgment that the "primary purpose" exception found in Section 19(e)(4)(i) of Article 81, Maryland Code (1957, 1980 Repl.Vol.),[6] violated the ERA. *Burning Tree I*, 305 Md. at 59–

---

4. The *Rand Court cited Darrin v. Gould*, 85 Wash.2d 859, 540 P.2d 882, 893 (1975), for the proposition that the ERA *itself* was the compelling state interest in a strict scrutiny analysis under the Washington State version of the ERA. *See also Burning Tree I*, 305 Md. at 97, 501 A.2d at 839, where Judge John C. Eldridge pointed out that the *Rand* standard may be "stricter . . . than the 'strict scrutiny' test."

5. At the time the suit was originally filed, Stewart Bainum was also a Maryland State Senator from Montgomery County; however, this fact bore no relationship to his standing to bring suit. *Burning Tree II*, 315 Md. at 260 n. 2, 291, 554 A.2d at 369 n. 2, 385; *Burning Tree I*, 305 Md. at 59–60, 501 A.2d at 820.

6. Section 19(e) of Article 81, Maryland Code (1957, 1980 Repl.Vol.), provided in relevant part (emphasis added):

60, 501 A.2d at 820. The Plaintiffs also sought to enjoin the State from extending preferential tax treatment to the Club, and sought a mandate that the Club entertain applications for female membership.[7] *Id.* at 60, 501 A.2d at 820.

---

> (e) Country clubs.—(1) The State Department of Assessments and Taxation shall have the power to make uniform agreements pursuant to this subsection relative to the assessment and taxation of lands actively devoted to use as a country club as defined herein.
> (2) Pursuant to such agreement or any extension thereof with the State Department of Assessments and Taxation, land which is actively devoted to use as a country club as defined herein shall be assessed on the basis of such use for the period of time provided for in the agreement or any extension thereof and shall not be assessed as if subdivided or used for any other purpose, except in accordance with subparagraph (3) hereof.
> (3) Whenever any land assessed according to subparagraph (2) hereof has an assessable value greater than its assessable value as land devoted to use as a country club, such land shall also be assessed on the basis of such greater value, provided however, that no taxes shall be due and payable upon such greater assessment except pursuant to the provisions of subparagraph
> (7) hereof.
> (4)(i) ... In order to qualify under this section, the club may not practice or allow to be practiced any form of discrimination in granting membership or guest privileges based upon the race, color, creed, sex, or national origin of any person or persons. The determination as to whether or not any club practices discrimination shall be made by the office of the Attorney General after affording a hearing to the club. The provisions of this section with respect to discrimination in sex do not apply to any club whose facilities are operated with the *primary purpose,* as determined by the Attorney General, to serve or benefit members of a particular sex, nor to the clubs which exclude certain sexes only on certain days and at certain times.
>
> ❖ ❖ ❖
>
> (7) If, prior to the expiration of the agreement, or any extension thereof, part or all of the property is conveyed to a new owner, or said property ceases to be used as, or fails to qualify as, a country club, as defined herein, then at such time as part or all of the property is conveyed, or at such time as said property ceases to be used as, or fails to qualify as, a country club, whichever is the earlier date, the unpaid taxes, calculated at the tax rates applicable for the particular year or years involved, upon the difference between the assessment or assessments made pursuant to subparagraph (2) and the assessment or assessments made pursuant to subparagraph (3) hereof, for the taxable years included in the following time period shall immediately become due and payable[.]

7. The plaintiffs also alleged that Section 19(e)(4)(i) violated Articles 15 and 24 of the Maryland Declaration of Rights. Article 15 provides, in

Section 19 (e) authorized the Department to make agreements with private country clubs such as Burning Tree whereby, in exchange for an agreement to preserve open spaces from development for a term of years, the club would receive a reduced real property tax rate. *Id.* at 56–57, 501 A.2d at 818–19. The statute established a dual system of assessments, one calculated under the ordinary assumption of "best use," the other, lower assessment, calculated under the assumption that the land remain undeveloped. *Id.* at 57, 501 A.2d at 818–19. So long as the agreement was in effect, the State collected property tax only on the lower assessed value. In case the country club breached the agreement, the State could collect taxes prospectively on the higher assessed value; moreover, a portion of the tax that would have been due based on the difference between the lower and higher assessed values would have been accelerated and become payable immediately.

In 1974, the General Assembly amended Section 19(e) to add an anti-discrimination provision, which conditioned the tax benefit on an agreement not to discriminate on account of race, color, creed, sex, or national origin, unless the clubs were "operated with the *primary purpose,* as determined by the Attorney General, to serve or benefit members of a particular sex." *Burning Tree I,* 305 Md. at 57, 501 A.2d at 819 (emphasis added); 1974 Md. Laws, Chap. 870. The amended statute also contained a so-called periodic discrimination clause, exempting from the anti-discrimination provision those "clubs which exclude certain sexes only on certain days and at

relevant part:

> [A]ll taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land ...; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community.

Article 24 states:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

certain times." *Burning Tree I*, 305 Md. at 57, 501 A.2d at 819; 1974 Md. Laws, Chap. 870.

There were several issues [8] before the Court in *Burning Tree I*: whether the roles of the State and the Department under Section 19(e) of Article 81 in conjunction with the Club's participation in the open space program, amounted to state action,[9] *Burning Tree I*, 305 Md. at 85, 501 A.2d at 833; whether the "primary purpose" clause violated the ERA; and whether the "primary purpose" clause was severable from the statute's overall prohibition against discrimination.[10] *Id.* at 80,

---

**8.** The circuit court did not reach the plaintiffs' claims under Articles 15 and 24, and neither did we. *Burning Tree I*, 305 Md. at 61, 501 A.2d at 821.

**9.** The Equal Protection Clause of the Fourteenth Amendment has been held to proscribe discrimination by private entities "whose activities so involve the government as to implicate the 'state action' doctrine." *Burning Tree I*, 305 Md. at 65, 501 A.2d at 822–23. Under the ERA, the state action doctrine has been held *in pari materia* with the "under the law" provision. *Id.* at 90 n. 3, 501 A.2d at 836 n. 3. *See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 n. 2, 121 S.Ct. 924, 930 n. 2, 148 L.Ed.2d 807, 817 n. 2 (2001) (state action equivalent to "under color of state law"); *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534, 546 (1982) (mere fact a business is regulated by the state does not automatically transform such regulation into state action for purposes of the Fourteenth Amendment); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 942, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482, 498–99 (1982) (prejudgment attachment of debtor's property constituted state action); *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 484 (1974) ("[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.") (cancellation of service by regulated public utility for non-payment held not state action); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627, 640 (1972) (granting state liquor license to racially discriminatory private club not state action); *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 724, 81 S.Ct. 856, 861, 6 L.Ed.2d 45, 51–52 (1961) (operation of racially discriminatory restaurant in premises leased from government agency was state action); *Shelley v. Kraemer,* 334 U.S. 1, 19, 68 S.Ct. 836, 845, 92 L.Ed. 1161, 1183 (1948) (judicial enforcement of racially restrictive covenant running with the land was state action).

**10.** The complaint challenged only the "primary purpose" clause, not the periodic discrimination clause; therefore, the circuit court limited

501 A.2d at 830–31. The Court issued three separate opinions. *Id.* at 56, 501 A.2d at 818 (Chief Judge Murphy, joined by Judges Smith and Orth); *id.* at 85, 501 A.2d at 833 (Judge Rodowsky, concurring); *id.* at 88, 501 A.2d at 835 (Judge Eldridge, joined by Judges Cole and Bloom).

Chief Judge Murphy, joined by Judges Charles E. Orth, Jr. and Marvin H. Smith, took the position that the involvement of the State and the Department in the open space program did not constitute state action. *Id.* at 64–65, 501 A.2d at 822–23. In Chief Judge Murphy's opinion, Section 19(e)(4)(i) was facially neutral, *id.* at 71, 501 A.2d at 826, and the State bore no responsibility for the Club's discrimination, because the State did not initiate the Club's discriminatory membership policy, the State did not cause the Club to implement those policies through coercion or inducement, and the statutory purpose [11] bore no relationship to sex discrimination. *Id.* at 75–76, 501 A.2d at 828–29. Judge Lawrence F. Rodowsky agreed only to the extent that the actions of the Attorney General and the Department in certifying compliance with the terms of Section 19(e)(4)(i), did not, in his view, become state action as a result of the Club's participation in the open space program, *id.* at 85–86, 501 A.2d at 833–34, although he maintained that the statute *itself* constituted state action, because the statute drew sex-based distinctions on its face. *Id.* at 85–86, 501 A.2d at 833–34. Judge John C. Eldridge, joined by Judges Harry A. Cole and Theodore G. Bloom, "totally dis-

---

its ERA analysis to that issue. *Burning Tree I,* 305 Md. at 80, 501 A.2d at 830–31.

**11.** Chief Judge Murphy regarded the open space program as the statutory purpose, a contention the plaintiffs, and Judge Eldridge, disputed. *Compare Burning Tree I,* 305 Md. at 76, 501 A.2d at 828 ("The purpose of the statute [was] to preserve open spaces . . . ."), *with id.* at 100, 501 A.2d at 841 ("It is undisputed that the sole purpose of the provision was to allow Burning Tree to continue discriminating against women and still receive the state subsidy."). In Judge Eldridge's view, the problem was the conflation in the Chief Judge's opinion of the original statute and the amended version, 1974 Maryland Law, Chapter 870, which contained the disputed anti-discrimination provision. *Burning Tree I,* 305 Md. at 101–02, 501 A.2d at 842.

agree[d]" with Chief Judge Murphy's view that the statute and its administration by the State were "gender neutral," *id.* at 91, 501 A.2d at 836; furthermore, Judge Eldridge believed there "clearly [was] state action," *id.* at 91, 501 A.2d at 836, because Section 19(e)(4)(i) drew a distinction between sex-based discrimination and other forms of discrimination, and because the administrative mechanism set up by the statute "clearly involve[d] the State in the discrimination" by the Club. *Id.* at 91–93, 501 A.2d at 836–37.

A majority of the Court, consisting of Judge Rodowsky, *id.* at 88, 501 A.2d at 834–35, and Judges Eldridge, Cole and Bloom, *id.* at 91, 501 A.2d at 836, held that the "primary purpose" clause on its face violated the ERA. Because Judge Rodowsky disagreed with Judge Eldridge about severability, *id.* at 91 & n. 5, 501 A.2d at 836 & n. 5, a different majority consisting of Chief Judge Murphy, and Judges Orth and Smith, *id.* at 84, 501 A.2d at 832–33, agreed with Judge Rodowsky, *id.* at 85, 501 A.2d at 833, holding that the "primary purpose" clause was not severable from Section 19(e)(4)(i), thereby invalidating the entire anti-discrimination provision (and rendering the periodic discrimination clause moot).

On the ERA issue, Chief Judge Murphy, writing for himself and two other judges, concluded that the "primary purpose" clause did not implicate the ERA and therefore, was not subject to strict scrutiny, because the clause benefitted and burdened both sexes equally, *id.* at 71, 501 A.2d at 826, and because the ERA was "essentially limited in its scope to unequal treatment imposed by law *as between* the sexes." *Id.* at 65, 501 A.2d at 823 (emphasis added). According to Chief Judge Murphy, enactment and administration of Section 19(e)(4) constituted "action by the State," *id.* at 70, 501 A.2d at 826; nevertheless, the statute "[did] not apportion or distribute benefits or burdens unequally among the sexes, but rather [made] the tax benefit equally available to all single sex country clubs agreeing to participate in the State's open space program." *Id.* at 71, 501 A.2d at 826. Furthermore, "[t]he only burden [was] that imposed on the public treasury as a

result of the preferential tax assessment afforded to qualifying country clubs," a burden "born equally by all Maryland citizens, men and women alike." *Id.* Likewise, the public benefits "which accrue[d] from the preservation of open spaces [were] shared equally by each sex." *Id.* Although acknowledging that separate but equal facilities for men and women may be subject to strict scrutiny "because of inherent inequality of treatment for one sex or the other in the separation process itself," *id.* at 79, 501 A.2d at 830, Chief Judge Murphy determined that heightened scrutiny was not implicated under the facts of *Burning Tree I* because the "primary purpose" clause was permissive, not mandatory.[12] *Id.*

Judge Eldridge, writing for himself and two other judges, rejected the Chief Judge's "gender neutral" analysis, warning that "Chief Judge Murphy's opinion seems to embrace a type of 'separate but equal' doctrine for purposes of the E.R.A." *Id.* at 91, 501 A.2d at 836. Judge Eldridge stated that regardless of whether the sexes are benefitted or burdened equally, *any* statute that implicates gender classifications on its face *must* be subject to strict scrutiny, *id.* at 99, 501 A.2d at 840, and explained the scope of the ERA:

> While it is true that many of our prior cases have involved government action directly imposing a burden or conferring a benefit entirely upon either males or females, *we have never held that the E.R.A. is narrowly limited to such situations.* On the contrary, we have viewed the E.R.A. more broadly, in accordance with its language and purpose.

*Id.* at 95, 501 A.2d at 838 (emphasis added). He then looked to our jurisprudence in *Rand*, in which we stated that the language of the ERA was " 'unambiguous' " and " 'can only

---

12. Chief Judge Murphy said that under the facts of *Burning Tree I*, it was unnecessary to give "detailed consideration to whether state action in providing 'separate but equal' facilities for men and women violates the E.R.A." Although conceivably such a law "might be subject to challenge," Section 19(e)(4) "does not *require*" separate but equal facilities, but simply *"recognizes "* that single sex clubs may be eligible to participate in the state program. 305 Md. at 79, 501 A.2d at 830 (emphasis added).

mean that *sex is not a factor*," *id.* at 95, 501 A.2d at 838, quoting *Rand*, 280 Md. at 512, 374 A.2d at 903 (emphasis added), and also in *Maryland State Board of Barber Examiners v. Kuhn*, 270 Md. 496, 312 A.2d 216 (1973), in which the Court took the position that "under the E.R.A. classifications based on sex were 'suspect classifications' subject to 'stricter scrutiny.'" *Burning Tree I*, 305 Md. at 95, 501 A.2d at 838, quoting *Kuhn*, 270 Md. at 506–07, 312 A.2d at 222.

In a concurring opinion, Judge Rodowsky agreed with Judge Eldridge that the "primary purpose" clause on its face violated the ERA, which represented the holding of the case. *Id.* at 85, 501 A.2d at 833. Indeed, in Judge Rodowsky's view, not only was the "primary purpose" clause constitutionally infirm, but the periodic discrimination provision failed for exactly the same reasons. *Id.* at 86–87, 501 A.2d at 834. Judges Eldridge and Rodowsky differed on the severability issue; Judge Rodowsky agreed with the Chief Judge that the "primary purpose" clause was nonseverable, and hence, the entire anti-discrimination provision was void. *Id.* at 85, 501 A.2d at 833.

A principal point of contention in *Burning Tree I* was the particular level of application of the disputed anti-discrimination provision. The Chief Judge regarded Section 19(e)(4)(i) as neutral, because in principle an all-female club could operate as a mirror-image of Burning Tree and enjoy the state tax benefit, so that the universe of consideration was the set of *all* eligible country clubs. *Id.* at 71, 501 A.2d at 826. According to this view, all country clubs were situated equally with respect to the open space program; all-female clubs and all-male clubs were free to discriminate equally, and hence, there was no ERA violation. The fact that a single all-male club just happened to be the only eligible entity under Section 19(e)(4)(i) was, in this view, an irrelevant coincidence.

A majority of the Court, however, held that the universe of consideration was each *particular* participating club. Judge Rodowsky stated this proposition explicitly:

It is not an answer to the subject argument of the appellees to say that at the elevated level of the statewide open space program established by § 19(e) the program is neutral with respect to sex, in the sense that an all female or an all male country club is eligible to participate. The ostensible prohibition against sex discrimination *applies to each individual country club* participating in the open space program. *The universe of consideration for the particular problem created by this antidiscrimination law is any participating country club, in and of itself.*

*Id.* at 87, 501 A.2d at 834 (emphasis added), and Judge Eldridge agreed, because he directly refuted the position of the Chief Judge. *Id.* at 95, 501 A.2d at 838 ("[T]he three apparently do not view the express sanctioning of single sex clubs as imposing a burden upon the excluded sex, as long as the governmental action in theory equally sanctions discrimination by single sex facilities against persons of the other sex.").

Ironically, the positions set out by Judges Eldridge and Rodowsky find support in an article by Barbara A. Brown, Thomas I. Emerson, Gail Falk & Ann E. Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 889–93 (1971), cited at several points as support in the minority opinion of Chief Judge Murphy. *Burning Tree I,* 305 Md. at 64 & n. 3, 70, 79, 501 A.2d at 822 & n. 3, 825, 830. The Brown article defines why the separate but equal theory implicit in the Chief Judge's opinion ultimately subverts the meaning and purpose of the ERA. Because the "basic principle" of the ERA is that "sex is not a permissible factor" in determining the legal rights of women and men, it follows that "the treatment of *any person*"[13] under the law may not be based on the

---

**13.** That Judges Eldridge and Rodowsky were prescient in their views on the individualized level of strict scrutiny was confirmed in the recent Supreme Court decision *Parents Involved in Community Schools v. Seattle School District No. 1,* 551 U.S. ——, ——, 127 S.Ct. 2738, 2753, 168 L.Ed.2d 508, 524–25 (2007), where Chief Justice John G. Roberts, Jr. said:

circumstance of a particular person's sex. Brown, *supra* at 889 (emphasis added). *Accord Burning Tree I,* 305 Md. at 64, 71, 501 A.2d at 822, 825; *Rand,* 280 Md. at 512, 374 A.2d at 903.

To summarize, in *Burning Tree I* a majority of this Court applied strict scrutiny to invalidate an ostensibly neutral statute that drew sex-based classifications. The analysis focused on the individual level to determine whether the State had granted a benefit or imposed a burden on the basis of sex. Four Judges of this Court rejected the separate but equal approach suggested in Chief Judge Murphy's minority opinion.

## 2. Maryland ERA Jurisprudence Before *Burning Tree I*

Because I disagree with the majority about the meaning and purpose of the ERA, and because the legislative history of the ERA is so sparse,[14] I set out in some detail the principal cases

---

The entire gist of the analysis in *Grutter[ v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003),] was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group. The classification of applicants by race upheld in *Grutter* was only as part of a "highly individualized, holistic review," 539 U.S. at 337, 123 S.Ct. [at 2343, 156 L.Ed.2d at 338].

The analogy to the instant case is clear. *See also Miller v. Johnson,* 515 U.S. 900, 911, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762, 776 (1995) (" 'At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens "as individuals, not 'as simply components of a racial, religious, sexual or national class.' " ' "). *Accord Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 2112–13, 132 L.Ed.2d 158, 182 (1995) ("It follows from" the "basic principle that the Fifth and Fourteenth Amendments . . . protect *persons,* not *groups* " that "all governmental action based on race—a group classification long recognized as 'in most circumstances irrelevant and therefore prohibited,'—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed.") (citation omitted) (emphasis in original).

**14.** The majority attempts to parse the meaning of the ERA from contemporaneous newspaper articles, *see* op. at 247–50 & n. 17, 932 A.2d at 587–89 & n. 17, although we have questioned the legitimacy of so doing. *See In re Jason W.,* 378 Md. 596, 607–11, 837 A.2d 168, 175–

interpreting the ERA decided by this Court before *Burning Tree I*, in the period between 1972 and 1985, because they afford better guidance regarding the interpretation of the ERA than any other extant source. That case law provides the backdrop for the opinions in *Burning Tree I* and supports the position that strict scrutiny applies in the instant case.

In *Maryland State Board of Barber Examiners v. Kuhn*, 270 Md. at 498, 312 A.2d at 217–18, a group of cosmetologists mounted a constitutional challenge to a statutory scheme that prohibited them from cutting and shampooing men's hair on the same basis as women's. One of the statutes at issue, Section 529(a) of Article 43, Maryland Code (1957, 1973 Supp.), defined the professional services performed by cosmetologists as "work . . . for the embellishment, cleanliness and beautification of women's hair." [15] A different statute, Section

---

78 (2003) (Harrell, J., concurring); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 661, 458 A.2d 758, 792 (1983) (Cole, J., dissenting). To appreciate the weakness of reliance on newspaper articles, consider the fact that an analysis of the interpretive methodology of this Court over the period from 1987 to 1994 revealed only one case out of sixty-six where this Court even mentioned newspaper accounts in the context of statutory interpretation. *See* Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L.Rev. 432, 466–72 (1995).

15. The statute stated, in relevant part:

(a) The term *"beauty culture"* includes any and all work done for compensation by any person which work is generally and usually performed by so-called hairdressers, cosmetologists, cosmetologists aides, cosmeticians, beauticians or beauty culturists and demonstrators of beauty preparations or equipment, and however denominated in so-called hairdressing and beauty shops ordinarily patronized by women, which work is for the embellishment, cleanliness and beautification of women's hair, such as arranging, dressing, curling, waving, permanent waving, cleansing, cutting, singeing, arching of eyebrows, dyeing of eyebrows and eyelashes, bleaching, coloring, or similar work thereon and thereabout, and the removal of superfluous hair, and the massaging, cleansing, stimulating, exercising, or similar work upon the scalp, face, arms or hands, by the use of mechanical or electrical apparatus or appliances or cosmetics, preparations, tonics, antiseptics, creams or lotions or by any other means, and of manicuring the nails of either sex, which enumerated practices shall be inclusive of the term beauty culture but not in limitation thereof. Md.Code (1957, 1973 Supp.), Art. 43, § 529(a).

323 of Article 43, Maryland Code (1957, 1973 Supp.), defined the corresponding services performed by barbers without limitation to the sex of the client.[16] Under this scheme, cosmetologists who applied to men's hair the same techniques they customarily used on women's hair, risked the loss of their licenses and even criminal prosecution. *Kuhn,* 270 Md. at 500–01, 312 A.2d at 218–19.

In holding that Article 46 was inapplicable, *id.* at 505–06, 312 A.2d at 221–22, this Court said that "the statute [did] not discriminate against cosmetologists of either sex; nor, for that matter, [was] there discrimination based on sex between barbers." *Id.* at 505, 312 A.2d at 221. The Court conceded that "if a group of males, individually and on behalf of others similarly situated, were complaining that because of their sex, they were being denied the services of cosmetologists," the result would have been different. *Id.* at 505–06, 312 A.2d at 221. Rather, Article 46 was inapplicable because the statute at issue treated every cosmetologist and barber exactly the same, and because the victims of discrimination were not parties to the case. Therefore, *Kuhn* stands for the proposi-

---

16. Before July 1, 1973, the statute stated:

> To shave, trim the beard or cut the hair of any person or to give shampoos, tonics or massages for hire or reward received by the person performing such service, or any other person, shall be construed as practicing the occupation of a barber within the meaning of this subtitle.

Md.Code (1957), Art. 43, § 323. Effective July 1, 1973, the statute was amended as follows:

> Within the meaning of this subtitle, the practicing of the occupation of a barber includes, but is not limited to, shaving, trimming the beard, cutting and razor cutting, styling, relaxing, body waving, shampooing, hair coloring, facial massaging, designing, fitting and cutting of hair pieces for hire or reward received by the person performing the service. These activities must be performed by a duly licensed barber or in a duly licensed barbering school except mere sales of wigs or hairpieces or where in the discretion of the Board, special circumstances merit exemption. This section shall not be construed as a limitation or restriction upon the services which licensed cosmetologists are permitted to perform pursuant to the provisions of this article.

Md.Code (1957, 1973 Supp.), Art. 43, § 323.

tion that sex-based classifications trigger the ERA if the challenging party is the target of discrimination.[17]

In *Rand v. Rand*, 280 Md. at 510–11, 374 A.2d at 902, this Court considered whether the common law duty of paternal support of minor children survived the enactment of the ERA. In a unanimous opinion, the Court held:

> The words of the E.R.A. are clear and unambiguous; they say without equivocation that "Equality of rights under the law shall not be abridged or denied because of sex." This language mandating equality of rights can only mean that sex is not a factor.

*Id.* at 511–12, 374 A.2d at 902–03. Therefore, the ERA mandated that the parental duty of child support was shared jointly by both parents, in derogation of the common law rule. *Id.* at 517, 374 A.2d at 905.

In its interpretation of the Maryland ERA, the Rand Court examined cases from a number of other states construing similar provisions in their own constitutions. *Id.* at 512–16, 374 A.2d at 903–05. At the conclusion of its analysis, a unanimous Court stated:

> It is thus clear that the tests employed under constitutional provisions dealing with equality of rights range from absolute to permissive. Like the Supreme Court of Washington, however, we believe that the "broad, sweeping, mandatory language" of the amendment is cogent evidence that the people of Maryland are fully committed to equal rights for men and women. The adoption of the E.R.A. in this [S]tate was intended to, and did, drastically alter traditional views of the validity of sex-based classifications.

---

17. *Kuhn* is not inconsistent with *Burning Tree I*. Bainum had taxpayer standing in *Burning Tree I* because Maryland has liberal rules of standing for taxpayer suits. *See Burning Tree II*, 315 Md. at 293, 554 A.2d at 385 ("The cases in this Court generally stand for the principle that a taxpayer has standing to challenge a statute's constitutionality upon a showing that the statute, as applied, actually or potentially increases the plaintiff's tax burden."). It is also noteworthy that Bainum's co-plaintiff Renschler *was* a victim of sex discrimination practiced by Burning Tree Club.

*Id.* at 515–16, 374 A.2d at 904–05. Because the Supreme Court of Washington "did not consider whether the sex-based classification at issue . . . satisfied the rational relationship or strict scrutiny test," but instead found an " 'overriding compelling state interest' " *intrinsic* to the ERA, *id.* at 512, 374 A.2d at 903,[18] the clear implication is that this Court endorsed a near-absolute level of scrutiny for sex-based classifications.

Other cases prior to *Burning Tree I* invalidated sex-based classifications on the basis of Article 46. For example, in *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980), this Court considered whether the common law cause of action for criminal conversation remained viable in light of the ERA. At common law,

> the cause of action for criminal conversation was available only to a man. The gravamen of this action was adultery. Its elements consisted of a valid marriage and an act of sexual intercourse between a married woman and a man other than her husband. The fact that the wife consented, that she was the aggressor, that she represented herself as single, that she was mistreated or neglected by her husband, that she and her husband were separated through no fault of her own, or that her husband was impotent, were not valid defenses.

*Id.* at 586–87, 414 A.2d at 930 (citations omitted). The Court applied Article 46, as construed in *Rand,* to abrogate the cause of action for criminal conversation. *Id.* at 593, 414 A.2d at 933.

In the present case, the majority interprets *Kline* to buttress its view that the ERA must be applied under a benefits/burdens analysis. *See* op. at 258–59 & n. 24, 932 A.2d at 594 & n. 24; *Kline,* 287 Md. at 592, 414 A.2d at 932 ("explicating this Court's holding that it would be unconstitutional to impose a burden on fathers which was not equally imposed on

---

**18.** *See Darrin,* 540 P.2d 882. The Supreme Court of Washington held that a rule prohibiting girls from participating in high school football violated that State's ERA, and that the ERA *itself* was the compelling state interest. *Id.* at 893.

mothers"); *id.* at 593, 414 A.2d at 933 ("Thus, Maryland's law provides different benefits for and imposes different burdens upon its citizens based solely upon their sex. Such a result violates the ERA."). That view is simply a consequence of the particular issue posed in *Kline,* where the common law rule, like most sex-based *classification* schemes, drew categorical distinctions between males and females *as classes.* A more accurate interpretation of *Kline* results from a comparison of the rights and obligations of the husband and wife in that case.

Because the elements of the tort of criminal conversation were a valid marriage and an act of sexual intercourse between the wife and a man other than her husband, it is obvious that the wife lacked a legally cognizable cause of action against the (hypothetical) mistress of her husband, whereas, at common law, the husband had a valid cause of action against the paramour of his wife. *Kline,* 287 Md. at 586–87, 414 A.2d at 930. But for the fact that the husband was male, he would have been unable to sustain the cause of action. It was obvious to the Court that the unequal rights under the law enjoyed by the wife, compared to the husband, could not survive the scrutiny mandated by the ERA. *Id.* at 593, 414 A.2d at 933 ("A man has a cause of action for criminal conversation, but a woman does not.").

The same conclusion results from a comparison of the legal obligations of the paramour and a hypothetical female mistress of the husband. At common law as it existed in this State up to 1980, for the act of engaging in sexual relations with the wife, the paramour was liable for damages to the husband. But for the fact he was male, the paramour would have suffered no liability. The hypothetical female mistress in our example could not have been sued for criminal conversation if she had engaged in sexual relations with the husband, even though she had engaged in the same conduct as the paramour. Clearly, such a sex-based classification scheme could not withstand the scrutiny mandated by the ERA. *Id.* ("The common law cause of action for criminal conversation ... cannot be reconciled with our commitment to equality of the sexes.").

Therefore, the conclusion drawn from *Kline* is that analysis of sex-based classifications focuses on the rights and obligations of the particular person affected by the classification. *See also Burning Tree I*, 305 Md. at 70, 501 A.2d at 825 (opinion of Murphy, C.J.) ("The equality between the sexes mandated by the Maryland E.R.A. is of 'rights' of *individuals* 'under the law.'")(emphasis added). Assuming other personal characteristics are held constant, the appropriate analysis under the ERA should compare the person affected by the challenged classification with a similarly situated person of the opposite sex, and then determine whether her rights or obligations have been altered. Viewed through this lens, it becomes clear that every sex-based classification that fails the benefits/burdens test must necessarily fail strict scrutiny at the individual level. This Court applied that analysis in the time span from 1972 until *Burning Tree I. See Kline*, 287 Md. at 591, 414 A.2d at 932, where the Court quoted approvingly from *Rand's* language that "[t]he adoption of the E.R.A. in this state was intended to, and did, drastically alter traditional views of the validity of sex-based classifications." *Rand*, 280 Md. at 515–16, 374 A.2d at 905.

It is also noteworthy that the *Kline* Court examined the legislative history surrounding criminal conversation and determined that, standing alone, history would have supported the inference that the General Assembly had intended to leave the common law doctrine in place. 287 Md. at 590–91, 414 A.2d at 931–32. In 1945, the General Assembly had abolished the closely related cause of action for alienation of affections,[19] but left standing the cause of action for criminal conversation. *Id.* at 590, 414 A.2d at 931–32. The crucial intervening fact during that time was the adoption of Article 46, which "additional factor" was "of sufficient significance to persuade us

---

**19.** Alienation of affections was a common law cause of action that arose when a man induced a married woman to leave her husband, or otherwise interfered with the marital relationship. Unlike criminal conversation, alienation of affections did not require proof of adultery as a separate element. *See Kline v. Ansell*, 287 Md. 585, 590, 414 A.2d 929, 932 (1980).

that the action for criminal conversation [was] no longer viable." *Id.* at 591, 414 A.2d at 932.

In *Condore v. Prince George's County,* 289 Md. 516, 425 A.2d 1011 (1981), this Court considered whether the common law doctrine of necessaries survived the enactment of the ERA. The majority determined that the ERA abrogated the doctrine, under which "the husband had a legal duty to supply his wife with necessaries suitable to their station in life, but the wife had no corresponding obligation to support her husband, or supply him with necessaries, even if she had the financial means to do so." *Id.* at 520, 425 A.2d at 1013. The Court agreed unanimously that the ERA mandated sex-neutrality for the doctrine of necessaries. *Compare id.* at 532, 425 A.2d at 1019 ("[E]xtend[ing] the common law necessaries doctrine to impose liability upon wives," or "eliminating the necessaries doctrine in its entirety," both would satisfy the "general purpose of the ERA to proscribe sex-based classifications."), *with id.* at 533, 425 A.2d at 1019 (Rodowsky, J., dissenting) ("I agree that this Court has the power to decide, based on the ERA ... that the necessaries doctrine applies alike to both sexes.").

The majority relied on *Rand* in its determination "that the words of the ERA clearly and unambiguously mandated equality of rights between men and women and 'canonly mean that sex is not a factor.'" *Id.* at 524, 425 A.2d at 1015, quoting *Rand,* 280 Md. at 512, 374 A.2d at 903. The dissenters likewise believed "the ERA and acts of the General Assembly have made it plain beyond doubt that family support obligations are no longer exclusively imposed on the male." *Id.* at 533, 425 A.2d at 1020. Nowhere did the Court invoke comparisons of "men and women as classes." *See* op. at 254, 932 A.2d at 591.

To summarize, in the years prior to *Burning Tree I,* our cases construing the ERA consistently applied strict scrutiny to sex-based classifications. This Court repeatedly affirmed its commitment to uphold the will of the People of Maryland to eradicate state sanctioned unequal treatment based on the happenstance of a particular person's sex.

### 3. Cases from Other States Analyzed by Judge Eldridge in *Burning Tree I*

In *Burning Tree I*, Judge Eldridge also examined cases from other jurisdictions interpreting state constitutional amendments similar to Maryland's ERA, *Burning Tree I*, 305 Md. at 96–98, 501 A.2d at 839–40, and recognized that courts in Massachusetts, Washington and Illinois interpreted ERA provisions in their own constitutions to require strict scrutiny of sex classifications.[20] *Id.* That body of case law helped shape our own interpretation of the ERA, and supports the idea that strict scrutiny should apply here.[21] *See, e.g., Rand,* 280 Md. at 512, 374 A.2d at 903 ("Cases from other state jurisdictions interpreting the breadth and meaning of their equal rights amendments are instructive in ascertaining the reach of Maryland's E.R.A.").

For example, the Supreme Judicial Court of Massachusetts interpreted the Massachusetts ERA[22] to require application of the "strict scrutiny—compelling State interest test" to assess

---

**20.** *See, e.g., Opinion of the Justices to the House of Representatives,* 374 Mass. 836, 371 N.E.2d 426, 427–28 (1977) (applying strict scrutiny to invalidate exclusion of girls from state-sanctioned contact sports); *Darrin,* 540 P.2d at 893 (same); *People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98, 101 (1974) (applying strict scrutiny to invalidate statute that permitted 17–year–old boys to be charged as adults, but precluded like treatment of 17–year–old girls).

**21.** Unlike the majority, see op. at 265–67, 932 A.2d at 598-99, the opinions I cite actually were decided on the basis of equal rights amendments in the various states. After quoting the exact same passage from *Rand,* the majority purports to analyze relevant cases, but fails to mention that the following were not decided under a state ERA: *In re Kandu,* 315 B.R. 123 (Bankr.W.D.Wash.2004) (decided under federal law); *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1 (2006) (no state ERA); *Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864 (1999) (same); and *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971) (same).

**22.** Mass. Const. pt. I, art. I ("All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.").

"*any governmental* classification based *solely* on sex." *Opinion of the Justices to the House of Representatives*, 374 Mass. 836, 371 N.E.2d 426, 428 (1977) (emphasis added). The court considered whether a proposed statute, House No. 6723, barring girls from participation with boys in football and wrestling, was permitted by the ERA.[23] The court compared decisions from a number of states that had adopted equal rights amendments, and held that the purpose of the ERA was to require, when evaluating sex-based equal protection claims, strict scrutiny rather than intermediate scrutiny,[24] the standard applied by federal and state courts to sex-based equal protection claims under the Fourteenth Amendment. *Opinion of the Justices*, 371 N.E.2d at 428 ("To use a standard in applying the Commonwealth's equal rights amendment which requires any less than the strict scrutiny test would negate the purpose of the equal rights amendment and the intention of

---

**23.** Unlike Maryland, in Massachusetts the Supreme Judicial Court is required to issue advisory opinions in response to questions presented by either house of the state legislature. *See* Mass. Const. pt. II, ch. 3, art II ("Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions.").

**24.** The Supreme Court developed the so-called intermediate scrutiny test for certain equal protection claims, including those based on sex classifications. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090, 1098 (1982) (classification must serve " 'important governmental objectives'," and the means employed must be " 'substantially related' " to achieving the objectives); *Frontiero v. Richardson*, 411 U.S. 677, 688, 93 S.Ct. 1764, 1771, 36 L.Ed.2d 583, 592 (1973) (Plurality consisting of Justices Brennan, Douglas, White and Marshall argued that "classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny."); *id.* at 691–92, 93 S.Ct. at 1773, 36 L.Ed.2d at 594–95 (concurrence unwilling to adopt strict scrutiny for sex classifications); *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225, 229 (1971) (early Supreme Court case invalidating sex-based classification under rational basis review). *But cf. United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735, 751 (1996) (emphasizing that justification proffered by the State for gender classifications must be "exceedingly persuasive," perhaps signaling a shift by the Court toward a standard closer to strict scrutiny).

the people in adopting it."). Application of strict scrutiny led the court to conclude that the proposed legislation would be unconstitutional:

> The enactment of House No. 6723 would violate [the Massachusetts ERA]. The absolute prohibition in the proposed legislation cannot survive the close scrutiny to which a statutory classification based solely on sex must be subjected. A prohibition of all females from voluntary participation in a particular sport under every possible circumstance serves no compelling State interest.

*Id.* at 429–30.

Judge Eldridge also relied upon *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882, 893 (1975), in which the Supreme Court of Washington invalidated a ban on girls' participation on high school football teams. A school district in Washington had prohibited two sisters from playing on a football team because their participation was barred by a rule of the Washington Interscholastic Activities Association ("WIAA"), a statewide association of high schools. *Id.* at 883–84. As a preliminary matter, the court addressed the applicable standard of review under the Equal Protection Clause of the Fourteenth Amendment, and its State counterpart, Article I, Section 12 of the Washington Constitution.[25] Having held less than two years previously, in a case where the ERA[26] was inapplicable,[27] that under Washington law, sex would be re-

---

**25.** The relevant provision states:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

Wash. Const. art. I, § 12. This provision is also known as the Privileges and Immunities Clause.

**26.** Wash. Const. art. XXXI, § 1. The Washington ERA states:

Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.

**27.** *Hanson v. Hutt,* 83 Wash.2d 195, 517 P.2d 599 (1973). The ERA was inapplicable because the cause of action arose in 1971, before the December 7, 1972 effective date of the ERA. *Id.* at 601, 603 n. 3.

garded as an "inherently suspect" classification triggering strict scrutiny, *Hanson v. Hutt,* 83 Wash.2d 195, 517 P.2d 599, 603 (1973),[28] the court held that adoption of the ERA required an even more stringent standard than strict scrutiny. *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882, 889 (1975) ("Presumably the people in adopting Const. art. 31 intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests."). Henceforth, in Washington,

> [t]he overriding compelling state interest as adopted by the people of this state in 1972 is that: "Equality of rights and responsibility under the law shall not be denied or abridged on account of sex."

*Id.* at 893. Because the involvement of public high schools in the WIAA implicated the state action doctrine, *id.* at 891, the court applied the "overriding compelling state interest" embodied in the ERA to invalidate the statewide ban on girls' participation in high school interscholastic football. *Id.* at 893.

A third case relied upon by Judge Eldridge in *Burning Tree I* was *People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98, 101 (1974), in which the Supreme Court of Illinois interpreted the ERA[29] to require that classifications based on sex be regarded as "suspect," and therefore, require " 'strict judicial scrutiny.' " From the plain language of the ERA and its legislative history, the court found "inescapable" the conclusion that the purpose of the ERA was "to supplement and expand the guaranties of the equal protection provision of the Bill of Rights" of the Federal Constitution. *Id.* Under a strict scrutiny analysis, the court held that a statute permitting 17–

---

**28.** The *Hanson* court based its holding on the plurality opinion of the Supreme Court in *Frontiero,* 411 U.S. at 688, 93 S.Ct. at 1771, 36 L.Ed.2d at 592. *See supra* note 24.

**29.** Ill. Const. art. I, § 18 ("The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts.").

year–old boys to be charged as adults for certain crimes, but requiring 17–year–old girls to be tried as juveniles, violated the Illinois E.R.A.[30] *Id.* at 99, 101.

### 4. Strict Scrutiny for Sex–Based Classifications Even Where Facially Neutral

On the basis of *Rand* and its progeny, and cases in sister states interpreting similar constitutional provisions, Judge Eldridge in *Burning Tree I* concluded that "the E.R.A. renders sex-based *classifications* suspect and subject to at least strict scrutiny, with the burden of persuasion being upon those attempting to justify the classifications." *Burning Tree I*, 305 Md. at 98, 501 A.2d at 840 (emphasis in original). Therefore, "[i]n this respect, the E.R.A. makes sex classifications subject to *at least the same scrutiny* as racial classifications." *Id.* (emphasis added). Even a facially neutral statute can implicate strict scrutiny if the purpose and effect of the classification are discriminatory, Judge Eldridge concluded. *Id.* at 100, 501 A.2d at 841. Indeed,

[i]f the purpose and effect of the primary purpose provision had related to *single race* rather than *single sex* clubs, the provision, *regardless of any alleged neutrality in the language*, would clearly fall under the principles of *Hunter v. Underwood*[31]; *Arlington Heights v. Metropolitan Housing*

---

**30.** The statute in force at the time of the crimes stated:

Except as provided in this Section, no boy who was under 17 years of age or girl who was under 18 years of age at the time of the alleged offense may be prosecuted under the criminal laws of this State or for violation of an ordinance of any political subdivision thereof.

Ill.Rev.Stat.1971, ch. 37, ¶ 702–7(1). The current gender neutral statute is codified at 705 Ill. Comp. Stat. 405/5–120 (1999).

**31.** *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S.Ct. 1916, 1923, 85 L.Ed.2d 222, 231 (1985), held that an Alabama constitutional provision requiring the disenfranchisement of those convicted of any "crime of moral turpitude" violated the Equal Protection Clause of the Fourteenth Amendment, because the provision had a racially disparate impact, and because racial discrimination was a "substantial" or "motivating" factor behind the enactment. The Supreme Court found the Alabama constitutional provision invalid despite its facial neutrality. *Id.* at 227, 105 S.Ct. at 1919–20, 85 L.Ed.2d at 227–28.

*Corp.*[32]; *Gomillion v. Lightfoot*[33], and similar cases.

*Id.* at 102, 501 A.2d at 842 (emphasis added). In Judge Eldridge's view, Section 19(e)(4)(1), which prohibited discrimination on the grounds of race, color, creed, sex, or national origin, but permitted sexual discrimination when the country club's primary purpose was "to serve or benefit members of a particular sex," was unconstitutional *both* on its face and in its effect. *Id.* at 99–102, 501 A.2d at 840–42. Because at all times from the enactment of the "primary purpose" anti-discrimination provision, until the time the case was litigated, Burning Tree was the *only* entity to which the provision applied, *id.* at 100, 501 A.2d at 841, it was undisputed that the purpose and effect of Section 19(e)(4)(1) were "to permit one country club to maintain its discriminatory policy while continuing to receive a substantial state benefit." *Id.* at 101, 501 A.2d at 841. In that respect, *Burning Tree I* was indistinguishable from a line of Supreme Court cases that invalidated ostensibly neutral laws the effects of which were patently discriminatory on grounds of race. *See, e.g., Hunter v. Underwood,* 471 U.S. 222, 227, 233, 105 S.Ct. 1916, 1919–20, 1923, 85 L.Ed.2d 222, 227–28, 231 (1985) (facially neutral state

**32.** *Village of Arlington Heights v. Metro. Hous. Corp.,* 429 U.S. 252, 270–71, 97 S.Ct. 555, 566, 50 L.Ed.2d 450, 468 (1977), upheld a facially neutral local zoning restriction against an Equal Protection challenge despite its racially disproportionate impact, because there was insufficient evidence of a racially discriminatory motive in the Village's zoning decision.

**33.** *Gomillion v. Lightfoot,* 364 U.S. 339, 340–42, 81 S.Ct. 125, 127, 5 L.Ed.2d 110, 113 (1960), held that action by a state legislature redefining the boundaries of a municipality was potentially unconstitutional on Fifteenth Amendment grounds, because the African–American plaintiffs below alleged a racially discriminatory purpose to deprive them of their voting rights. Because the procedural posture was an appeal from dismissal for failure to state a claim upon which relief could be granted, the Court declined to address the substantive issue. *Id.* at 348, 81 S.Ct. at 130, 5 L.Ed.2d at 117. In a concurring opinion, Justice Whittaker argued that the Court should have analyzed the case under the Fourteenth Amendment Equal Protection Clause. *Id.* at 349, 81 S.Ct. at 131–32, 5 L.Ed.2d at 118–19 (Whittaker, J., concurring). Subsequent Supreme Court decisions adopted this rationale. *See Shaw v. Reno,* 509 U.S. 630, 645, 113 S.Ct. 2816, 2825–26, 125 L.Ed.2d 511, 527 (1993).

constitutional provision disenfranchising disproportionate numbers of African–Americans held in violation of Fourteenth Amendment Equal Protection Clause); *Loving v. Virginia*, 388 U.S. 1, 11–12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010, 1017–18 (1967) (facially neutral anti-miscegenation statutes held in violation of Fourteenth Amendment Equal Protection and Due Process Clauses); *Gomillion v. Lightfoot*, 364 U.S. 339, 341–42, 81 S.Ct. 125, 127, 5 L.Ed.2d 110, 113 (1960) (local law altering municipal boundary to exclude nearly all African–American voters constitutionally suspect).

To summarize, in *Burning Tree I*, a majority of this Court interpreted our prior cases to mandate a robust interpretation of the ERA. Henceforth, government action resulting in sex-based classifications would be subject to strict scrutiny, with the burden placed on the proponents of the classifications to demonstrate they were narrowly tailored to further a compelling state interest. This Court took special care to look beneath ostensibly neutral classifications to their underlying purpose and effect, in order to ferret out state sanctioned discrimination masquerading as facially neutral law.

## B. Burning Tree II

In *Burning Tree II*, this Court adopted Judge Eldridge's rationale in *Burning Tree I* and rejected the benefits/burdens analysis of Chief Judge Murphy, invalidating what was termed a "sex neutral" law. In response to the decision of this Court in *Burning Tree I*, the effect of which was to remove the anti-discrimination provision in its entirety from Section 19(e), the General Assembly enacted 1986 Maryland Laws, Chapter 334, which attempted to reenact the periodic discrimination provision.[34] *Burning Tree II*, 315 Md. at 260–61, 554 A.2d at 370.

---

**34.** The periodic discrimination provision permitted a country club to "exclude certain sexes on specific days or at specific times on the basis of sex." The relevant statutory section stated:

(a) *In General*—Except as provided in subsection (b) of this section, if a country club that meets the qualifications of § 8–212 of this subtitle allows or practices discrimination based on race, color, creed, sex, or

We held that any "enactment of legislation which on its face draws classifications based on sex is *state action sufficient to invoke the E.R.A." Id.* at 293, 554 A.2d at 386 (emphasis added).

For the precise reasons the "primary purpose" clause failed under Article 46, Chapter 334 failed as well. *Id.* at 294–95, 554 A.2d at 386–87. Exactly like Section 19(e), Chapter 334 drew sex-based classifications: first, Chapter 334 distinguished sex-based discrimination from other types of discrimination; second, Chapter 334 permitted some types of sex discrimination (periodic), but proscribed others (total). *Id.* In addressing the State's contention that physical differences between the sexes justified the contested provision, this Court said:

> In order to justify a racially or sexually discriminatory statute, it is not enough for the State to claim legitimate interests which it seeks to further. Under strict scrutiny, legislation must be narrowly tailored and precisely limited to achieving those legitimate ends.

*Id.* at 296, 554 A.2d at 387. We held [35] that the State had failed to meet its burden of demonstrating that Chapter 334 was narrowly tailored to achieving its purposes, *id.* ("Nothing in the statute narrowly confines the permitted sex discrimination to [single-sex golf tournaments]."), regardless of whether

---

national origin in granting membership or guest privileges, the country club may not make an agreement under this subtitle.

(b) *Exception*—If the country club excludes certain sexes on specific days or at specific times on the basis of sex, the country club does not discriminate under subsection (a) of this section.

1986 Md. Laws, Chap. 334, codified as Section 8–214 of the Tax–Property Article, Maryland Code (1986, 1987 Supp.). In the time span between *Burning Tree I* and *Burning Tree II*, Article 81 had been recodified as the Tax–Property Article. *See supra* note 6.

**35.** As the majority points out, *Burning Tree II* also presented issues under, *inter alia*, the First Amendment, the Contract Clause (Article I, Section 10), and Article III, Section 33 of the Maryland Constitution. *See* op. at 256 n. 21, 932 A.2d at 593 n. 21; *Burning Tree II*, 315 Md. at 261–62, 554 A.2d at 370. These issues are unrelated to the instant case.

those purposes were "substantial," *id.* at 295, 554 A.2d at 387, or "legitimate." [36] *Id.* at 296, 554 A.2d at 387.

The majority in the present case fails to recognize that *Burning Tree II* clearly adopted strict scrutiny as the standard in ERA cases. Regardless of whether ostensibly the sexes are benefitted or burdened equally by a statutory classification, that statute must withstand strict scrutiny under the ERA or else be invalidated. *Id.* at 293–96, 554 A.2d at 386–87. "In order to justify a racially or sexually discriminatory statute, it is not enough for the State to claim legitimate interests which it seeks to further." *Id.* at 296, 554 A.2d at 387. Rather, the State must shoulder the heavy burden of demonstrating that the means chosen are the most restrictive possible consistent with achieving a *compelling* state interest. Furthermore, the holding of *Burning Tree II* on the ERA issue relied on the "analytically indistinguishable [*Burning Tree I* ] case," *Burning Tree II,* 315 Md. at 294, 554 A.2d at 386, which, as I have demonstrated, traces its reasoning back to *Rand* and ultimately, to the enactment of Article 46 itself. Therefore, the majority in the present case errs fundamentally in its assertion that "[v]irtually every Maryland case applying Article 46 has dealt with situations where the distinction drawn by a particular governmental enaction or action singled-out for disparate treatment men and women as discrete classes." *See* op. at 258–59, 932 A.2d at 594.

---

**36.** Whether the state interest was merely "legitimate," "substantial," or "compelling" was immaterial to the case at hand. Subsequent decisions of this Court leave no doubt that the appropriate state interest must be at least "substantial." *See In re Roberto d.B.,* 399 Md. 267, 279 n. 13, 923 A.2d 115, 122 n. 13 (2007). I generally agree with the majority opinion's statement of the standards of review governing equal protection and substantive due process claims, *see* op. at 271–76, 932 A.2d at 602–05, with the added proviso that under rational basis review, the burden of persuasion lies with those challenging the government action, whereas under both intermediate and strict scrutiny, the burden of persuasion rests with the State.

## C. Maryland Cases After *Burning Tree II* Apply Strict Scrutiny to Sex–Based Classifications

Contrary to the assertion of the majority in the present case, our cases subsequent to *Burning Tree II* have held that state action effecting classifications solely on the basis of sex is subject to strict scrutiny under the ERA.

*Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993), was an appeal of a murder conviction in which the defendants contested the State's use of peremptory challenges to strike women from the jury pool. This Court extended *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 82–83 (1986) (race-based peremptory strikes presumptively invalid under equal protection analysis), in light of Articles 24 and 46 of the Maryland Declaration of Rights, to hold that sex-based peremptory strikes are prohibited. In the words of Judge Orth, speaking for the majority:

> The equality of rights under law, without regard to gender, bestowed by Art. 46 of the Maryland Declaration of Rights, flowing through the equal protection guarantees of Art. 24 of the Maryland Declaration of Rights to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), prohibits the State in a criminal prosecution from using peremptory challenges *so as to exclude a person from service as a juror because of that person's sex.*

*Tyler,* 330 Md. at 270, 623 A.2d at 653 (emphasis added). Because the Supreme Court had not yet[37] addressed the applicability of *Batson* to sex-based peremptory strikes, and because this Court had specifically reserved the question, *Tolbert v. State,* 315 Md. 13, 23 n. 7, 553 A.2d 228, 232 n. 7 (1989), it was necessary that we construe the ERA to require " 'substantial justification' " for " 'state action providing for segregation based upon sex'," just as the Fourteenth Amendment applies to segregation based upon race. *Tyler,* 330 Md. at 265, 623 A.2d at 651. Indeed, the ERA was outcome

---

**37.** Subsequently the Supreme Court would extend *Batson* to preclude sex-based peremptory challenges. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 130–31, 114 S.Ct. 1419, 1422, 128 L.Ed.2d 89, 98 (1994).

determinative; we reversed the Court of Special Appeals, which had declined to extend *Batson* on the grounds that under Maryland common law, the peremptory challenge historically was regarded as "conclusive" and hence, unchallengeable, *Eiland v. State*, 92 Md.App. 56, 94, 607 A.2d 42, 61 (1992), *rev'd sub nom Tyler*, 330 Md. at 261, 623 A.2d at 648, and because the Supreme Court had not yet evinced a clear intent effectively "to destroy the peremptory challenge" through consistent application of "the heavy artillery of the Equal Protection Clause." *Eiland*, 92 Md.App. at 88, 90, 607 A.2d at 58, 59.

It is noteworthy that in extending *Batson* to sex-based peremptory strikes, we applied strict scrutiny to vindicate the right of an individual stricken juror not to suffer state sanctioned discrimination, rejecting a separate but equal approach. *See Tyler*, 330 Md. at 263, 623 A.2d at 649 (" '[T]he State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause.' "), quoting *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82. *Compare Swain v. Alabama*, 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759, 773 (1965) ("[W]e cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case."), *with Batson*, 476 U.S. at 92 n. 17, 106 S.Ct. at 1721 n. 17, 90 L.Ed.2d at 85 n. 17 (In overruling *Swain*, the Court noted the "practical difficulties" faced by the defendant who must demonstrate a systematic use of peremptory challenges to exclude African–Americans "over a number of cases."). Whereas *Swain* burdened the defendant with the virtually impossible task of demonstrating a pervasive discriminatory pattern over the course of many trials, *Batson* reduced the defendant's evidentiary burden by focusing on a single trial, and then shifting the burden of persuasion to the State upon satisfaction of a greatly diminished burden of production by the defendant. 476 U.S. at 96–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88. Moreover, the *Batson* Court noted the application of equal protection principles to the excluded *ju-*

*rors,* not merely to the defendant. *Id.* at 97–98, 106 S.Ct. at 1723–24, 90 L.Ed.2d at 88.

Ultimately, the Supreme Court recognized explicitly the equal protection right of an *individual* juror "not to be excluded from [a petit jury] on account of race" in *Powers v. Ohio,* 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411, 424 (1991), where the Court extended *Batson* to cover instances of peremptory strikes exercised against potential jurors of a different race than that of a criminal defendant and repudiated the doctrine of separate but equal in the context of peremptory challenges. The Court consciously "reject[ed] . . . the view that race-based peremptory challenges survive equal protection scrutiny because members of all races are subject to like treatment, which is to say that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors." *Powers,* 499 U.S. at 410, 111 S.Ct. at 1370, 113 L.Ed.2d at 424–25. *See also J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 159, 114 S.Ct. 1419, 1437, 128 L.Ed.2d 89, 116 (1994) (Scalia, J., dissenting) (criticizing the majority for "focusing unrealistically upon individual exercises of the peremptory challenge," and arguing unsuccessfully in favor of a group-based equal protection analysis of sex-based peremptory strikes). Thus, in adopting the Supreme Court's equal protection analysis under *Batson* and its progeny and applying that reasoning in light of the ERA, our holding in *Tyler* flatly contradicts the equal application approach espoused by the majority in the instant case.

*Giffin v. Crane,* 351 Md. at 133, 716 A.2d at 1029, likewise was entirely consistent with the interpretation of the ERA as applicable to individuals. In *Giffin,* this Court faced the question whether Article 46 permitted a judge to weigh, as a relevant factor in a child custody proceeding, the sex of either parent in awarding physical custody. *Id.* at 143, 716 A.2d at 1034. We noted that, under the best interest of the child standard, the trial judge exercises broad discretion. *Id.* at 144–45, 716 A.2d at 1035. That discretion is not unlimited, however; the judge cannot, consistent with the "clear, unambiguous and unequivocal" language of Article 46, *id.* at 148,

716 A.2d at 1037, assume that a parent will be a better custodian of her child solely because she is of the same sex. *Id.* at 155, 716 A.2d at 1040. We said that "this Court has interpreted the Amendment's 'broad, sweeping mandatory language,' as the expression of Maryland's commitment to equal rights for men and women and the statement of its intention to alter traditional attitudes with respect to such rights." *Id.* at 151, 716 A.2d at 1038, quoting *Rand,* 280 Md. at 515, 374 A.2d at 905 (citation omitted). Furthermore, "the equality between the sexes demanded by the Maryland Equal Rights Amendment focuses on 'rights' of *individuals* 'under the law,' which encompasses all forms of privileges, immunities, benefits and responsibilities of citizens." *Id.* at 149, 716 A.2d at 1037, quoting *Burning Tree I,* 305 Md. at 70, 501 A.2d at 825 (emphasis added). We applied this understanding of the ERA to invalidate a custody award based on whether a parent and the child were of the same or opposite sex, despite the fact that a sex-matched custody determination would satisfy the equal application approach.

In *Blount v. Boston,* 351 Md. 360, 718 A.2d 1111 (1998), a candidate running for Maryland State Senate filed suit in the Circuit Court for Anne Arundel County to strike the name of his opponent from the ballot on the basis of an alleged failure to satisfy the residency requirements. At issue was whether the incumbent, Senator Clarence W. Blount, could run for re-election in a district entirely in Baltimore City despite the fact that he spent some "90 percent" of his nights at a condominium maintained by his wife in Pikesville, Baltimore County. *Id.* at 375, 718 A.2d at 1119. This Court conducted a thorough analysis of the law of domicile in light of Article III, Section 9 of the Maryland Constitution,[38] because our case law has

---

**38.** This constitutional provision governs, inter alia, residency requirements for members of the General Assembly. It provides as follows:

A person is eligible to serve as a Senator or Delegate, who on the date of his election, (1) is a citizen of the State of Maryland, (2) has resided therein for at least one year next preceding that date, and (3) if the district which he has been chosen to represent has been

construed "resided" to mean "domiciled." Blount, 351 Md. at 365, 718 A.2d at 1113. Although the domicile of Mrs. Blount was not directly at issue, this Court noted that "[i]t is obvious that the general rule [that a married woman's domicile was determined by that of her husband regardless of her domiciliary intent] . . . was overruled by Article 46." *Id.* at 385 n. 5, 718 A.2d at 1124 n. 5.

Other cases have affirmed that strict scrutiny is the rule applied to state action that draws classifications on the basis of sex. *See Ehrlich v. Perez*, 394 Md. 691, 717 n. 10, 908 A.2d 1220, 1236 n. 10 (2006) (" '[B]ecause of the Equal Rights Amendment to the Maryland Constitution . . . , classifications based on gender are suspect and subject to strict scrutiny.' "); *Murphy v. Edmonds*, 325 Md. 342, 357 n. 7, 601 A.2d 102, 109 n. 7 (1992) (same); *Ritchie v. Donnelly*, 324 Md. 344, 366, 597 A.2d 432, 443 (1991) (sex-based discharge of State employee "clearly not permitted" by Article 46); *Briscoe v. Prince George's County Health Dept.*, 323 Md. 439, 452 n. 7, 593 A.2d 1109, 1115 n. 7 (1991) ("[B]ecause of Article 46 . . . , gender-based classifications are suspect and are subject to strict scrutiny. Consequently, a classification based on gender is in no way comparable to an employment classification based on different occupations.") (citations omitted).

## D. Other States Have Interpreted Similar Constitutional Provisions to Require Strict Scrutiny.

Because it is settled law in Maryland that sex-based classifications implicate strict scrutiny under the ERA, *Burning Tree II*, 315 Md. at 293–96, 554 A.2d at 386–87, the majority must

---

established for at least six months prior to the date of his election, has resided in that district for six months next preceding that date. If the district which the person has been chosen to represent has been established less than six months prior to the date of his election, then in addition to (1) and (2) above, he shall have resided in the district for as long as it has been established. A person is eligible to serve as a Senator, if he has attained the age of twenty-five years, or as a Delegate, if he has attained the age of twenty-one years, on the date of his election.

Md. Const. art. III, § 9.

look, as it does, to cases from our sister states that refuse to acknowledge the sex-based classifications inherent in their same-sex marriage prohibitions, thereby avoiding ERA scrutiny altogether. *See* op. at 265–67, 932 A.2d at 598–99. Several cases cited by the majority, however, were decided on grounds other than the ERA, and thus, are completely irrelevant to the question of the applicable standard of review under our ERA. Among these are *In re Kandu,* 315 B.R. 123 (Bankr. W.D.Wash.2004) (decided under federal law); *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1 (2006) (no state ERA); *Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864 (1999) (same); and *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971) (same).

In cases that actually applied some version of the ERA to sex-based classifications, courts have consistently adopted strict scrutiny as the proper analytical framework. For example, the Supreme Court of New Mexico considered whether the Secretary of the New Mexico Human Services Department could implement a regulation, Rule 766,[39] restricting state reimbursement to abortion providers under the Medicaid program. *N.M. Right to Choose/NARAL v. Johnson,* 126 N.M. 788, 975 P.2d 841 (1998). In 1995, the Department amended Rule 766 to restrict state funding of abortions to cases certified by a physician as necessary to save the life of the mother, to terminate an ectopic pregnancy,[40] or in cases of rape or incest, *id.* at 846, whereas the previous version of the rule permitted state funding under a much broader definition

---

**39.** Pursuant to N.M. Stat. § 27-2-12 (1993), the Department was responsible for establishing rules to administer New Mexico's Public Assistance Act. At the time the suit was filed, the statute stated:

Consistent with the federal act and subject to the appropriation and availability of federal and state funds, the medical assistance division of the human services department may by regulation provide medical assistance, including the services of licensed doctors of oriental medicine, licensed chiropractic physicians and licensed dental hygienists in collaborative practice, to persons eligible for public assistance programs under the federal act.

**40.** An ectopic pregnancy "occur[s] elsewhere than in the cavity of the uterus." *Stedman's Medical Dictionary* 611 (28th ed.2006).

of medical necessity that included any pregnancy having "a profound negative impact upon the physical or mental health of an individual." *Id.* at 845. Because federal law prohibits reimbursement except in cases of rape or incest, or to save the life of the mother, but permits states, at their own expense, to reimburse all "medically necessary" abortions, *id.*, the plaintiffs argued that the New Mexico Constitution afforded greater protection than the federal law. *Id.* at 850.

The court interpreted the New Mexico ERA [41] as providing that enhanced protection, and that Rule 766 did not escape heightened scrutiny merely because it was based on a physical characteristic, the ability to become pregnant and bear children, unique to females. *Id.* at 851, 854–55. Because Rule 766 did not apply the same standard of medical necessity to both males and females, the rule was presumptively unconstitutional under the ERA, and the court found no compelling justification for the rule. *Id.* at 857. The court based its reasoning on the intent behind the enactment of the ERA; it cited *Ellis*, 311 N.E.2d at 101, and *Darrin*, 540 P.2d at 889, and adopted the same analysis, that the intent of the ERA was to "provid[e] something beyond that already afforded by the general language of the Equal Protection Clause." *N.M. Right to Choose*, 975 P.2d at 851–52. The court said:

> Based on our review of the text and history of our state constitution, we conclude that New Mexico's Equal Rights Amendment is a specific prohibition that provides a legal remedy for the invidious consequences of the gender-based discrimination that prevailed under the common law and civil law traditions that preceded it. As such, the Equal Rights Amendment requires a searching judicial inquiry

---

**41.** N.M. Const. Art. II, § 18. The New Mexico Constitution incorporated its ERA into its guarantees of due process and equal protection. The entire section reads as follows:

> No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws. Equality of rights under law shall not be denied on account of the sex of any person. The effective date of this amendment shall be July 1, 1973.

concerning state laws that employ gender-based classifications. This inquiry must begin from the premise that such classifications are presumptively unconstitutional, and it is the State's burden to rebut this presumption.

*Id.* at 853.

The Department argued that Rule 766 should not have been subjected to strict scrutiny because the classification at issue was based on a physical condition unique to one sex, and thus, males and females could not possibly be situated similarly with respect to that condition. *Id.* at 854. The court conceded that "not all classifications based on physical characteristics unique to one sex are instances of invidious discrimination," and thus, the presumptive unconstitutionality of such classifications is rebuttable. *Id. See* Brown, *supra* at 893. The court emphasized, however, that "similarly situated" cannot mean simply that every member of the class possesses the classifying trait, because under that test, every classification would be reasonable. *N.M. Right to Choose*, 975 P.2d at 854. *See* Joseph Tussman & Jacobus tenBrock, *The Equal Protection of the Laws*, 37 Cal. L.Rev. 341, 345 (1949). Instead, the court looked " 'beyond the classification to the purpose of the law.' " *N.M. Right to Choose*, 975 P.2d at 854, quoting Tussman & tenBrock, *supra*, at 346. *Accord Burning Tree I*, 305 Md. at 100, 501 A.2d at 841 ("[A]n inquiry into the actual facts, to determine the existence of a discriminatory purpose and impact, is appropriate.").

Because the statutory purpose was to provide qualified persons with necessary medical care, the court found that men and women who met a general need-based test for Medicaid eligibility were similarly situated, *N.M. Right to Choose*, 975 P.2d at 855, but that Rule 766 applied a different standard of medical necessity to women than to men. *Id.* at 856. The Department alleged two compelling interests, cost reduction and the protection of potential life, but the court found them self-contradictory and inadequate, *id.* at 856–57, and that Rule 766 was not narrowly tailored to achieving those interests. *Id.* at 857.

In *Guard v. Jackson*, 132 Wash.2d 660, 940 P.2d 642 (1997), the Supreme Court of Washington addressed the constitutionality of a wrongful death statute [42] that required a father to have provided regular contributions to the support of a deceased, illegitimate child as a prerequisite to have standing, but imposed no such requirement on the mother. The court applied the ERA to invalidate the statute, and to sever the support provision, affirming the decision of the intermediate appellate court. *Id.* at 645, *aff'g Guard v. Jackson*, 83 Wash. App. 325, 921 P.2d 544 (1996).

The court contrasted its standard of review of sex-based classifications with the more lenient federal equal protection standard,[43] *id.* at 643, and noted that under *Darrin* and the ERA, " 'the equal protection/suspect classification test is replaced by the single criterion: Is the classification by sex discriminatory?' " *Id.* at 644. Noting there had been few exceptions to the ERA-mandated prohibition of sex-based classifications, *id.*, the court held that the sex-based classification in the wrongful death statute did not bear even a rational relationship to the statutory purpose of excluding as plaintiffs those parents who fail to support their children. *Id.* at 645.

The Supreme Court of Colorado applied "the closest judicial scrutiny" under that state's ERA [44] to a sex-based classifica-

---

**42.** The relevant statutory provision stated:

The mother or father or both may maintain an action as plaintiff for the injury or death of a minor child, or a child on whom either, or both, are dependent for support: PROVIDED, That in the case of an illegitimate child the father cannot maintain or join as a party an action unless paternity has been duly established and the father has regularly contributed to the child's support.

Wash. Rev.Code § 4.24.010 (1973).

**43.** Under the more lenient federal equal protection analysis, the Supreme Court has upheld a similar Georgia wrongful death statute. *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979). A plurality of the Court applied rational basis review to affirm, because in their view mothers and fathers of illegitimate children are not similarly situated, *id.* at 353–55, 99 S.Ct. at 1747–48, 60 L.Ed.2d at 276–77; Justice Powell concurred in the judgment, but would have applied intermediate scrutiny. *Id.* at 359–60, 99 S.Ct. at 1749–50, 60 L.Ed.2d at 279–80 (Powell, J., concurring).

tion in *Colorado Civil Rights Commission v. Travelers Insurance Co.*, 759 P.2d 1358, 1363 (Colo.1988). The case involved statutory and administrative prohibitions against sex discrimination, allegedly violated by an employer whose group health insurance excluded coverage for expenses incurred for normal pregnancy and childbirth. *Id.* at 1359. The insurer argued that the exclusion did not discriminate against women, because there was no risk from which men were protected but women were not; however, the court disagreed. *Id.* at 1363. Instead, the court found discrimination because the insurance plan provided full coverage for men, including conditions for which men were uniquely susceptible, but did not cover pregnancy, a condition unique to women. *Id.* The court rejected the argument that the health plan treated all pregnant people alike, and held that the definition of the recipient class was "inherently discriminatory," because the classification excluded all women from reimbursement for the expenses associated with a physiological condition that affects only women. *Id.* at 1364.

## E. *Singer v. Hara* and *Andersen v. King County* not Persuasive

The majority in the present case considers a number of cases from our sister states as persuasive authority. *See* op. at 265–67, 932 A.2d at 598–99. As I have pointed out, many of these cases did not address the application of equal rights amendments. Of those that did, two are most significant: *Andersen v. King County*, 158 Wash.2d 1, 138 P.3d 963 (2006), and *Singer v. Hara*, 11 Wash.App. 247, 522 P.2d 1187 (1974). Because there have been close parallels between ERA jurisprudence in Maryland and Washington State, *Burning Tree I*, 305 Md. at 95–96, 501 A.2d at 838–39; *Rand*, 280 Md. at 512–15, 374 A.2d at 903–04, and because that State has interpreted

---

**44.** Colo. Const. art. II, § 29 ("Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex.").

its ERA to be inapplicable to same-sex marriage, it is important to examine Washington case law in this area.

Unlike in Maryland, there was a legal challenge to the statutory ban on same-sex marriages in Washington shortly after that State adopted its ERA. *Singer*, 522 P.2d at 1187. Two men who had been denied a marriage license sought a court order to compel a county official to issue the license, and when the trial court denied their motion to show cause why the license should not be issued, the men appealed on several grounds: first, they alleged the trial court erred in construing the statute to prohibit same-sex marriage; second, the appellants claimed that the marriage statute as applied violated the ERA; and third, the appellants claimed violations of the Eighth, Ninth and Fourteenth Amendments to the U.S. Constitution. *Id.* at 1188–89.

During the relevant time period, the marriage statute stated as follows:

> Marriage is a civil contract which may be entered into by persons of the age of eighteen years, who are otherwise capable: *Provided,* That every marriage entered into in which either party shall not have attained the age of seventeen years shall be void except where this section has been waived by a superior court judge of the county in which the female resides on a showing of necessity.

*Id.* at 1189 n. 2; Wash. Rev.Code Section 26.04.010 (1970). The Court of Appeals of Washington interpreted the statute to prohibit same-sex marriage, relying in part on the plain language of the statute, which used the word "female" in singular form, thereby "implying that a male was contemplated as the other marriage partner," and relying also on the context provided by closely related statutes,[45] which at several points referred explicitly to "male" and "female." *Singer*, 522 P.2d at 1189 & n. 3. The appellate court then rejected the contention that the statute as applied violated the ERA. *Id.* at

---

45. Wash. Rev.Code §§ 26.04.020–040 (1970) (prohibited marriages); *id.* at § 26.04.210 (affidavits required for issuance of marriage license).

1190–95. The appellants argued that "to construe state law to permit a man to marry a woman but at the same time to deny him the right to marry another man is to construct an unconstitutional classification 'on account of sex,'" but the court agreed with the State's contention that "so long as marriage licenses are denied equally to both male and female pairs," there was no ERA violation. *Id.* at 1190–91. The court determined that the definition of marriage was "the legal union of one man and one woman," and that, in previous cases, this definition "was deemed by the court in each case to be so obvious as not to require recitation." *Id.* at 1191–92. The court then concluded that the appellants had been denied a marriage license "because of the recognized definition of that relationship as one which may be entered into only by two persons who are members of the opposite sex," not "because of their sex;" thus, there *was no* sex-based classification. *Id.* at 1192. Therefore, in the court's view, *Loving v. Virginia,* 388 U.S. at 1, 87 S.Ct. at 1817, 18 L.Ed.2d at 1010, and *Perez v. Lippold,* 32 Cal.2d 711, 198 P.2d 17 (1948), the seminal cases invalidating anti-miscegenation statutes, were inapplicable. *Singer,* 522 P.2d at 1192 n. 8 (maintaining that *Loving* and *Perez* "did not change the basic definition of marriage as the legal union of one man and one woman"). Finally, the court applied rational basis review to affirm the trial court ruling on the federal constitutional issues. *Id.* at 1195–97.

More recently, the Supreme Court of Washington was faced with the same question addressed in *Singer.* In *Andersen v. King County,* 138 P.3d at 963, a challenge to the Washington Defense of Marriage Act ("DOMA"),[46] the court considered the

---

**46.** The Washington Defense of Marriage Act ("DOMA") amended two statutes; the amended versions, in relevant part, are as follows:

(1) Marriage is a civil contract between a male and a female who have each attained the age of eighteen years, and who are otherwise capable.

(2) Every marriage entered into in which either the husband or the wife has not attained the age of seventeen years is void except where this section has been waived by a superior court judge of the county in which one of the parties resides on a showing of necessity.

Wash. Rev.Code § 26.04.010 (1998).

constitutionality of the same-sex marriage prohibition. The court followed the ERA analysis of the *Singer* court, stating:

> Men and women are treated identically under DOMA; neither may marry a person of the same sex. DOMA therefore does not make any "classification by sex," and it does not discriminate on account of sex.

*Andersen,* 138 P.3d at 988, citing *Singer,* 522 P.2d at 1195. In this respect, the *Andersen* court echoes the opinion of the majority in the instant case. *See* op. at 265–66, 932 A.2d at 599. The difficulty lies in the inability of the Andersen court to recognize the true nature of the classification at issue; by failing to distinguish between sex-based classifications and those grounded in sexual orientation, the court avoids application of the ERA at the outset. *Andersen,* 138 P.3d at 988 (denial of marriage license "not based on their sex but upon the fact they were both of the same sex"), citing *Singer,* 522 P.2d at 1195. Cf. op. at 277, 932 A.2d 605, ("While Family Law § 2–201 does not draw a distinction based on sex, the legislation does differentiate implicitly on the basis of sexual preference."). In all significant respects, the Andersen court adopted the ERA analysis of Singer, and thus, makes the same errors. Furthermore, the majority in the present case adopts the analysis of Singer and Andersen, and therefore, adopts those errors as well.

In my view, the *Singer* court erred in two significant respects: first, the court misconstrued the nature of the classification established by the same-sex marriage prohibition; second, the court analyzed the impact of the classification scheme as it applied to *couples,* rather than to individuals, and cited no authority for so doing. The Washington same-

---

(1) Marriages in the following cases are prohibited:

<div align="center">* * *</div>

(c) When the parties are persons other than a male and a female.

<div align="center">* * *</div>

(3) A marriage between two persons that is recognized as valid in another jurisdiction is valid in this state only if the marriage is not prohibited or made unlawful under subsection (1)(a), (1)(c), or (2) of this section.

Wash. Rev.Code § 26.04.020 (1998).

sex marriage prohibition *did* classify on grounds of sex, because a homosexual was *permitted* to marry a partner of the *opposite sex,* but was prohibited from marrying a partner of the *same* sex. Indeed, Wash. Rev.Code Section 26.04.010 (1970) as construed by the *Singer* court effected a classification scheme identical to that contained in Family Law Section 2–201 in the instant case. Therefore, the *Singer* court avoided the ERA question though an analytical error whereby the court failed to recognize that the definition of marriage *itself* was part of a sex-based classification scheme, and thus, the court analyzed the issue under an incorrect standard of review under its own state law.

An interesting distinction may be drawn between *Singer* and the present case. Whereas the *Singer* court defined marriage as "the legal union of one man and one woman" on the basis of case law and the overall context of the statutory scheme, 522 P.2d at 1191, the present case differs because the plain language of Section 2–201 draws a distinction between a marriage between a man and a woman, and marriages between two men or two women. Furthermore, Section 2–201 clearly contemplates the possibility of marriages between two men or two women, because it singles out for special treatment "only" those marriages between a man and a woman. Therefore, the language of Section 2–201 itself refutes the notion that the definition of marriage necessarily does not include same-sex marriages.[47]

In its analysis of the impact of the same-sex marriage prohibition on the appellants, the *Singer* court implicitly adopted the separate but equal theory relied upon by the majority in the instant case. *Compare id.* ("[T]he state suggests that appellants are not entitled to relief under the ERA because they have failed to make a showing that they are somehow being treated differently by the state than they would be if they were females. Appellants suggest, however, that the holdings in [*Loving, Perez* ] and *J.S.K. Enterprises,*

---

47. The argument about the plain meaning of Section 2–201 applies with equal force to the Washington DOMA at issue in *Andersen.*

*Inc. v. City of Lacey,*[48] are contrary to the position taken by the state. We disagree."), *with* op. at 264, 932 A.2d at 598 ("[Family Law Section 2–201] prohibits equally both men and women from the same conduct."). Thus, the majority in the present case commits the same error as the *Singer* court: in order to find no sex-based classification in the same-sex marriage prohibition, both analyses compare the rights of a male *couple* to those of a female *couple.*

The majority offers no principled basis for applying equal protection analysis to couples rather than to individuals, for the simple reason that there is no principled basis for the distinction. In order to get around this obstacle, the majority posits the notion that Family Law Section 2–201 is facially neutral, and hence, the proper test for evaluating whether sex discrimination has occurred is to search for a discriminatory purpose. *See* op. at 270–71, 932 A.2d at 601–02. Having determined, mistakenly in my view, that Section 2–201 does not classify on the basis of sex, the majority then reaches the conclusion that the purpose of the same-sex marriage prohibition cannot be linked to a " 'design[ ] to subordinate either men to women or women to men as a class.' " *See* op. at 270, 932 A.2d at 601, quoting [49] *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 11 (2006). Having avoided the sex-based classification at issue, and having found no invidious purpose, the majority in the present case retreats to rational basis review. *See* op. at 260–65, 932 A.2d 595–98. In reaching this result, the majority breathes life into the corpse of separate but equal that this Court laid to rest in *Burning Tree II.* It saddens me to say that Judge Eldridge's worst fears have now come to fruition:

> The principal purpose of this opinion is to respond to the positions taken in Parts VI–IX of Chief Judge Murphy's

---

**48.** In *J.S.K. Enterprises, Inc. v. City of Lacey,* 6 Wash.App. 43, 492 P.2d 600 (1971), a city ordinance prohibiting massagists from performing services for clients of the opposite sex was invalidated on federal equal protection and state statutory grounds.

**49.** *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1 (2006), the recent New York same-sex marriage case, is inapposite to the instant case because New York lacks an ERA.

opinion announcing the judgment of the Court, even though that opinion is not an opinion of the Court. If the views set forth in Parts VI–VIII of Chief Judge Murphy's opinion were in the future to be adopted by a majority of this Court, the effectiveness of the Equal Rights Amendment to the Maryland Constitution would be substantially impaired.

*Burning Tree I*, 305 Md. at 88, 501 A.2d at 835.

## F. Strict Scrutiny and the Present Case

Our cases stand for the proposition that all state action that draws sex-based distinctions, regardless of whether such action "directly impos[es] a burden or confer[s] a benefit entirely upon either males or females," *id.* at 95, 501 A.2d at 838 (opinion of Eldridge, J.), implicates the ERA and must be subjected to strict scrutiny. *See In re Roberto d.B.*, 399 Md. 267, 279 n. 13, 923 A.2d 115, 122 n. 13 (2007) ("This Court has applied a strict scrutiny standard when reviewing gender-based discrimination claims."); *Murphy*, 325 Md. at 357 n. 7, 601 A.2d at 109 n. 7 ("In Maryland, because of the Equal Rights Amendment to the Maryland Constitution . . ., classifications based on gender are suspect and subject to strict scrutiny."); *Burning Tree II*, 315 Md. at 293, 554 A.2d at 386 ("In [*Burning Tree I* ], . . . a majority of this Court took the position that the enactment of legislation which on its face draws classifications based on sex is state action sufficient to invoke the E.R.A."). Until today, this Court has never shied away from that standard when applying the ERA. *See Giffin*, 351 Md. at 148, 716 A.2d at 1037 ("[T]he [Equal Rights] Amendment can only mean that sex is not, and can not be, a factor in the enjoyment or the determination of legal rights."); *id.* at 149, 716 A.2d at 1037 ("[T]he Equal Rights Amendment flatly prohibits gender-based classifications, absent substantial justification, whether contained in legislative enactments, governmental policies, or by application of common law rules."); *Burning Tree II*, 315 Md. at 295, 554 A.2d at 387 ("Plainly, under prior holdings of this Court, state action providing for segregation based upon sex, absent substantial justification, violates the E.R.A., just as segregation based upon race

violates the Fourteenth Amendment."); *Rand,* 280 Md. at 511–12, 374 A.2d at 902–03 ("The words of the E.R.A. are clear and unambiguous; they say without equivocation that 'Equality of rights under the law shall not be abridged or denied because of sex.' This language mandating equality of rights can only mean that sex is not a factor.").

In a recent case we reviewed the constitutionality of a statutory scheme [50] permitting challenges to paternity, and applied strict scrutiny, *In re Roberto d.B.,* 399 Md. at 279 n. 13, 923 A.2d at 122 n. 13, to hold that the statutes must be construed in a sex-neutral fashion. *Id.* at 283, 923 A.2d at 124. On its face, Title 5, Subtitle 10 of the Family Law Article contemplated only the right of a man, found not genetically linked to a child, to petition a court to set aside a declaration of paternity.[51] We applied the doctrine of constitutional avoidance to infer a judicial gloss to a statutory scheme that was silent to the possibility that a gestational mother could challenge maternity. *Id.* at 278–79, 283–84, 923 A.2d at 121–22, 124–25. Our analysis focused on the unequal application of Subtitle 10 to a particular woman, and was not predicated on a group-by-group comparison. We held that the ERA mandated a focus on the unequal treatment of an individual under the law; just as the Supreme Court applied strict scrutiny to state-sanctioned discrimination against persons of all races on a purportedly equal basis, *Powers,* 499 U.S. at 410, 111 S.Ct. at 1370, 113 L.Ed.2d at 425; *Loving,* 388 U.S. at 8, 87 S.Ct. at 1822, 18 L.Ed.2d at 1016,[52] so too have we held that the equal

---

**50.** Md.Code (1984, 2006 Repl.Vol.), §§ 5–1001 to—1048 of the Family Law Article.

**51.** Section 5–1038(a)(2)(i) of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.), reads in relevant part:

A declaration of paternity may be modified or set aside:

\* \* \*

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

**52.** In *Powers,* the Court said "[t]he suggestion that racial classifications may survive when visited upon all persons is no more authoritative

application of discriminatory laws does not preclude strict scrutiny under Article 46. *In re Roberto d.B.,* 399 Md. at 282–84, 923 A.2d at 124–25; *Giffin,* 351 Md. at 148–49, 716 A.2d at 1037; *Burning Tree II,* 315 Md. at 293–95, 554 A.2d at 386–87; *Rand,* 280 Md. at 515–16, 374 A.2d at 904–05.

In the instant case, the State argues on the basis of the equal application theory of the ERA that Section 2–201 does not implicate Article 46. In its brief, the State points to the dissenting opinion of Chief Judge Murphy in *Burning Tree I,* 305 Md. at 64, 501 A.2d at 822, to support its view that Section 2–201 passes muster because its prohibitions burden both sexes equally. To bolster its argument, the State quotes from *Giffin,* 351 Md. at 149, 716 A.2d at 1037, which in turn cites the opinion of Chief Judge Murphy in *Burning Tree I.* The State omits the following key portion from *Giffin:* "[T]he equality between the sexes demanded by the Maryland Equal Rights Amendment focuses on 'rights' of individuals 'under the law,' which encompasses all forms of privileges, immunities, benefits and responsibilities of citizens." *Id.* Thus, the passage from *Giffin* does not support the State's argument; neither does the Court's holding in the case, as I explained previously. Furthermore, as I have explained in great detail, the opinion of Chief Judge Murphy in *Burning Tree I* was a minority view insofar as its theory of the scope and effect of the ERA was concerned. Therefore, the State's argument is fundamentally misplaced. Likewise, the State's reliance on *Cannon v. Cannon,* 384 Md. 537, 572 n. 19, 865 A.2d 563, 583 n. 19 (2005), is unpersuasive. Although *Cannon* was correct

---

today than the case which advanced the theorem, *Plessy v. Ferguson,* 163 U.S. 537[, 16 S.Ct. 1138, 41 L.Ed. 256] (1896)." *Powers,* 499 U.S. at 410, 111 S.Ct. at 1370, 113 L.Ed.2d at 425. In *Loving,* the Court was equally emphatic, emphasizing that the State's proffer of equal application did not shield the statute from strict scrutiny. 388 U.S. at 8, 87 S.Ct. at 1822, 18 L.Ed.2d at 1016 ("Because we reject the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations, we do not accept the State's contention that these statutes should be upheld if there is any possible basis for concluding that they serve a rational purpose.").

about the inapplicability of the ERA to the confidential relationship and concomitant duty to disclose inhering in antenuptial agreements, the reason for the legally imposed duty arises out of fundamental principles of contract law. *Id.* at 556 n. 8, 570–71, 865 A.2d at 573 n. 8, 582–83 (contrasting antenuptial and post-marital agreements, and noting that the ERA invalidated gender-based classification only in the latter case).

To summarize, in a long line of cases extending back to *Giffin, Burning Tree I* and *II, Condore, Kline* and *Rand,* we have consistently interpreted the ERA to require that the rights of *any person* cannot depend on sex-based classifications, unless the State demonstrates a compelling governmental interest, and then only if the classification is narrowly tailored and precisely limited to achieving that compelling interest. Today this Court denies the commitment to equal rights made by the General Assembly and ratified by the People of this State in 1972. As we said in *Giffin,* 351 Md. at 148–49, 716 A.2d at 1037, and iterated in *In re Roberto d.B.,* 399 Md. at 281, 923 A.2d at 123–24:

> "The basic principle of the Maryland Equal Rights Amendment, thus, is that sex is not a permissible factor in determining the legal rights of women, or men, so that *the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other[;]* that amendment generally invalidates governmental action which imposes a burden on, or grants a benefit to, one sex but not the other one."

(emphasis added). Clearly, this language means that the analysis must focus on the *individual* whose rights are infringed by the sex-based classification, because rights accrue to the *individual,* not to couples, or to some abstract group entity. We emphasized that equal rights between the sexes are personal, not group, rights:

> "[T]he equality between the sexes demanded by the Maryland Equal Rights Amendment focuses on 'rights' of individuals 'under the law,' which encompasses all forms of privileges, immunities, benefits and responsibilities of citizens.

As to these, the Maryland E.R.A. absolutely forbids the determination of such 'rights,' as may be accorded by law, solely on the basis of one's sex, i.e., sex is an impermissible factor in making any such determination."

*Id.* at 281–82, 923 A.2d at 124, quoting *Giffin*, 351 Md. at 149, 716 A.2d at 1037 (alteration in original). The majority in the present case deliberately misconstrues the passage quoted above through selective quotation, conveniently omitting the second sentence, to support its narrowly constrained view of the ERA as somehow permitting separate but "equal" in matters of sex discrimination. *See* op. at 258–59, 932 A.2d at 594–95. Its strained interpretation ignores what until today had been well-settled in Maryland: the ERA is intended to address the rights of individuals, not the rights of "men and women *as classes.*" *See* op. at 259, 932 A.2d at 595 (emphasis in original). Our predecessors stated a similar idea in *Rand*, 280 Md. at 511–12, 374 A.2d at 902–03:

The words of the E.R.A. are clear and unambiguous; they say without equivocation that "Equality of rights under the law shall not be abridged or denied because of sex."

I repeat: the words of the ERA are clear and unambiguous and can only mean that the rights of any person under the law cannot be abridged because of sex. The majority today pursues a results-based jurisprudence that distorts our case law construing the ERA, and in so doing, dilutes its effect.

## II. The State's Arguments Against Applicability of Article 46

The State focuses most of its argument against application of strict scrutiny to the same-sex marriage ban, and I address those arguments now. First, the State argues that the legislative history of Article 46 and Family Law Section 2–201 compels the conclusion that the same-sex marriage ban is constitutional.

The State points to the voting records surrounding Article 46 of the Declaration of Rights and Section 1 of Article 62, Maryland Code (1957, 1979 Repl.Vol.), the predecessor to

Family Law Section 2–201,[53] to conclude that the framers of the ERA understood and intended that the same-sex marriage ban was compatible with the ERA. Thus, in 1972, House Bill 687, a measure to add the ERA to the Maryland Declaration of Rights, passed the House of Delegates by the overwhelming margin 120–1, *see* 1972 Maryland House Journal 1281–82 (Mar. 22, 1972); the Senate voted 39–0 in favor. *See* 1972 Maryland Senate Journal 1899 (Apr. 1, 1972). In 1973, the same legislature passed Senate Bill 122, a measure adopting the same-sex marriage ban. The measure passed the House by 112–1, *see* 1973 Maryland House Journal 2743 (Apr. 1, 1973); the Senate voted 37–1 in favor. *See* 1973 Maryland Senate Journal 273 (Jan. 24, 1973). Detailed comparison of the roll call votes indicates that 94 Delegates voted in favor of both measures; if Delegates who co-sponsored but did not vote for the ERA are included, then the total number of Delegates in favor of both the ERA and the same-sex marriage ban was 100 out of a total of 142.[54] Out of 43 Senators, 33 voted both for the ERA and the same-sex marriage ban. From these facts the State concludes that "those legislators who approved [the ERA] in 1972 did not see anything inconsistent about their decision in 1973 to vote for legislation clarifying that the State recognizes only a marriage between a man and a woman."

The difficulty with this argument is two-fold. First, the State offers no basis for distinguishing the situation involving

---

**53.** 1973 Maryland Laws, Chapter 213 amended Section 1 of Article 62, Maryland Code (1957, 1972 Repl.Vol.), to read: "Only a marriage between a man and a woman is valid in this State. If any person within this State shall marry within any of the degrees of kindred or affinity expressed in the following table, the marriage shall be void." *See* Md.Code (1957, 1979 Repl.Vol.), Art. 62, § 1. The "following table" refers to Section 2 of Article 62 (recodified as Section 2–202 of the Family Law Article), the statute that lists the prohibited degrees of consanguinity and affinity. The first sentence of Section 1 of Article 62 is identical to the current statute, Section 2–201 of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.).

**54.** In 1972–73, the total number of Delegates was 142, and the number of Senators was 43. *See* 1969 Md. Law, Chap. 785, amending Md. Const. art. III, § 2.

the unconstitutional statute [55] enacted by the General Assembly in 1974 and invalidated in *Burning Tree I* from that which is presented here. Clearly Chapter 870, the discriminatory anti-discrimination provision in *Burning Tree I*, was nearly contemporaneous with Section 1 of Article 62 and Article 46; nevertheless, no one seriously contended that mere temporal nearness could save Chapter 870 from invalidation. The State is forced to combine the nearly contemporaneous enactment of the same-sex marriage ban and the ERA with the additional rule of constitutional interpretation elaborated in *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 620, 458 A.2d 758, 770 (1983):

> In this regard, it has been held that a contemporaneous construction placed upon a particular provision of the Maryland Constitution by the legislature, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period, furnishes a strong presumption that the intention is rightly interpreted.

I find this argument unpersuasive in the present context. The relevant time frame in the instant case extends only to 1972, not to "a very early period," because "[t]he adoption of the E.R.A. in this state was intended to, and did, drastically alter traditional views of the validity of sex-based classifications." *Rand*, 280 Md. at 515–16, 374 A.2d at 905. Therefore, the undeniable fact that marriage has always been recognized only between a man and a woman, although undoubtedly "acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period," carries no greater legal weight in light of the ERA than the multitude of sex-based common law rules and presumptions that have been invalidated since 1972. *See, e.g., Giffin*, 351 Md. at 133, 716 A.2d at 1029; *Condore*, 289 Md. at 516, 425 A.2d at 1011; *Kline*, 287 Md. at 585, 414 A.2d at 929; *Rand*, 280 Md. at 508, 374 A.2d at 900.

---

**55.** 1974 Md. Laws, Chap. 870. *See Burning Tree I*, 305 Md. at 56, 501 A.2d at 817.

In a related vein, the State argues that the plain meaning of Article 46 and the case law interpreting it foreclose the interpretation given by the Appellees and adopted by the Circuit Court, that Family Law Section 2–201 classifies on the basis of sex. In the State's view, Section 2–201 is facially neutral and simply does not constitute sex discrimination. The State's argument focuses on discrimination based on sexual orientation, a classification indisputably within the scope of Section 2–201. Relying on the statutory scheme established by the Commission on Human Relations, Article 49B, Maryland Code (1957, 2003 Repl.Vol.), as amended, 2001 Maryland Laws, Chapter 340,[56] the State maintains that the General Assembly has demonstrated repeatedly its ability to distinguish "sex" from "sexual orientation," and because Article 46 is silent on "sexual orientation," the logical conclusion is that Family Law Section 2–201 was never intended to fall

---

**56.** Representative excerpts from some of these statutes include:

(a) *"Sexual orientation" defined.*—In this subheading, "sexual orientation" means the identification of an individual as to male or female homosexuality, heterosexuality, or bisexuality.

(b) *Prohibited.*—It is unlawful for an owner or operator of a place of public accommodation or an agent or employee of the owner or operator, because of the race, creed, sex, age, color, national origin, marital status, sexual orientation, or disability of any person, to refuse, withhold from, or deny to such person any of the accommodations, advantages, facilities and privileges of such place of public accommodation.

Md.Code (1957, 2003 Repl.Vol.), Article 49B, § 5. From a related statute prohibiting discrimination in public accommodations:

(a) *In general.*—It is unlawful for any person, business, corporation, partnership, copartnership or association or any other individual, agent, employee, group or firm which is licensed or regulated by a unit in the Department of Labor, Licensing, and Regulation as set out in § 2–108 of the Business Regulation Article to refuse, withhold from, deny or discriminate against any person the accommodations, advantages, facilities, privileges, sales, or services because of the race, sex, creed, color, national origin, marital status, sexual orientation, or disability of any person.

*Id.* at § 8. Section 14 uses the phrase, "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, or disability," in a declaration of policy governing employment discrimination. Section 16 uses similar language in a related statute enumerating unlawful employment practices. Sections 19 and 22 use similar language in the context of housing discrimination.

inside the scope of Article 46. The majority adopts this interpretation, stating that "[t]o accept [Appellees'] contention that Family Law § 2–201 discriminates on the basis of sex would be to extend the reach of the ERA beyond the scope intended by the Maryland General Assembly and the State's voters who enacted and ratified, respectively, the amendment." *See* op. at 264–65, 932 A.2d 598.

This argument is entirely irrelevant to the question of constitutionality of sex-based classifications under Article 46 and hence, is a classic red herring. Although the majority asserts that Family Law Section 2–201 draws classifications based on sexual orientation, on its face the statute actually classifies on the basis of sex, not sexual orientation. Section 2–201 does not prohibit homosexuals from marrying; in fact, a homosexual male may marry either a heterosexual or homosexual female, and a homosexual female may marry either a heterosexual or homosexual male. Only by virtue of a person's sex is he or she prohibited from marrying a person of the same sex. Clearly, Section 2–201 draws distinctions based on sex and thus, the issue of sexual orientation simply does not enter into an ERA analysis.

The Appellees in the present case allege that Section 2–201 has a discriminatory effect, regardless of its alleged facial neutrality, and that the landmark Supreme Court decision in *Loving*, 388 U.S. at 1, 87 S.Ct. at 1817, 18 L.Ed.2d at 1010, should control the outcome here. *Loving* involved the State assertion of an analogous allegedly neutral, generally applicable statute prohibiting miscegenation. *Id.* at 2, 87 S.Ct. at 1818, 18 L.Ed.2d at 1012. The Court applied strict scrutiny to the Virginia statute despite its ostensibly equal application to both races. *Id.* at 9, 87 S.Ct. at 1822, 18 L.Ed.2d at 1016 ("In the case at bar, ... we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race."). Not only did the Court weigh the long history of white supremacy and racial segregation heavily against the State, but the Court

found the anti-miscegenation statute applied only to interracial marriages involving whites, and thus, was not facially neutral as asserted by Virginia. *Id.* at 11–12, 87 S.Ct. at 1823, 18 L.Ed.2d at 1017–18. The Court reached its holding independently of the issue of discriminatory intent, however, "find[ing] the racial classifications in these statutes repugnant to the Fourteenth Amendment, even assuming an even-handed state purpose to protect the 'integrity' of all races." *Id.* at 11 n. 11, 87 S.Ct. at 1823 n. 11, 18 L.Ed.2d at 1018 n. 11. Clearly, the Court found no legitimate purpose in the racial classifications themselves, regardless of the proffered justification. *Id.* at 11, 87 S.Ct. at 1823, 18 L.Ed.2d at 1017 ("There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification.").

The State attempts to distinguish *Loving* from the instant case on the basis that the same-sex marriage ban does not evince the intent to impose segregation based on sex. The State's position is reinforced by *amici*, The Maryland Catholic Conference, who argue that "anti-miscegenation statutes were intended to keep persons of *different* races *separate*; marriage statutes, on the other hand, are intended to bring persons of the *opposite* sex *together*." (emphasis in original). This argument begs the question whether Family Law Section 2–201 is facially neutral; it is well-settled that the question of discriminatory intent does not arise unless the threshold question of facial neutrality is answered in the affirmative. *See, e.g., Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 1549, 143 L.Ed.2d 731, 738 (1999) ("When racial classifications are explicit, no inquiry into legislative purpose is necessary."); *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511, 525 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute.").

Here, there is no plausible assertion that Section 2–201 accrues only to the benefit of either men or women as a class. Just as in *Rand, Kline, Condore, Burning Tree I* and *Giffin,* however, there is sex discrimination at the level of the *individual* who wishes to marry but is precluded from doing so

because of the statute. Thus, a man who wishes to marry another man is prevented from choosing his marriage partner purely on the basis of sex; likewise, a woman who wishes to marry another woman is prevented from choosing her marriage partner purely on the basis of sex. Manifestly, Section 2–201 classifies on the basis of sex; because it would be necessary to consider the underlying legislative intent only if the same-sex marriage ban did not draw sex-based distinctions, the question of legislative intent is irrelevant. Just as in *Loving*, it is the *nature of the classifications themselves* that implicates strict scrutiny.

### III. Application of the Correct Standard to the Instant Case

I turn now to consider whether Family Law Section 2–201 ("Only a marriage between a man and a woman is valid in this State."), survives strict scrutiny. A statutory classification will be upheld under strict scrutiny only if it "further[s] a compelling state interest," and "if it is deemed to be suitably, or narrowly, tailored" to achieving that goal. *Koshko v. Haining*, 398 Md. 404, 438, 921 A.2d 171, 191 (2007); *Burning Tree II*, 315 Md. at 296, 554 A.2d at 387; *Hornbeck*, 295 Md. at 641, 458 A.2d at 781. Regardless of the strength of the governmental interest at stake, statutory classifications subject to strict scrutiny must " ' "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate ... prejudice or stereotype.' " *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226, 115 S.Ct. 2097, 2112, 132 L.Ed.2d 158, 181 (1995), quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854, 882 (1989). In other words, the "classification at issue must 'fit' with greater precision than any alternative means." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 1850 n. 6, 90 L.Ed.2d 260, 272 n. 6 (1986), citing John Hart Ely, *The Constitutionality of Reverse Racial Discrimination*, 41 U. Chi. L.Rev. 723, 727 n. 26 (1974).

An example of a compelling state interest that survived strict scrutiny under the ERA is the sex-based classification scheme inherent in the crime of rape. At common law and under the current statutes,[57] it is impossible for a woman to commit first or second degree rape other than as a principal in the second degree, because vaginal intercourse is required,[58] *see, e.g., Wilson v. State,* 132 Md.App. 510, 517–18, 752 A.2d 1250, 1254 (2000); nevertheless, this sex-based distinction has been upheld under strict scrutiny. *See, e.g., People v. Green,* 183 Colo. 25, 514 P.2d 769, 770 (1973) (upholding Colorado

---

**57.** *See, e.g.,* Md.Code (2002, 2006 Supp.), § 3–303 of the Criminal Law Article, entitled "Rape in the first degree," which states in relevant part:

(a) *Prohibited.*—A person may not:

(1) engage in vaginal intercourse with another by force, or the threat of force, without the consent of the other; and

(2)(i) employ or display a dangerous weapon, or a physical object that the victim reasonably believes is a dangerous weapon;

(ii) suffocate, strangle, disfigure, or inflict serious physical injury on the victim or another in the course of committing the crime;

(iii) threaten, or place the victim in fear, that the victim, or an individual known to the victim, imminently will be subject to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping;

(iv) commit the crime while aided and abetted by another; or

(v) commit the crime in connection with a burglary in the first, second, or third degree.

Similarly, Section 3–304 of the Criminal Law Article, entitled "Rape in the second degree," states in relevant part:

(a) Prohibited.—A.person may not engage in vaginal intercourse with another:

(1) by force, or the threat of force, without the consent of the other;

(2) if the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual, and the person performing the act knows or reasonably should know that the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual; or

(3) if the victim is under the age of 14 years, and the person performing the act is at least 4 years older than the victim.

Despite the sex neutral term "person" whose behavior is proscribed, the context makes it clear that the only "person" capable of the enumerated crimes is a male. *See Brooks v. State,* 24 Md.App. 334, 337–38, 330 A.2d 670, 672, *cert. denied,* 275 Md. 746 (1975).

**58.** Because vaginal intercourse is required, necessarily "[p]enetration, however slight" is "an essential element of the crime of rape." *Craig v. State,* 214 Md. 546, 547, 136 A.2d 243, 244 (1957).

rape statute [59] against an ERA challenge).

Other examples of sex-based classifications that were upheld under an ERA analysis include prohibitions on public nudity that prohibit display of female breasts, *City of Seattle v. Buchanan,* 90 Wash.2d 584, 584 P.2d 918 (1978); *City of Albuquerque v. Sachs,* 135 N.M. 578, 92 P.3d 24 (App.2004); *Messina v. State,* 904 S.W.2d 178 (Tex.App.1995), and affirmative action programs designed to alleviate the effects of past discrimination. *Brackett v. Civil Serv. Comm'n,* 447 Mass. 233, 850 N.E.2d 533 (2006); *S.W. Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce County,* 100 Wash.2d 109, 667 P.2d 1092 (1983). Thus, strict scrutiny of sex-based classifications under the ERA need not always be "strict in theory, but fatal in fact." *Adarand,* 515 U.S. at 237, 115 S.Ct. at 2117, 132 L.Ed.2d at 188 (citation omitted) (holding that minority setasides must pass strict scrutiny, but emphasizing that "benign" discrimination may constitute a compelling state interest).

---

**59.** The appellant was convicted of first degree rape under the following statute:

*Rape.*—(1)(a) Rape is an act of sexual intercourse, accomplished with, by or between a male and a female person or male and female persons, where such female person is not the wife of the principal perpetrator, as distinguished from accessory to such offense, under any of the following circumstances:

(b) By the male person where the female person is unmarried, and where the female person is under, and the male person is over the age of eighteen years; and this is rape in the first degree.

*People v. Green,* 183 Colo. 25, 514 P.2d 769, 770 (1973); Colo.Rev.Stat. § 40–2–25(1)(a)–(b) (1963). A female could be charged only under subsection (k) of the same statute for the lesser crime of third degree rape:

(k) By the female person of whatever age, not being an accessory as defined in subsection (1)(*l*), of this section, where the male person is under the age of eighteen years, where such sexual intercourse is had at the solicitation, inducement, importuning or connivance of such female person, or where such female person was at the time of commission of such offense, a free, common, public or clandestine prostitute, and the male person was, prior and up to the time of commission of the offense, of good moral character; and this is rape in the third degree.

*Green,* 514 P.2d at 770; Colo.Rev.Stat. § 40–2–25(1)(k) (1963).

Because the early equal protection cases typically examined racial classifications, subsequent jurisprudence in the area of gender discrimination necessarily analogized to the precedents involving racial discrimination. One point of attack by opponents of equal rights for women has been to emphasize the limitations of the analogy between race and sex classifications; equal rights opponents have distinguished racial discrimination from sex-based discrimination on the basis of the inherent differences between the sexes. *See Brown, supra* at 893–96. *See also United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 2276, 135 L.Ed.2d 735, 752 (1996) (noting that " 'inherent differences' " are "no longer accepted" as a basis for racial and national origin classifications, but that "[p]hysical differences between men and women ... are enduring"). Evolution of the law in this area has been, in no small measure, a process of sifting truly substantial gender differences from distinctions that masquerade as such but in reality merely embody "traditional, often inaccurate, assumptions about the proper roles of men and women." *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 726, 102 S.Ct. 3331, 3337, 73 L.Ed.2d 1090, 1099 (1982). The movement among the several states to enact equal rights amendments was motivated, in part, to counteract the tendency of courts to extend deference to sexual stereotypes cloaked as truly substantial differences. Brown, *supra* at 879–82. There can be no doubt that Marylanders overwhelmingly adopted this approach through enactment of the ERA. *See Rand,* 280 Md. at 515–16, 374 A.2d at 904–05 ("[W]e believe ... the people of Maryland are fully committed to equal rights for men and women. The adoption of the E.R.A. in this state was intended to, and did, drastically alter traditional views of the validity of sex-based classifications.").

The only operative distinction between sex-based and race-based classifications obtains from "the inherent differences between the sexes"; thus, some sex-based classifications may survive strict scrutiny "whereas comparable race-based classifications could not be sustained." *Burning Tree I,* 305 Md. at 98, 501 A.2d at 840. However, this distinction has been construed narrowly, generally applying only to cases of obvi-

ous anatomical differences. For example, the ERA has been interpreted to permit separate bathrooms for each sex in public accommodations, *id.* at 98 & n. 8, 501 A.2d at 840 & n. 8, and rape statutes that punish only men. *Brooks v. State,* 24 Md.App. 334, 337–39, 330 A.2d 670, 672–73, *cert. denied,* 275 Md. 746 (1975); 74 Op. Att'y Gen. 19, 22 (Md.1989). *See also People v. Barger,* 191 Colo. 152, 550 P.2d 1281 (1976); *Green,* 514 P.2d at 770. Chief Judge Murphy suggested, if anything, an even narrower construction of the "inherent differences" exception to strict scrutiny. *See Burning Tree I,* 305 Md. at 64 n. 3, 501 A.2d at 822 n. 3 ("Disparate treatment on account of physical characteristics unique to one sex is generally regarded as beyond the reach of equal rights amendments."). *Accord* Brown, *supra* at 893 ("The fundamental legal principle underlying the Equal Rights Amendment, then, is that the law must deal with particular attributes of individuals, not with a classification based on the broad and impermissible attribute of sex. This principle, however, does not preclude legislation (or other official action) which regulates, takes into account, or otherwise deals with a physical characteristic unique to one sex.").

The implications of the "inherent differences" between males and females for the present case are unclear. There would appear to be a colorable argument that traditional marriage arose out of an inchoate recognition that reproduction of our species and thus, the very future existence of society, is inextricably linked to the state interest in promoting the formation of stable, nurturing families beginning with the intimate sexual union of a man and a woman. *Fornshill v. Murray,* 1 Bland 479, 481 (1828) ("Marriage has been considered among all nations as the most important contract into which individuals can enter, *as the parent not the child of civil society.*") (emphasis added).

With regard to narrow tailoring, the *Burning Tree* cases themselves illustrate the concept through its exact opposite. The anti-discrimination provision invalidated in *Burning Tree II,* for instance, "permit[ted] a club to engage in periodic sex discrimination in any of its facilities for any reason at all";

consequently, the statute failed the narrow tailoring requirement. 315 Md. at 296, 554 A.2d at 387. The touchstone of narrow tailoring is whether, when faced with "other, reasonable ways to achieve [its] goals with a lesser burden on constitutionally protected activity," the State has rejected "the way of greater interference" and chosen instead the least burdensome means to further its interest. *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 285 (1972).

It is critical to bear in mind the allocation of burdens under the various equal protection review standards. Regardless of the applicable standard, the plaintiff always bears the initial burden of production, just as in any other civil cause. Under rational basis review, the plaintiff also shoulders the burden of persuasion, because rational basis review presumes the validity of the challenged classification. *See, e.g., Heller v. Doe*, 509 U.S. 312, 320–21, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257, 271 (1993) ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. . . . A statute is presumed constitutional, and '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record.") (citations omitted) (alteration in original). Under both intermediate and strict scrutiny, on the other hand, the *government* has the burden of justifying the challenged classifications. *See, e.g., Johnson v. California*, 543 U.S. 499, 505, 125 S.Ct. 1141, 1146, 160 L.Ed.2d 949, 958 (2005) ("Under strict scrutiny, the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.' "), quoting *Adarand Constructors, Inc.*, 515 U.S. at 227, 115 S.Ct. at 2113, 132 L.Ed.2d at 182; *United States v. Virginia*, 518 U.S. at 533, 116 S.Ct. at 2275, 135 L.Ed.2d at 751 (Under intermediate scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State."); *Hornbeck*, 295 Md. at 641, 458 A.2d at 781 ("Laws which are subject to [strict scrutiny] violate the equal protection guarantee unless the State can demonstrate that

the statute is necessary to promote a compelling governmental interest.").

The compelling interests asserted in the State's brief are (1) maintaining the same definition of marriage as that mandated by the Federal DOMA, 1 U.S.C. § 7 (2006); (2) ensuring that dramatic cultural changes be adopted through vigorous public debate culminating in legislative decisions; and (3) maintaining the traditional institution of marriage because it is so deeply ingrained in our history and traditions.

The first state interest expresses a general public policy of promoting comity in relations with our sister states and the federal government; undoubtedly that interest could comport with rational basis review, because the desire to conform Maryland laws with those of other jurisdictions has been a touchstone of our jurisprudence in many areas of the law. *See, e.g.,* Section 9.5-101 et seq. of the Family Law Article, Maryland Code (1984, 2006 Repl.Vol.) (Maryland Uniform Child Custody Jurisdiction and Enforcement Act); Section 7–101 et seq. of the Criminal Procedure Article, Maryland Code (2001) (Uniform Postconviction Procedure Act); Section 11–1201 et seq. of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.) (Maryland Uniform Trade Secrets Act). The policy of promoting uniformity is not confined to our statutory law; our cases are replete with instances where we look to our sister states for guidance in interpreting our own common law. *See, e.g., Burning Tree I,* 305 Md. at 66–70, 95–98, 501 A.2d at 823–25, 838–40. The examples illustrating the point are literally too numerous to mention.

The fundamental difficulty with the State's argument, however, is that it has pointed to no case, nor am I aware of a single case, where this Court has held that the desire to conform our laws to those of other jurisdictions rises to the level of a *compelling* interest. Indeed, the State's position inverts the fundamental legal hierarchy, because the values embodied in the Maryland Constitution take precedence over every Act of the General Assembly. The only recognized exception, inapplicable to the present case, is where our

organic law conflicts with the U.S. Constitution itself. *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (state constitutional amendment prohibiting any governmental action to afford protection to homosexuals held violation of Fourteenth Amendment Equal Protection Clause); *Hunter*, 471 U.S. at 227, 233, 105 S.Ct. at 1919–20, 85 L.Ed.2d at 227–28, 231 (facially neutral state constitutional provision disenfranchising disproportionate numbers of African–Americans held in violation of Fourteenth Amendment Equal Protection Clause).

The State's argument that there is "a compelling interest in ensuring that social and economic change of this type is accomplished through a robust public debate, through the legislative process" is wholly without merit. If we were to accept this argument, we would be ignoring the fact that "robust public debate" resulted in the adoption of the ERA. Moreover, the lone Maryland case cited by the State pertaining to legislative deference, *Sugarloaf Citizens Ass'n v. Gudis*, 319 Md. 558, 573 A.2d 1325 (1990), is easily distinguished from the instant case, because that case dealt with a county ethics law purporting to confer authority on a court to void legislation whenever it thought the public interest so required, which we determined violated the constitutional separation of powers mandated by Article 8 [60] of the Declaration of Rights. Here we deal with a constitutional challenge to legislative action; our authority to construe the Maryland Constitution is mandated by Article IV, Section 1 [61] of our Constitution. *See Galloway v. State*, 365 Md. 599, 611, 781 A.2d 851, 858 (2001)

---

**60.** "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." Md. Const., Decl. of Rights, art. 8.

**61.** "The Judicial power of this State is vested in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court. These Courts shall be Courts of Record, and each shall have a seal to be used in the authentication of all process issuing from it." Md. Const. art IV, § 1.

("If, however, a statute violates a 'mandatory provision' of the Constitution, 'we are required to declare such an act unconstitutional and void.' "). This proposition has been well-settled since the earliest days of our statehood; one year before *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), Chief Judge Jeremiah Townley Chase of the Maryland General Court stated the doctrine of judicial review in terms that still ring true today:

> The power of determining finally on the validity of the acts of the Legislature cannot reside with the Legislature, because such power would defeat and render nugatory, all the limitations and restrictions on the authority of the Legislature, contained in the Bill of Rights and form of government, and they would become judges of the validity of their own acts, which would establish a despotism, and subvert that great principle of the Constitution, which declares that the powers of making, judging, and executing the law, shall be separate and distinct from each other.

> \* \* \*

> It is the office and province of the Court to decide all questions of law which are judicially brought before them, according to the established mode of proceeding, and to determine whether an Act of the Legislature, which assumes the appearance of a law, and is clothed with the garb of authority, is made pursuant to the power vested by the Constitution in the Legislature; for if it is not the result of emanation of authority derived from the Constitution, it is not law, and cannot influence the judgment of the Court in the decision of the question before them.

*Whittington v. Polk,* 1 H. & J. 236, 243–44 (1802).

The final argument posed by the State is the public's "direct interest" in marriage "as an institution of transcendent importance to social welfare." *Picarella v. Picarella,* 20 Md.App. 499, 504, 316 A.2d 826, 830 (1974), citing to, inter alia, *Fornshill,* 1 Bland at 479. Indeed, in *Fornshill* our predecessors expressed the view that "[m]arriage has been considered

among all nations as the most important contract into which individuals can enter, as the parent not the child of civil society." 1 Bland at 481. Thus, it has been recognized from time immemorial that marriage preceded its legal recognition; i.e., marriage originated as an organic constituent of society that predated the development of the legal system. Undoubtedly, until the recent advances in assisted reproductive technology, there was a close albeit imperfect fit between opposite-sex marriage and the inherent biological fact that reproduction of our species could result only from the sexual union of a man and a woman. "What had not been fathomed exists today," however. *In re Roberto d.B.*, 399 Md. at 279, 923 A.2d at 122. The correspondence between opposite-sex marriage and biological necessity has never been more tenuous than it is today. What had always been an imperfect fit between marriage and procreation [62] is now called into question.

Although infertility is not a bar to marriage, it is nonetheless true that traditional marriage remains the *only* way to create families in which children are biologically related to *both* parents. Certainly it is true that opposite-sex couples can and do cohabit and produce offspring and thus create non-traditional families, but that very fact points to the substantiality of the state interest: the State asserts a strong interest in encouraging opposite-sex couples to formally recognize their child-bearing unions. The difficulty faced by the State is that this interest has been posed and defended successfully only under the deferential rational basis standard. *See, e.g., Andersen,* 138 P.3d at 982–83; *Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 7. Likewise, the argument that the State has an interest in promoting marriage between opposite-sex couples because their *careless* sexual unions pose a significant possibility of creating offspring and all the attendant burdens and

---

**62.** The marriage statutes are silent about fertility and maximum age requirements of the parties. *See* Md.Code (1957, 2006 Repl.Vol.), § 2–202 of the Family Law Article ("Marriages within certain degrees of relationship void; penalties."); *id.* at §§ 2–301 to—302 ("Marriages of Certain Minors."). Even insanity as a bar to capacity appears in the statutes only by implication. *Id.* at § 7–103 ("Absolute divorce.").

duties, whereas same-sex couples cannot reproduce without extensive, expensive outside intervention that evinces a far greater level of responsibility and commitment, has been upheld only under rational basis scrutiny. *Morrison v. Sadler*, 821 N.E.2d 15, 24–25 (Ind.Ct.App.2005).

The Appellees assert a number of reasons why Section 2-201 does not even *rationally* further a legitimate governmental interest, and thus purport to refute any compelling interest presented by the State on the theory that failure to survive the most deferential test obviously implies failure under strict scrutiny. Logically that theory is unassailable as far as it goes, but the Appellees do not address a crucial underlying assumption: in order to dispose of the opponent's arguments, it is necessary in the first instance actually to address each opposing argument. Many of the arguments disposed of in the Appellees' brief almost certainly would fail under the strict scrutiny mandated under Article 46. Thus, arguments that the same-sex marriage ban promotes cost savings or that the ban is justified on grounds of "legislative hegemony" obviously fail strict scrutiny. Indeed, such assertions approach the level of straw man arguments, a status undoubtedly applicable to the supposed state interest in "discrimination for its own sake." The Appellees also dispute the notion that the same-sex marriage ban rationally furthers a legitimate state interest in child welfare; here the Appellees stand on shakier ground, and quite possibly would fail to sustain their burden *if the standard were rational basis review.* However, the correct standard is strict scrutiny, a much greater burden for the State.

Let us assume arguendo that the State has failed to meet its burden to demonstrate that there exist no "other, reasonable ways" posing "a lesser burden on constitutionally protected activity," *Dunn*, 405 U.S. at 343, 92 S.Ct. at 1003, 31 L.Ed.2d at 285, to further the undoubtedly substantial state interest in promoting child welfare. At this stage there still remains the possibility that the Appellees are wrong in their assertion that there is no causal link between judicial recognition of same-sex marriage and the behavior of opposite-sex couples, an argu-

ment asserted with particular force by *amici*, The American Center for Law & Justice. The phenomena of assisted reproduction and same-sex marriage are so new and radical that there exists no evidence thus far to support or refute the asserted link and its concomitant external effects. Thus far, courts that have weighed this argument favorably have done so under rational basis review. *See, e.g., Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 7–8; *Andersen*, 138 P.3d at 983, 984. The State's contention that the same-sex marriage ban arises organically from the nature of marriage itself, and that the much later codification accomplished by Section 2–201 merely clarifies society's compelling interest in "the historic family unit as a mechanism for protecting the progeny of biological unions," actually asserts the state interest in promoting an orderly, stable society. *See Goodridge v. Dep't of Pub. Health*, 440 Mass. 309, 798 N.E.2d 941, 997 & n. 20 (2003) (Cordy, J., dissenting) (" 'It is important to distinguish the individual interests in domestic relations from the social interest in the family and marriage as social institutions.' "). On the present state of the record, I believe neither party has explored this issue in the depth appropriate to an issue of such permanent, transcendent magnitude.

Under our authority to order a remand so "that justice will be served by permitting further proceedings," Md. Rule 8–604(d), I would remand this case to the Circuit Court for a full evidentiary hearing. Without expressing an ultimate opinion on whether the State could meet its burden, I believe the State's unrebutted contention regarding the broad societal interest in retaining traditional marriage presents an issue of triable fact that requires a remand. "If there is any issue of fact undisposed of and remaining to be determined by the trier of the facts upon the weight of the evidence, summary judgment can not be granted." *Tellez v. Canton R.R. Co.*, 212 Md. 423, 431, 129 A.2d 809, 813 (1957). Especially in light of the grave issues of constitutional dimension presented here, I believe it is inappropriate to reach this issue on the basis of such an undeveloped record. *See Montgomery County v. Broad. Equities, Inc.*, 360 Md. 438, 457, 758 A.2d 995, 1005

(2000) ("[T]he constitutional exception to the exhaustion requirement does not apply when the constitutional challenge to a statute 'as a whole' involves the need for some factual exploration, which may be necessary when statutory classifications are challenged on equal protection grounds or under Article 46 of the Maryland Declaration of Rights."); *Ins. Comm'r v. Equitable Life Assurance Soc'y*, 339 Md. 596, 623–24, 664 A.2d 862, 876 (1995). Consequently, I respectfully dissent from the majority opinion.

Chief Judge BELL has authorized me to state that he joins in this dissenting opinion.

Dissenting Opinion by BELL, C.J.

I join Judge BATTAGLIA's dissent. As Judge Battaglia carefully and correctly explains,[1] sex-based classifications are analogous to race-based classifications and Maryland law, unlike federal law, by refusing to apply intermediate scrutiny to the review of sex-based classifications, does not draw a distinction between them. In *State v. Burning Tree Club, Inc.*, 315 Md. 254, 294, 554 A.2d 366, 386 (1989), this Court held that the burden of justifying sex-based classifications falls upon the State, and that the level of scrutiny to which the classifications are subject is "at least the same scrutiny as racial classifications." *See also Giffin v. Crane*, 351 Md. 133, 148, 155, 716 A.2d 1029, 1037, 1040 (1998) (holding that the Equal Rights Amendment plainly prohibits sex-based classifications, absent substantial justification); *Murphy v. Edmonds*,

---

1. Judge Battaglia also fully analyzes, and explains, why, under Maryland law, Maryland Code (1957, 2006 Repl.Vol.) § 2–201 of the Family Law Article, creates a sex-based classification. *Conaway v. Deane*, 401 Md. 219, 277–86, 932 A.2d 571, 605–11 (2007). As stated simply in a case presenting much the same issues as this one, *Hernandez v. Robles*, 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 27 (2006) (Kaye, C.J., dissenting) (citing *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)), "[h]omosexuals meet the constitutional definition of a suspect class, that is, a group whose defining characteristic is 'so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy . . . .' "

325 Md. 342, 357 n. 7, 601 A.2d 102, 109 n. 7 (1992); *Rand v. Rand,* 280 Md. 508, 512–14, 374 A.2d 900, 903–04 (1977) (finding instructive, in interpreting the scope of the Equal Rights Amendment as it applied to sex discrimination, the Supreme Court of Washington's "overriding compelling state interest" standard). It, therefore, is clear that an equal application approach cannot render constitutional a discriminatory sex-based classification any more than it could do so for a discriminatory race-based classification.

To justify its rejection of the enhanced standard of review, strict scrutiny, that this Court has applied to the review of gender-based classifications, the majority dismisses, an undisputed but extensive history of pervasive prejudice and discrimination targeted at homosexuals. *Conaway v. Deane,* 401 Md. 219, 283–88, 291–92, 932 A.2d 571, 609–12, 614–15 (2007). It then concludes, as a result, that (1) homosexuals have enough political power to effect the eventual establishment, by statute, of marriage or civil unions for same-sex couples; and (2) this political power precludes their characterization as a suspect class. *Id.*

I am not persuaded. The fact is that Maryland has not adopted, and it may safely be said, is not on the verge of adopting, a comprehensive statewide domestic partnership scheme for same-sex couples that approximates the institution of civil marriage, and thereby confers upon such couples the approximate rights and responsibilities of married heterosexual couples. Moreover, the laudable, though piecemeal, civil advances that the majority references and on which it relies, *id.* at 291–92, 932 A.2d at 614–15, occurred because marriage has remained an exclusive benefit of heterosexuality. *See In Tyma v. Montgomery County,* 369 Md. 497, 512, 801 A.2d 148, 158 (2002) (upholding local law granting benefits to the domestic partners of its employees by virtue of holding that such law does not implicate Maryland's marriage laws). Thus, the conditioning of advances that benefit same-sex couples on the limitation that homosexuals shall not acquire the right to marry belies any argument that the right to marry, or its

functional equivalent, is imminent, or likely to be, not to mention, inevitable, for same-sex couples.

In any event, a due process analysis requires that we reach a different result than the majority does. The majority determines that same-sex marriage is not deeply rooted in this State or in the United States, and, therefore, does not implicate a fundamental liberty interest. 401 Md. at 296–310, 932 A.2d at 617–26. That determination, however, only recognizes and gives voice and substance to an undisputed prejudice and objection—against and to homosexuality—that is not legally cognizable; it does not address, never mind resolve, the real issue. Chief Judge Kaye made this point, in addition to identifying the real issue, in *Hernandez v. Robles*, 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 27 (2006) (Kaye, C.J., dissenting). There, the New York Court of Appeals framed the issue, as the majority in this case has done, as whether "same-sex marriage" is deeply rooted in tradition, and concluded, again as the majority does here, that such marriages are not. Noting that"[f]undamental rights are those 'which are, objectively, deeply rooted in this Nation's history and tradition ... and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed,' " *id.* at 770, 855 N.E.2d at 23, quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772, 787–788 (1997), agreeing with the Supreme Court of the United States and Court of Appeals precedent, Chief Judge Kaye concluded that "the right to marry is fundamental," *id.*, citing, among others, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding unconstitutional statutes that prohibit interracial marriage) and *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 730 N.Y.S.2d 15, 754 N.E.2d 1099, 1108 (2001) (G.B.Smith, J., concurring) ("marriage is a fundamental constitutional right"), and that, as a matter of due process, "central to the right to marry is the right to marry the person of one's choice." *Id.* at 770, 855 N.E.2d at 22–23. (citations omitted).

Chief Judge Kaye then opined:

"Fundamental rights once recognized cannot be denied to particular groups on the ground that these groups have historically been denied those rights. Indeed, in recasting the plaintiffs' invocation of their fundamental right to marry as a request for recognition of a 'new' right to same-sex marriage, the Court misapprehends the nature of the liberty interest at stake."

*Id.* at 770, 855 N.E.2d at 23.

Relying on *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), in which the United States Supreme Court warned against such misapprehension, she explained:

"*Lawrence* overruled *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which had upheld a Georgia statute criminalizing sodomy. In doing so, the *Lawrence* court criticized *Bowers* for framing the issue presented too narrowly. Declaring that '*Bowers* was not correct when it was decided, and it is not correct today' (539 U.S. at 578, 123 S.Ct. 2472), *Lawrence* explained that *Bowers* purported to analyze erroneously-whether the Constitution conferred a 'fundamental right upon homosexuals to engage in sodomy' (539 U.S. at 566, 123 S.Ct. 2472 [citation omitted] ). This was, however, the wrong question. The fundamental right at issue, properly framed, was the right to engage in private consensual sexual conduct-a right that applied to both homosexuals and heterosexuals alike. In narrowing the claimed liberty interest to embody the very exclusion being challenged, *Bowers* 'disclose[d] the Court's own failure to appreciate the extent of the liberty at stake' (*Lawrence,* 539 U.S. at 567, 123 S.Ct. 2472)."

*Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 23. (Kaye, C.J., dissenting). What Chief Judge Kaye next said applies with equal force to the case *sub judice:*

"The same failure is evident here. An asserted liberty interest is not to be characterized so narrowly as to make inevitable the conclusion that the claimed right could not be fundamental because historically it has been denied to those who now seek to exercise it (*see Planned Parenthood of*

*Southeastern Pa. v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 [1992] [it is ' tempting ... to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. . . . But such a view would be inconsistent with our law'] )."

*Id.* at 770, 855 N.E.2d at 23–24.

It is clear to me that the majority misapprehends the nature of the liberty at issue in this case. It is not whether a same-sex marriage, with all the pejorative emotions that evokes, is a fundamental right; the real issue in this case, when properly framed, is whether *marriage* is a fundamental right. The issue has already been resolved; indeed, we all agree that it has been answered in the affirmative and the right is firmly established. *See Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding unconstitutional statutes that prohibit interracial marriage); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (concluding that state requirement that indigent individuals pay court fees to obtain divorce unconstitutionally burdened the fundamental right to marry); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (determining that states cannot require individuals with child support obligations to obtain court approval in order to marry); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (holding that inmates could not be denied the right to marry).

The right to marry, encompassing as it does the related and critically important element of choice—the freedom to choose whom to marry, to select the "lucky" person—is not inherently party-centric. Neither is it either hetero—or homo—sexual. I agree with Chief Judge Kaye, to construe the right to marry as narrowly as does the majority, *i.e.,* based on sexual orientation, makes inevitable the conclusion that this fundamental right, by virtue of historical prejudice, does not exist for same-sex couples. *See Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 24. (Kaye, C.J., dissenting) (citations omitted).

As Chief Judge Kaye observed:

"the result in *Lawrence* was not affected by the fact, acknowledged by the Court, that there had been no long history of tolerance for homosexuality. Rather, in holding that '[p]ersons in a homosexual relationship may seek autonomy for the [ ] purpose [of making intimate and personal choices], just as heterosexual persons do.' *Lawrence* rejected the notion that fundamental rights it had already identified could be restricted based on traditional assumptions about who should be permitted their protection. As the Court noted, 'times can blind us to certain truths and later generations can see that laws once thought necessary and proper only served to oppress.' As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom" (*Lawrence*, 539 U.S. at 579, 123 S.Ct. 2472; see also *id.* at 572, 539 U.S. 558, 123 S.Ct. 2472 ['(h)istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry. . . .']; *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 466, 105 S.Ct. 3249, 87 L.Ed.2d 313 [1985] [Marshall, J., concurring in the judgment in part and dissenting in part] ['what once was a 'natural' and 'self-evident' ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom'] ). Simply put, fundamental rights are fundamental rights. They are not defined in terms of who is entitled to exercise them."

*Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 24. (Kaye, C.J., dissenting) (citing *Lawrence,* 539 U.S. at 574, 579, 123 S.Ct. at 2472).

To be sure, there are important differences between the African American experience and that of gay men and lesbians in this country, yet many of the arguments made in support of the antimiscegenation laws were identical to those made today in opposition to same-sex marriage and, as in *Loving,* their goal is to restrict the right of an individual to marry the person of his or her choice. Consequently, the reasoning of *Loving* requires rejection of the petitioners' argument. *Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 24–25, 26, (Kaye,

C.J., dissenting) (citing and quoting Brief of NAACP Legal Defense and Education Fund, Inc., as amicus curiae in support of plaintiffs).

Finally,

"[i]t is no answer that same-sex couples can be excluded from marriage because 'marriage,' by definition, does not include them. In the end, 'an argument that marriage is heterosexual because it 'just is' amounts to circular reasoning' (*Halpern v. Attorney Gen. of Can.*, 65 OR3d 161, 172 OAC 276, ¶ 71 [2003] ). 'To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question we are asked to decide' (*Goodridge v. Department of Pub. Health*, 440 Mass. 309, 348, 798 N.E.2d 941, 972–973 [2003] [Greaney, J., concurring] )."

*Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 26 (Kaye, C.J., dissenting).

At the very least, the benefits appurtenant to marriage accrue, whoever and whatever the nature of the parties. Therefore, I agree with, and join, Judge Raker's dissent to the extent that it endorses and advocates that committed same-sex couples are entitled to the myriad statutory benefits that are associated with and flow from marriage. I do not join that part of her opinion that accepts the majority's analysis and determination that rational basis review is the appropriate standard to be applied in this case.

As to a determination under rational basis review, again, I am persuaded by Chief Judge Kaye's *Hernandez* dissent. Thus, if the proper test were "rational basis," I, like Chief Judge Kaye, believe that the classification at issue in this case does not pass muster: "it does not satisfy even rational basis review, which requires that the classification 'rationally further a legitimate state interest.' " *Hernandez*, 821 N.Y.S.2d 770, 855 N.E.2d at 30. (Kaye, C.J., dissenting) (citations omitted).

The majority determines that, under rational basis review, the limitation of marriage to "a man and a woman"[2] is reasonably related to the State's legitimate interest in fostering procreation, in a "stable environment," *i.e.,* traditional heterosexual marriage. *See* 401 Md. at 315–18, 932 A.2d at 629–30. While the State undoubtedly has an interest in encouraging heterosexual couples to marry prior to procreation, "the *exclusion* of gay men and lesbians from marriage in no way furthers this interest. There are enough marriage licenses to go around for everyone." *Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 30.

The majority discusses, at length, statistics and other evidence that support the existence of trend toward the "gradual erosion of the 'traditional' nuclear family in today's society," 401 Md. at 320, 932 A.2d at 632, and also identifies the ways in which Maryland Code (1957, 2006 Repl.Vol.), Family Law Article, § 2–201 (hereinafter "Family Law § 2–201") is both over-and under-inclusive. *Id.* at 319–22, 932 A.2d at 631–33. Reasoning that, because rational basis review does not require "mathematic exactitude, and may contain imperfections which result in *some degree* of inequality," the majority submits that both the aforementioned trend and the inexactness, that is, the over-and under-inclusive nature of Family Law § 2–201, are insufficient to support a determination that Family Law § 2–201 runs afoul of equal protection. *Id.* at 325, 932 A.2d at 635 (emphasis added). At issue here, however, is not some degree of inequality but *total exclusion* of same-sex couples "from the *entire spectrum* of protections that come with civil marriage— purportedly to encourage other people to procreate." *Hernandez,* 821 N.Y.S.2d 770, 855 N.E.2d at 31. (Kaye, C.J., dissenting) (emphasis added).

Consequently, it is disingenuous indeed to surmise that the "*possibility* of procreation" creates a reasonable relationship in this context. 401 Md. at 322, 932 A.2d at 633 (emphasis

2. Maryland Code (1957, 2006 Repl.Vol.), Family Law Article, § 2–201.

added). As simply put by Chief Judge Kaye, "[m]arriage is about much more than producing children," and yet the majority leaves open gaping questions such as "how offering only heterosexuals the right to visit a sick loved one in the hospital ... conceivably furthers the State's interest in encouraging opposite-sex couples to have children." *See id.* at 770, 855 N.E.2d at 31 (Kaye, C.J., dissenting). The sheer breadth of the benefits appurtenant to marriage that are, pursuant to Family Law § 2–201, made unavailable to same-sex couples renders justification "impossible to credit." *Id.* at 770, 855 N.E.2d at 32. (Kaye, C.J., dissenting) (citing *Romer v. Evans*), 517 U.S. 620, 635, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855 (1996)).